**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CATHOLIC HEALTH INITIATIVES, | ) |
| 1999 Broadway, Suite 2600 | ) |
| Denver, Colorado  80202 | ) |
| and | ) |
| | ) |
| ST. VINCENT HEALTH SYSTEM,  d/b/a | ) |
| ST. ANTHONY'S MEDICAL CENTER | ) |
| #4 Hospital Drive | ) |
| Morrilton, Arkansas  72110 | ) |
| and | ) |
| | ) |
| ST. VINCENT HEALTH SYSTEM,  d/b/a | )     CASE NO.:_____ |
| ST. VINCENT INFIRMARY MEDICAL CENTER | ) |
| Two St. Vincent Circle | ) |
| Little Rock, Arkansas  72205 | ) |
| and | ) |
| | ) |
| ST. VINCENT HEALTH SYSTEM, d/b/a | ) |
| ST. VINCENT MEDICAL CENTER NORTH | ) |
| 2215 Wildwood | ) |
| Sherwood, Arkansas  72120 | ) |
| and | ) |
| | ) |
| CATHOLIC HEALTH INITIATIVES COLORADO, d/b/a | ) |
| ST. MARY-CORWIN MEDICAL CENTER | ) |
| 1008 Minnequa Avenue | ) |
| Pueblo, Colorado  81004 | ) |
| and | ) |
| | ) |
| MERCY REGIONAL MEDICAL CENTER OF DURANGO | ) |
| 1010 Three Springs Boulevard | ) |
| Durango, Colorado  81004 | ) |
| and | ) |
| | ) |
| CATHOLIC HEALTH INITIATIVES COLORADO, d/b/a | ) |
| ST. ANTHONY CENTRAL HOSPITAL | ) |
| 4231 West 16th Avenue | ) |
| Denver, Colorado  80204 | ) |
| and | ) |
| | ) |

CATHOLIC HEALTH INITIATIVES COLORADO, d/b/a    )
ST. THOMAS MORE HOSPITAL                        )
1338 Phay Street                                )
Canon City, Colorado  81212                     )
                and    )
                                            )

CATHOLIC HEALTH INITIATIVES COLORADO, d/b/a    )
PENROSE/ST. FRANCIS HEALTHCARE                  )
2215 N. Cascade                                 )
Colorado Springs, Colorado  80933               )
                and    )
                                            )

CATHOLIC HEALTH INITIATIVES COLORADO, d/b/a    )
ST. ANTHONY NORTH HOSPITAL                      )
2551 West 84th Avenue Road                      )
Westminster, Colorado  80030                    )
                and    )
                                            )

MERCY MEDICAL CENTER                            )
1512 12th Avenue                                )
Nampa, Idaho  83686                             )
                and    )
                                            )

CATHOLIC HEALTH INITIATIVES IOWA               )
 CORPORATION,  d/b/a                         )
MERCY MEDICAL CENTER – DES MOINES               )
1111 6th Avenue                                 )
Des Moines, Iowa  50314                         )
                and    )
                                            )

ST. CATHERINE HOSPITAL                          )
401 East Spruce                                 )
Garden City, Kansas  67846                      )
                and    )
                                            )

CENTRAL KANSAS MEDICAL CENTER                   )
3515 Broadway                                   )
Great Bend, Kansas  67530                       )
                and    )
                                            )

MNMCH, INC.,  d/b/a                             )
ST. JOHN'S MAUDE NORTON MEMORIAL HOSPITAL       )
220 North Pennsylvania                          )
Columbus, Kansas  66725                         )
                and    )
                                            )

SAINT JOSEPH HEALTHCARE, INC., d/b/a )
ST. JOSEPH HOSPITAL )
One Saint Joseph Drive )
Lexington, Kentucky 40504 )
        and )
)
MARYMOUNT MEDICAL CENTER, INC., d/b/a )
MARYMOUNT MEDICAL CENTER )
310 East Ninth Street )
London, Kentucky 40741 )
        and )
)
OUR LADY OF THE WAY HOSPITAL )
11203 Main Street )
Martin, Kentucky 41649 )
        and )
)
CARITAS MEDICAL CENTER )
1850 Bluegrass Avenue )
Louisville, Kentucky 40215 )
        and )
)
CARITAS PEACE CENTER )
2020 Newburg Road )
Louisville, Kentucky 40205 )
        and )
)
ST. JOSEPH MEDICAL CENTER, INC. )
7601 Osler Drive )
Towson, Maryland 21204 )
        and )
)
ST. FRANCIS MEDICAL CENTER, d/b/a )
ST. FRANCIS HEALTHCARE CAMPUS )
2400 St. Francis Drive )
Breckenridge, Minnesota 56520 )
        and )
)
LAKEWOOD HEALTH CENTER )
600 South Main )
Baudette, Minnesota 56623 )
        and )
)
ST. JOHN'S REGIONAL MEDICAL CENTER )
2727 McClelland Boulevard )
Joplin, Missouri 64804 )

and                                                                          )
                                                                             )
GOOD SAMARITAN HEALTH SYSTEMS, d/b/a                                          )
GOOD SAMARITAN HOSPITAL                                                       )
10 East 31st Street                                                          )
Kearney, Nebraska  68847                                                     )
           and                                                               )
                                                                             )
SAINT ELIZABETH HEALTH SYSTEM, d/b/a                                          )
SAINT ELIZABETH REGIONAL MEDICAL CENTER                                       )
555 South 70th Street                                                        )
Lincoln, Nebraska  68510                                                     )
           and                                                               )
                                                                             )
SAINT FRANCIS MEDICAL CENTER                                                  )
2620 West Fraidley Avenue                                                    )
Grand Island, Nebraska  68803                                                )
           and                                                               )
                                                                             )
ST. MARY'S COMMUNITY HOSPITAL                                                 )
1314 Third Avenue                                                           )
Nebraska City, Nebraska  68410                                              )
           and                                                               )
                                                                             )
GOOD SAMARITAN HEALTH SYSTEMS, INC.,  d/b/a                                   )
RICHARD H. YOUNG HOSPITAL                                                     )
4600 17th Avenue                                                            )
Kearney, Nebraska  68848                                                     )
           and                                                               )
                                                                             )
ST. JOSEPH HEALTHCARE SYSTEM, f/d/b/a                                         )
ST. JOSEPH MEDICAL CENTER                                                     )
601 Dr. Martin Luther King Drive                                            )
Albuquerque, New Mexico  87102                                               )
           and                                                               )
                                                                             )
ST. JOSEPH HEALTHCARE SYSTEM, f/d/b/a                                         )
ST. JOSEPH NORTHEAST HEIGHTS HOSPITAL                                         )
4701 Montgomery N.E.                                                          )
Albuquerque, New Mexico  87109                                               )
           and                                                               )
                                                                             )
ST. JOSEPH HEALTHCARE SYSTEM, f/d/b/a                                         )
ST. JOSEPH WEST MESA HOSPITAL                                                 )
10501 Golf Course Road, N.W.                                                 )
Albuquerque, New Mexico  87114                                               )

4

and )
)
ST. JOSEPH HEALTHCARE SYSTEM, f/d/b/a )
ST. JOSEPH REHABILITATION HOSPITAL )
505 Elm Street N.E. )
Albuquerque, New Mexico 87102 )
and )
)
ST. JOSEPH'S HOSPITAL AND HEALTH CENTER )
30 West 7th Street )
Dickinson, North Dakota 58601 )
and )
)
MERCY HOSPITAL OF VALLEY CITY )
570 Chautauqua Boulevard )
Valley City, North Dakota 58072 )
and )
)
OAKES COMMUNITY HOSPITAL )
314 S. 8th Street )
Oakes, North Dakota 58474 )
and )
)
MERCY MEDICAL CENTER )
1301 15th Avenue West )
Williston, North Dakota 58801 )
and )
)
MERCY HOSPITAL OF DEVIL'S LAKE )
1301 7th Street )
Devil's Lake, North Dakota 58301 )
and )
)
CARRINGTON HEALTH CENTER )
800 N. Fourth Street )
Carrington, North Dakota 58421 )
and )
)
GOOD SAMARITAN HOSPITAL OF CINCINNATI )
375 Dixmyth Avenue )
Cincinnati, Ohio 45220 )
and )
)
ST. ELIZABETH HEALTH SERVICES, INC. )
3325 Pocahontas Road )
Baker City, Oregon 97814 )

and )
)
MERCY HEALTHCARE, INC., d/b/a )
MERCY MEDICAL CENTER, INC. )
2700 Stewart Parkway )
Roseburg, Oregon 97470 )
     and )
)
THE DOMINICAN SISTERS OF ONTARIO, INC., d/b/a )
HOLY ROSARY MEDICAL CENTER )
351 S.W. Ninth Street )
Ontario, Oregon 97914 )
     and )
)
ST. ANTHONY HOSPITAL )
1601 S.E. Court Avenue )
Pendleton, Oregon 97801 )
     and )
)
ST. JOSEPH HEALTH MINISTRIES, f/d/b/a )
ST. JOSEPH HOSPITAL )
2135 Noll Drive, #c )
Lancaster, Pennsylvania 17603 )
     and )
)
ST. JOSEPH REGIONAL HEALTH NETWORK, d/b/a )
ST. JOSEPH MEDICAL CENTER )
2500 Bernville Road )
Reading, Pennsylvania 19605 )
     and )
)
ST. MARY'S HEALTHCARE CENTER OF PIERRE, S.D. )
801 E. Sioux Avenue )
Pierre, South Dakota 57501 )
     and )
)
MEMORIAL HEALTH CARE SYSTEM, d/b/a )
MEMORIAL HOSPITAL )
2525 de Sales Avenue )
Chattanooga, Tennessee 37404 )
     and )
)
FRANCISCAN HEALTH SYSTEM, d/b/a )
ST. CLARE HOSPITAL )
11315 Bridgeport Way SW )
Lakewood, Washington 98499 )

|                                                                      |    |
|----------------------------------------------------------------------|----|
| and                                                                  | )  |
|                                                                      | )  |
| FRANCISCAN HEALTH SYSTEM, d/b/a                                      | )  |
| ST. JOSEPH MEDICAL CENTER                                           | )  |
| 1717 South "J" Street                                                | )  |
| Tacoma, Washington  98405                                            | )  |
| and                                                                  | )  |
|                                                                      | )  |
| FRANCISCAN HEALTH SYSTEM, d/b/a                                      | )  |
| ST. FRANCIS HOSPITAL                                                | )  |
| 34515 Ninth Avenue South                                             | )  |
| Federal Way, Washington  98003                                       | )  |
| and                                                                  | )  |
|                                                                      | )  |
| FRANCISCAN VILLA OF SOUTH                                            | )  |
|   MILWAUKEE, INC., d/b/a                                              | )  |
| FRANCISCAN VILLA                                                     | )  |
| 3601 S. Chicago Avenue                                               | )  |
| South Milwaukee, Wisconsin 53172                                     | )  |
|                                                                      | )  |
| Plaintiffs,                                                          | )  |
|                                                                      | )  |
| vs.                                                                  | )  |
|                                                                      | )  |
| MICHAEL O. LEAVITT, Secretary                                        | )  |
| United States Department of Health and Human Services                | )  |
| 200 Independence Avenue, N.W.                                         | )  |
| Washington, D.C. 20201,                                              | )  |
|                                                                      | )  |
| Defendant.                                                          | )  |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
## AND FOR SUMS DUE UNDER THE MEDICARE ACT

Plaintiffs state:

## I.    INTRODUCTION

1.    This is an action for judicial review of a final agency decision denying Medicare

reimbursement for any of the insurance premium costs incurred by a group of non-profit

hospitals to obtain liability insurance coverage through a captive insurer or for any portion of the

liability claims paid by the captive insurer on behalf of the hospitals. The final decision under appeal was a split 3-2 decision dated January 24, 2007 by the Secretary's Provider Reimbursement Review Board ("PRRB" or "Board"). PRRB Dec. No. 2007-D14.

2.      Each of the plaintiff hospitals participates in the federal Medicare program as a provider of hospital services and is part of a nonprofit, Catholic health system called Catholic Health Initiatives ("CHI"). CHI wholly owns and controls a subsidiary "captive" insurer that provides liability insurance coverage for the plaintiff hospitals in CHI's national health system. Defendant is the Secretary of the Department of Health and Human Services ("Secretary"), the federal agency that administers the Medicare program.

3.      In the final decision from which this appeal is taken, the PRRB majority refused to reimburse the hospitals for either Medicare's share of the liability insurance premiums paid by the hospitals or the program's share of the liability claims paid on their behalf because the captive insurer invested more than ten percent of its assets in equities. The sole basis for the denial of reimbursement is a Medicare program guideline set forth in section 2162.2.A.4 of the agency's Provider Reimbursement Manual ("PRM" or "Manual").

4.      The program guideline in the Manual restricts investment in equities by captive insurers that are domiciled outside of the United States (but not investments by captive insurers domiciled domestically). That restriction is not set forth in any statute or regulation, and it was not adopted in accordance with the notice and comment rulemaking procedure prescribed by the Administrative Procedure Act. Nevertheless, that restriction was the sole basis for the PRRB majority decision denying reimbursement for Medicare's share of either the liability insurance

premiums paid to the captive by the plaintiff hospitals or the liability claims and administrative expenses paid by the captive on behalf of the plaintiff hospitals.

5.     There is no question that the actuarially-determined insurance premiums that the plaintiff hospitals paid to the captive insurer are costs related to patient care and are reasonable in amount.  There is also no question that the Medicare program would have reimbursed the plaintiff hospitals for the program's share of their liability insurance premium expense if CHI had limited the captive's investments to meet the restrictions in the Secretary's program guideline.  But that expense, and thus Medicare's reimbursable share of that expense, would have been greater than the amount actually incurred for the periods at issue.  The undisputed record evidence shows that by increasing the rate of return on investments, the captive's investment in equities reduced the premiums needed to cover actuarially determined losses by millions of dollars as compared to the premiums that would have been required to cover losses if the CHI captive insurer had limited investments to meet the restrictions in the Secretary's program guideline.  The undisputed evidence also shows that the plaintiff hospitals would have incurred greater cost to obtain liability insurance coverage from a commercial carrier.  Both on its face and as applied in this case, the Secretary's restriction on the offshore captive's investment in equities is contrary to the controlling law requiring the Secretary to reimburse the hospitals for the reasonable cost actually incurred in the efficient delivery of necessary health services.  See 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.9(c); Memorial Hospital/Adair County Health Center v. Bowen, 829 F.2d 111, 118 (D.C. Cir. 1987); Home Health Care, Inc. v. Heckler, 717 F.2d 587, 592 (D.C. Cir. 1983);  GranCare, Inc. v. Shalala, 93 F.Supp. 24, 30-34 (D.D.C. 2000); LGH, Ltd. v. Sullivan, 786 F.Supp. 1047, 1053-54 (D.D.C. 1992).

6.      The undisputed record evidence also shows that applicable State laws would have allowed the CHI captive's investment in equities, and the Medicare program would have reimbursed the plaintiff hospitals for the premiums they paid to the captive, if the captive were domiciled domestically during the period at issue.  This discriminatory treatment between premiums paid by hospitals to domestic and offshore captive insurers is arbitrary and capricious, not based upon substantial evidence, and otherwise contrary to law.  As shown below, there is no substantial evidence in the record supporting any rational explanation for this inconsistent treatment of similarly-situated hospitals, and the Secretary entirely failed to either appreciate or consider relevant factors in determining to restrict an offshore captive's investment in equity securities.  See Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996) (it is arbitrary and capricious for an agency to treat "similar situations differently" unless the agency offers sufficient reasons for its discriminatory treatment); Garrett v. FCC, 513 F.2d 1056, 1060 (D.C. Cir. 1975).

7.      The plaintiff hospitals contend that the final decision below must be reversed.  It is contrary to the controlling reasonable cost reimbursement provisions of the Medicare statute and regulations, it exceeds the Secretary's statutory authority, it is not based upon substantial evidence, it is arbitrary and capricious and it is otherwise contrary to law.

## II.    **JURISDICTION AND VENUE**

8.      This action arises under the Medicare Act, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*.

9.      This Court has jurisdiction under 42 U.S.C. § 1395oo(f).

10.     Venue lies in this judicial district pursuant to 42 U.S.C. § 1395oo(f)(1).

### III.    PARTIES

11.    Catholic Health Initiatives is a nonprofit charitable purpose corporation with its headquarters in Denver, Colorado.  CHI is the second largest Catholic health system in the United States.  During the periods at issue, CHI was the sole corporate member of each of the other plaintiffs in this case, all of which are nonprofit corporations that owned or operated the plaintiff hospitals during the periods at issue.

12.    The following 55 plaintiff hospitals participated in the Medicare program for the following fiscal years at issue in this case.

    (1)    St. Vincent Health System, d/b/a:

        a.    St. Anthony's Medical Center (Morrilton, Arkansas), Medicare Provider No. 04-0003, fiscal year ending June 30, 2001;

        b.    St. Vincent Infirmary Medical Center (Little Rock, Arkansas), Medicare Provider No. 04-0007, fiscal years ending August 31, 2000, August 31, 2001 and August 31, 2002;

        c.    St. Vincent Medical Center North (Sherwood, Arkansas), Medicare Provider No. 04-0137, fiscal year ending June 30, 2002;

    (2)    Catholic Health Initiatives Colorado, d/b/a:

        a.    St. Mary-Corwin Medical Center (Pueblo, Colorado), Medicare Provider No. 06-0012, fiscal years ending June 30, 1998, June 30, 1999, June 30, 2000, June 30, 2001 and June 30, 2002;

        b.    St. Anthony Central Hospital (Denver, Colorado), Medicare Provider No.06-0015, fiscal years ending June 30, 1999, June 30, 2000, June 30, 2001 and June 30, 2002;

        c.    St. Thomas More Hospital (Canon City, Colorado), Medicare Provider No. 06-0016, fiscal years ending June 30, 1998, June 30, 1999, June 30, 2000 and June 30, 2002;

     d.   Penrose/St. Francis Healthcare (Colorado Springs, Colorado), Medicare Provider No. 06-0031, fiscal years ending June 30, 1998, June 30, 1999, June 30, 2000, June 30, 2001 and June 30, 2002;

     e.   St. Anthony North Hospital (Westminster, Colorado), Medicare Provider No. 06-0104, fiscal years ending June 30, 1998, June 30, 1999, June 30, 2000 and June 30, 2002;

(3)    Mercy Regional Medical Center of Durango (Durango, Colorado), Medicare Provider No. 06-0013, fiscal years ending June 30, 2000 and June 30, 2001;

(4)    Mercy Medical Center (Nampa, Idaho), Medicare Provider No. 13-0013, fiscal years ending June 30, 2000, June 30, 2001 and June 30, 2002;

(5)    Catholic Health Initiatives Iowa Corp., d/b/a Mercy Medical Center – Des Moines (Des Moines, Iowa), Medicare Provider No. 16-0083, fiscal years ending June 30, 1998, June 30, 1999, June 30, 2000, June 30, 2001 and June 30, 2002;

(6)    St. Catherine Hospital (Garden City, Kansas), Medicare Provider No. 17-0023, fiscal years ending June 30, 2000, June 30, 2001 and June 30, 2002;

(7)    Central Kansas Medical Center (Great Bend, Kansas), Medicare Provider No. 17-0033, fiscal year ending June 30, 2001;

(8)    MNMCH, INC., d/b/a St. John's Maude Norton Memorial Hospital (Columbus, Kansas), Medicare Provider No. 17-1308, fiscal year ending June 30, 2002;

(9)    Saint Joseph HealthCare, Inc., d/b/a St. Joseph Hospital (Lexington, Kentucky), Medicare Provider No. 18-0010, fiscal years ending August 31, 1998, August 31, 1999, August 31, 2000, June 30, 2001 and June 30, 2002;

(10)    Marymount Medical Center, Inc., d/b/a Marymount Medical Center (London, Kentucky), Medicare Provider No. 18-0011, fiscal years ending August 31, 1999, August 31, 2000, August 31, 2001 and June 30, 2002;

(11)    Our Lady of the Way Hospital (Martin, Kentucky), Medicare Provider No. 18-0032, fiscal years ending June 30, 1998 and June 30, 2000;

(12)    Our Lady of the Way Hospital (Martin, Kentucky), Medicare Provider No. 18-1305, fiscal years ending June 30, 2001 and June 30, 2002;

(13)    CARITAS Medical Center (Louisville, Kentucky), Medicare Provider No. 18-0037, fiscal years ending August 31, 2000, June 30, 2001 and June 30, 2002;

(14)    CARITAS Peace Center (Louisville, Kentucky), Medicare Provider No. 18-4000, fiscal years ending August 31, 2000 and July 31, 2001;

(15)    St. Joseph Medical Center (Towson, Maryland), Medicare Provider No. 21-0007, fiscal years ending June 30, 1997 and June 30, 1998;

(16)    St. Francis Medical Center, d/b/a St. Francis Healthcare Campus (Breckenridge, Minnesota), Medicare Provider No. 24-0029, fiscal years ending June 30, 2000 and June 30, 2002;

(17)    LakeWood Health Center (Baudette, Minnesota), Medicare Provider No. 24-1301, fiscal years ending June 30, 2001 and June 30, 2002;

(18)    St. John's Regional Medical Center (Joplin, Missouri), Medicare Provider No. 26-0001, fiscal years ending June 30, 1998, June 30, 1999, June 30, 2000, June 30, 2001 and June 30, 2002;

(19)    Good Samaritan Health Systems, Inc., d/b/a Good Samaritan Hospital (Kearney, Nebraska), Medicare Provider No. 28-0009, fiscal years ending June 30, 2000 and June 30, 2002;

(20)    Saint Elizabeth Health System, d/b/a St. Elizabeth Regional Medical Center (Lincoln, Nebraska), Medicare Provider No. 28-0020, fiscal years ending June 30, 1998, June 30, 1999, June 30, 2000, June 30, 2001 and June 30, 2002;

(21)    St. Francis Medical Center (Grand Island, Nebraska), Medicare Provider No. 28-0023, fiscal years ending June 30, 1998, June 30, 1999, June 30, 2000, June 30, 2001 and June 30, 2002;

(22)    St. Mary's Community Hospital (Nebraska City, Nebraska), Medicare Provider No. 28-0062, fiscal years ending June 30, 1999, June 30, 2000 and November 30, 2000;

(23)    St. Mary's Community Hospital (Nebraska City, Nebraska), Medicare Provider No. 28-1342, fiscal year ending June 30, 2002;

(24)    Good Samaritan Health Systems, Inc., d/b/a Richard H. Young Hospital (Kearney, Nebraska), Medicare Provider No. 28-4007, fiscal years ending June 30, 2001 and June 30, 2002;

(25)    St. Joseph Healthcare System, f/d/b/a:

    a.  St. Joseph Medical Center (Albuquerque, New Mexico), Medicare Provider No. 32-0009, fiscal years ending June 30, 2001 and August 31, 2002;

    b.  St. Joseph Northeast Heights Hospital (Albuquerque, New Mexico), Medicare Provider No. 32-0017, fiscal years ending June 30, 2001 and August 31, 2002;

    c.  St. Joseph West Mesa Hospital (Albuquerque, New Mexico), Medicare Provider No. 32-0074, fiscal years ending June 30, 1999, June 30, 2000, June 30, 2001 and June 30, 2002;

    d.  St. Joseph's Rehabilitation Hospital (Albuquerque, New Mexico), Medicare Provider No. 32-3028, fiscal year ending August 31, 2002;

(26)    St. Joseph's Hospital and Health Center (Dickinson, North Dakota), Medicare Provider No. 35-0003, fiscal years ending June 30, 1999, June 30, 2000 and June 30, 2001;

(27)    Mercy Hospital of Valley City (Valley City, North Dakota), Medicare Provider No. 35-0013, fiscal years ending June 30, 1999 and June 30, 2000;

(28)    Mercy Hospital of Valley City (Valley City, North Dakota), Medicare Provider No. 35-1324, fiscal year ending June 30, 2002;

(29)    Oakes Community Hospital (Oakes, North Dakota), Medicare Provider No. 35-0012, fiscal year ending June 30, 2000;

(30)    Oakes Community Hospital (Oakes, North Dakota), Medicare Provider No. 35-1315, fiscal year ending June 30, 2002;

(31)    Mercy Medical Center (Williston, North Dakota), Medicare Provider No. 35-0017, fiscal years ending June 30, 1999, June 30, 2000, June 30, 2001 and June 30, 2002;

(32)    Mercy Hospital of Devil's Lake (Devil's Lake, North Dakota), Medicare Provider
        No. 35-0030, fiscal years  ending June 30, 1999, June 30, 2000, June 30, 2001 and
        June 30, 2002;

(33)    Carrington Health Center (Carrington, North Dakota), Medicare Provider No. 35-
        1318, fiscal year ending June 30, 2002;

(34)    Good Samaritan Hospital of Cincinnati (Cincinnati, Ohio), Medicare Provider No.
        36-0134, fiscal years ending June 30, 1998, June 30, 1999, June 30, 2000, June
        30, 2001 and June 30, 2002;

(35)    St. Elizabeth Health Services, Inc. (Baker City, Oregon), Medicare Provider No.
        38-0011, fiscal years ending June 30, 1998, June 30, 1999, June 30, 2000, June
        30, 2001 and June 30, 2002;

(36)    Mercy HealthCare, Inc., d/b/a Mercy Medical Center, Inc. (Roseburg, Oregon),
        Medicare Provider No. 38-0027, fiscal years ending June 30, 1998, June 30, 1999,
        June 30, 2000 and June 30, 2002;

(37)    The Dominican Sisters of Ontario, Inc., d/b/a Holy Rosary Medical Center
        (Ontario, Oregon), Medicare Provider No. 38-0052, fiscal years June 30, 1998,
        June 30, 1999 and June 30, 2000;

(38)    St. Anthony Hospital (Pendleton, Oregon), Medicare Provider No. 38-0066, fiscal
        years ending June 30, 1999 and June 30, 2000;

(39)    St. Joseph Health Ministries, f/d/b/a St. Joseph Hospital (Lancaster,

Pennsylvania), Medicare Provider No. 39-0061, fiscal years ending June 30,

1997, June 30, 1998, June 30, 1999 and June 30, 2000;

(40)    St. Joseph Regional Health Network, d/b/a St. Joseph Medical Center (Reading,

Pennsylvania), Medicare Provider No. 39-0096, fiscal years ending June 30,

1997, June 30, 1998, June 30, 1999, June 30, 2000, June 30, 2001, and June 30,

2002;

(41)    St. Mary's Healthcare Center of Pierre, South Dakota (Pierre, South Dakota),

Medicare Provider No. 43-0015, fiscal years ending June 30, 1999, June 30, 2000

and June 30, 2001;

(42)    Memorial Health Care System, Inc., d/b/a Memorial Hospital (Chattanooga,

Tennessee), Medicare Provider No. 44-0091, fiscal years ending June 30, 1998,

August 31, 1999 and June 30, 2000;

(43)    Franciscan Health System, d/b/a:

    a.  St. Clare Hospital (Lakewood, Washington), Medicare Provider No. 50-0021,
        fiscal years ending June 30, 1998 and June 30, 2001;

    b.  St. Joseph Medical Center (Tacoma, Washington), Medicare Provider No. 50-
        0108, fiscal years  ending June 30, 1998, June 30, 2001 and June 30, 2002;

    c.  St. Francis Hospital (Federal Way, Washington), Medicare Provider No. 50-
        0141, fiscal years ending June 30, 1998 and June 30, 2001;

(44)    Franciscan Villa of South Milwaukee, Inc., d/b/a Franciscan Villa (South

Milwaukee, Wisconsin), Medicare Provider No. 52-5526, fiscal years ending June

30, 1998 and June 30, 1999.

13.     Defendant Michael O. Leavitt ("the Secretary") is Secretary of the United States Department of Health and Human Services ("HHS"), the federal agency that administers the Medicare program.  HHS' headquarters is located in the District of Columbia.  The Secretary is sued only in his official capacity.  References to him herein are meant to refer to Defendant Leavitt, his subordinate agencies and officials, and to his official predecessors or successors as the context required.

14.     CMS is a component of HHS.  CMS was formerly known as the Health Care Financing Administration ("HCFA") during the periods at issue, and was and is responsible for day-to-day operation and administration of the Medicare program.  For ease of reference, this Complaint generally refers to CMS without regard to the name the agency used before.

## IV.    GENERAL STATUTORY AND REGULATORY BACKGROUND

15.     Congress enacted the Medicare program in 1965 to establish health insurance for the aged and disabled. Social Security Amendments of 1965, Pub. L. No. 89-97, § 102(a).

16.     Since its inception in 1965, the Medicare program has encompassed two separate insurance programs that are established in Parts A and B of title XVIII of the Social Security Act (the "Act").

17.     Part A of the Medicare Act, 42 U.S.C. §§ 1395c -1395i-5, covers hospital services furnished to inpatients.  See 42 U.S.C. § 1395d(a)(1).

18.     Part B of the Medicare Act, 42 U.S.C. §§ 1395j-1395w-4, covers hospital outpatient services.  42 U.S.C. § 1395k(a)(2)(B).

A.    **Medicare Reasonable Cost Reimbursement**

19.    Prior to 1983, the Medicare program paid all hospitals the lower of their customary charges for, or their reasonable costs of, inpatient and outpatient services furnished to Medicare beneficiaries.  See 42 U.S.C. §§ 1395f(b) and 1395*l*(b)(2)(A).

20.    In 1983, Congress enacted a prospective payment system for the operating costs of inpatient hospital services furnished by most general acute care hospitals.  Social Security Amendments of 1983, Pub. L. No. 98-21, § 601(e);  42 U.S.C. § 1395ww(d).  See generally, County of Los Angeles v. Shalala, 192 F.3d 1005, 1008 (D.C. Cir. 1999).

21.    The prospective payment system does not apply to all hospitals or types of hospital services.  For example, the prospective payment system did not apply to hospital outpatient services furnished prior to August 1, 2000, see 42 C.F.R. § 419.1(a) and 65 Fed. Reg. 40535, 40535 (June 30, 2000) (implementing a separate prospective payment system for hospital outpatient services effective August 1, 2000), nor did it apply to any services furnished to inpatients or outpatients of critical access hospitals at any time during the 1997-2002 period at issue.  42 C.F.R. § 413.70 (1997 and 2002).  In general, Medicare reasonable cost principles apply to hospitals and hospital services that are not subject to the prospective payment system.

22.    Section 1861(v)(1)(A) of the Social Security Act (the "Act") defines "reasonable cost" as follows:

> The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs. . . .

42 U.S.C. § 1395x(v)(1)(A). Section 1861(v)(1)(A) of the Act also requires that the regulations take into account both the direct and indirect costs of services furnished to Medicare beneficiaries. In addition, the statute precludes CMS from determining such cost in a manner that shifts the cost of services furnished to Medicare beneficiaries to other patients, and *vice-versa*. Id. This is referred to as the "prohibition on cross-subsidization."

23.    The intent of the statutory provision for payment of reasonable cost, which has been in place since the inception of the Medicare program in 1965, is:

> [T]o meet the actual costs, however widely they may vary from one institution to another, except where a particular institution's costs are found to be substantially out of line with those of institutions similar in size, scope of services, utilization, and other relevant factors.

S. Rep. No. 404, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.C.C.A.N. 1943, 1976.

24.    The regulations implementing the statutory provision for payment of reasonable cost are codified in 42 C.F.R. § 413.9. Section 413.9(a) provides that reasonable cost includes all "necessary and proper costs incurred" in furnishing "services covered under Medicare and related to the care of beneficiaries."

25.    Section 413.9(b) of the reasonable cost regulation defines "necessary and proper costs" to mean:

> costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs that are common and accepted occurrences in the field of the provider's activity.

42 C.F.R. § 413.9(b).

26.    Consistent with the manifest intent of the reasonable cost statute, the implementing reasonable cost regulation in section 413.9 has always provided that the reasonable cost of services includes the "actual costs" incurred, "however widely they may vary

from one institution to another." 31 Fed. Reg. 14,816-17 (1966) (adopting 20 C.F.R. § 405.451,

now codified at 42 C.F.R. § 413.9(c)(2)). In addition, the regulation has always provided that

this provision is subject to just one limitation that applies only when "a particular institution's

costs are found to be substantially out of line with other institutions in the same area which are

similar in size, scope of services, utilization, and other relevant factors." Id.

27.    The PRM recognizes that liability insurance is a necessary and proper cost related

to patient care. PRM §§ 2160.2, 2160.5; accord LGH, Ltd. v. Sullivan, 786 F. Supp. 1047, 1053

(D.D.C. 1992) (holding assessments voluntarily paid by hospitals to a State fund for incurred but

not reported malpractice losses are necessary costs related to patient care). At the hearing in this

case, the Secretary's own witness, Sandra Cavanaugh, admitted that this type of liability

insurance  expense is "common and accepted," Transcript of Hearing (Tr.) at 353-54, and it is

clearly "appropriate and helpful" in the operation of a hospital.[1] Tr. at 253-56. See also 42

C.F.R. § 413.9(b) (defining "necessary and proper" to mean costs that are "appropriate and

helpful" in furnishing patient care and are "common and accepted" expenses in the field).

28.    The Manual imposes additional conditions on reimbursement for costs incurred to

obtain liability insurance from a captive. PRM § 2162.2. For example, the Manual stipulates

that when a provider is related to a captive insurer, the premiums paid to the insurer are

allowable if they do not exceed the cost of comparable commercial insurance, the captive is

established under and complies with the laws of its domicile, and the captive has an adequate

claims management and risk management program. Id.

---

[1]    References herein to the transcript, exhibits and stipulations refer to the transcript of the
hearing before the PRRB, to the exhibits filed by the parties and to the stipulations of the parties
in the proceedings below in this case.

29.     The Manual also imposes further conditions that apply only to premiums paid to an offshore captive. PRM § 2162.A.4. With respect to captives domiciled offshore, but not a captive domiciled onshore, the Manual dictates certain investment limitations, including a provision limiting the investment in equity securities to no more than 10% of the captive's admitted assets. Id. As applied in this case, this restriction in the Manual disallows all actuarially-determined premiums paid to an offshore captive that exceeds the guideline's investment allocation limits.

### B.    Medicare Cost Reporting and Appeals

30.     The Secretary contracts with private organizations known as "fiscal intermediaries" or "intermediaries" to make determinations of the amounts payable to providers for services furnished to Medicare beneficiaries. See 42 U.S.C. § 1395h(a).

31.     A hospital participating in the Medicare program is usually referred to, for Medicare reimbursement purposes, as a "provider of services," or a "provider." See 42 U.S.C. § 1395x(u).

32.     After the close of each fiscal year, a participating hospital must file a cost report with its Medicare fiscal intermediary. 42 C.F.R. § 413.20(b). The intermediary audits the cost report and issues a final determination of the reimbursement due to the provider for services furnished to Medicare beneficiaries in a notice of program reimbursement ("NPR"). See 42 U.S.C. §§ 1395h and 1395oo(a)(1)(A)(i); 42 C.F.R. § 413.20; 42 C.F.R. § 405.1803(a)(1); Bethesda Hospital Ass'n v. Bowen, 485 U.S. 399, 400-01 (1988).

33.     When a hospital is reimbursed under Medicare reasonable cost principles, and the hospital obtains items or services, such as centralized management or purchasing services, from

a related parent company or "home office," the hospital is entitled to reimbursement only for the cost to the home office of the items and services furnished to the hospital. 42 C.F.R. § 413.17; PRM § 2050. Accordingly, Medicare procedures also require annual cost reports from the "home office" for a system or chain of two or more hospitals that are related through common ownership or control. PRM §§ 2050, 2050.3. Each hospital's allocable share of the allowable home office costs are then included in each hospital's individual cost report.

34.    A hospital is entitled to appeal to the PRRB if the hospital is dissatisfied with the intermediary's determination as to the amount of reimbursement due the hospital for a fiscal year. 42 U.S.C. § 1395oo(a); 42 C.F.R. §§ 405.1835 and 405.1889.

35.    The PRRB is an administrative tribunal comprised of five members appointed by the Secretary. 42 U.S.C. § 1395oo(h). Members of the Board serve three-year terms. 42 C.F.R. § 405.1845(b).

36.    In an appeal to the PRRB, a hospital has the right to a hearing in which it may introduce evidence and examine and cross-examine witnesses. 42 U.S.C. §§ 1395oo(a) and (c); 42 C.F.R. § 405.1835.

37.    The PRRB is required to issue a written decision "based upon the record made at such hearing," and that decision must be supported by substantial evidence in the record. 42 U.S.C. § 1395oo(d); C.F.R. § 405.1871(a). The Board's written decision must be rendered "as soon as practicable after the conclusion of its hearing." 42 C.F.R. § 405.1871(a).

38.    A decision of the PRRB reversing, affirming or modifying an intermediary's determination is final unless the Secretary reverses, affirms, or modifies the Board's decision

within 60 days after the provider is notified of the PRRB's decision.  42 U.S.C. § 1395oo(f)(1);

42 C.F.R. § 405.1877(a).  The Secretary has delegated the authority to review the Board's

decisions to the Administrator of CMS.  See 42 Fed. Reg. 57,351 (Nov. 2, 1977); 42 C.F.R.

§ 405.1875.

39.     A provider that is dissatisfied with a final decision of the PRRB or the CMS

Administrator may appeal to this Court within 60 days after the provider receives notice of the

final decision.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. §§ 405.1877(a) and (f).

40.     The Court must review the final decision below pursuant to the applicable

provisions of the Administrative Procedure Act ("APA").  42 U.S.C. § 1395oo(f)(1).  The

applicable provisions of the APA provide that the Court should set aside the agency's decision if

it exceeds the agency's statutory authority, is arbitrary and capricious, is not based upon

substantial evidence,  or is otherwise contrary to law.  5 U.S.C. § 706.

## V.     FACTS SPECIFIC TO THIS CASE

41.     For the 1997-2002 period at issue in this case, the plaintiff hospitals operated

under the common ownership or control of CHI.  Stipulations of the Parties ("Stipulations")

¶¶ 1-2.

42.     During the period at issue, the hospitals paid insurance premiums to an offshore

captive insurance company, First Initiatives Insurance, Ltd. ("FIIL").  See PRRB Dec. at 3.  FIIL

is a wholly-owned subsidiary of CHI.  Id. at 4.

43.     During the period at issue, FIIL invested between 40-50% of its assets in equity

securities.  Stipulations ¶ 2.

44.     Because FIIL's investment of assets did not comply with the limitations set forth in PRM § 2162.2.A.4, CHI and the plaintiff hospitals disclosed and self-disallowed this expense under protest on the cost reports they submitted to the Medicare program for the periods at issue. Stipulations ¶ 4; Tr. at 221-24.  In following this disclosure process, CHI preserved its right to challenge the application of the program guideline in an appeal to the PRRB.  See Bethesda Hospital Ass'n v. Bowen, 485 U.S. 399, 400-01 (1988).

### A.     Formation of CHI and The Offshore Captive Insurer

45.     Three Catholic health care systems, Franciscan Health System, Catholic Health Corporation, and Sisters of Charity Health Care System, merged to create CHI in 1996.  Tr. at 70.

46.     Prior to the merger, primary medical professional and general liability insurance coverage for the three predecessor healthcare systems was provided by Neumann Insurance Company ("Neumann"), MSJ Insurance Company ("MSJ"), and the Health Services Self-Protection Plan, respectively.  Exhibit P-1 at p.10-11; Tr. at 71.

47.     Neumann and MSJ were captive insurers domiciled in Colorado.  Id.  Health Services Self-Protection Plan was a trust.  Id.

48.     MSJ and Neumann each invested more than 10% of their admitted assets in equities.  MSJ had a 28% equity allocation and Neumann had a 46% equity allocation.  Exhibit P-3 at p.6; Tr. at 72-73.  Because both captives were domiciled onshore, the restrictions set forth in PRM § 2162.2.A.4 did not apply.  In addition, these investment allocations in equity securities were permitted under Colorado law.

49.    After the 1996 merger, CHI decided to consolidate the three liability insurance programs.  Exhibit P-1; Tr. at 75-101.

50.    CHI had three main goals in consolidating the liability insurance programs: 1) increased coverage flexibility, 2) lowered costs and 3) the ability to provide coverage to strategic partners (e.g., ambulatory surgical centers) that were affiliated with CHI but not directly controlled by it.  Exhibit P-1 at p.6; Tr. at 75-78.

51.    In order to determine the best consolidation plan to achieve its goals, CHI formed an Advisory Board and engaged Alexander & Alexander ("A&A"), a predecessor to Aon Corporation, which is the second largest insurance services firm in the nation, to perform a feasibility study.  Tr. at 75, 79-80.  The CHI Advisory Board was composed of financial officers, risk insurance professionals, and chief executive officers of the plaintiff hospitals – leadership from across CHI.  Tr. at 80.  The Advisory Board reviewed A&A's report and recommendations. See Exhibit P-1 at p.1.

52.    CHI and A&A considered several alternative business structures for CHI's consolidated risk and insurance program, including the acquisition of a licensed commercial insurer and the formation of a risk retention group, trust, pure captive insurer and group captive. Exhibit P-1 at 27-37; Tr. at 81-88.  A "captive" is an insurance company that is owned by its insureds; it is funded through an insurance policy where the captive's owner pays premiums and assessments into it and the money is held there until the owner incurs covered losses.  Tr. at 82. A group captive has multiple insured owners.  Exhibit P-1 at p. 29, 31; Tr. at 83.

53.    Based upon A&A's recommendation, CHI decided to form a captive insurer, FIIL, as the best means for achieving its goals.  Exhibit P-1 at 35-36; Tr. at 88.

54.    A&A reviewed, and CHI carefully considered, where the captive insurer, FIIL, should be domiciled.  A&A and CHI considered several domestic and offshore jurisdictions, including Colorado, Hawaii, Vermont, U.S. Virgin Islands, Barbados, Bermuda and the Cayman Islands.  Exhibit P-1 at p. 37-44; Tr. at 87.  Colorado was considered carefully because it was the domiciliary jurisdiction for the two predecessor insurance captives.  Exhibit P-1 at p. 37-38; Tr. at 87.  Vermont was also considered carefully because that is the domicile for the largest number of domestic health care captives.  Exhibit P-1 at p. 39; Tr. at 87, 337.

55.    A&A ultimately recommended, and CHI decided, to establish an offshore captive because this would provide more coverage flexibility and would be less costly than other alternatives.  Exhibit P-1 at 37; Tr. at 88.  Based on the feasibility study, it was estimated that an offshore captive would save CHI and the plaintiff hospitals anywhere from $108,980 to $294,475 in administrative expenses in its first year alone, as compared to a captive domiciled in various domestic jurisdictions.  Exhibit P-1 at 54.

56.    Ultimately, CHI decided to domicile FIIL in the Cayman Islands because this would allow CHI to achieve all three of its strategic goals:  increased coverage flexibility, the ability to extend coverage to strategic partners, and lower administrative cost.  Exhibit-P-1 at 37; Tr. at 89-95.  The ability to extend insurance coverage through the captive to related third parties increased the spread of risk and thereby contributed to lower premium expenses for the plaintiff hospitals.  Tr. at 94-101.  By achieving a greater spread of risk, CHI and the plaintiff hospitals were able to spread fixed costs over a larger pool and to reduce premium expense through more predictable loss for the larger risk pool.  Tr. at 94-101.

B.     **Management And Oversight Of The Captive**

57.     When FIIL was formed on December 31, 1996, all assets and liabilities of the

three predecessor insurance programs were assigned to it.  Tr. at 102-03.

58.     FIIL is subject to regulatory oversight by the Cayman Islands Monetary

Authority.  The Caymans Authority must annually approve FIIL's business plan and investment

polices in accordance with established guidelines.  See Exhibit P-29; Tr. at 149-50.

59.     FIIL operates as a centralized funding mechanism for the malpractice and other

liability lines of coverage for CHI and its hospitals.  Tr. at 92-94, 103.  CHI administers and pays

claims and seeks reimbursement from FIIL.  Tr. at 103, 108-11.

60.     FIIL writes coverage for CHI on property and casualty risks.  It does not cover

life or health insurance.  Tr. at 92-94.

61.     FIIL is a wholly-owned subsidiary of CHI; however, no CHI or FIIL employees

work in the Cayman Islands.  Tr. at 103.  A subsidiary of Aon keeps the books and business plan

of FIIL and deals on FIIL's behalf with the Cayman Islands Monetary Authority.  Tr. at 104.  All

claims administration and risk management functions are performed by CHI employees in

Erlanger, Kentucky.  Tr. at 110-11.  Thus, all payroll, employee benefit and income taxes for

CHI risk and insurance personnel remain in the United States.

62.     FIIL is provided with a great deal of management oversight, both internal and

external.  FIIL's board of directors is comprised of CHI executives and external members who

are insurance experts and leaders from other health care systems.  Exhibit P-5 at p. 5; Tr. at 104-

05.  The board of directors approves all business plans and investment policies of FIIL.  Id.

63.    Mellon Bank ("Mellon") acts as custodian for all the assets in the FIIL portfolio.
Exhibit P-5 at p. 5; Tr. at 105-06.  Mellon is overseen by the CHI Investment Management
Committee.  Mellon is required to maintain appropriate accounting records of all deposits,
withdrawals, security purchases, and security sales.  FIIL receives monthly statements from
Mellon identifying the holdings as of month end, the net changes for the month and a detail of all
transactions during the month.  Tr. at 107-08.  Investments are managed by several
(approximately 13) professional money managers.  Exhibit P-5 at p. 5; Tr. at 106.  FIIL is also
supported by CHI treasury staff, independent consultants and CHI's Investment Committee.  Tr.
at 108-09.  The Investment Committee is currently comprised of five members, most of whom
are independent of CHI.  Tr. at 109-110.  The members are typically business leaders from
organizations similar to CHI.  Each member has significant experience in investing for a health
care organization; at least two members must be trustees for the FIIL Board, and the CEO of CHI
must also be on the Committee.  Exhibits P-8 and P-26;Tr. at 109-110.

64.    As noted above, FIIL also contracts with professional investment managers to
manage its funds.  Exhibit P-5 at p. 5.  CHI and FIIL regularly compare the managers'
investment results with industry standards to ensure that FIIL's investments are performing
appropriately.  Tr. at 157.

65.    CHI treasury staff also oversee and monitor the FIIL funds.  Tr. at 108-09.

66.    FIIL's books are audited annually.  Tr. at 103, 112; Exhibit P-13.

C.      **Actuarilly Determined Premium Funding**

67.     CHI employs Tillinghast-Towers Perrin ("Tillinghast"), a leader in actuarial science, to conduct annual actuarial studies of expected loss for each year.  Tr. at 111-12.  Once Tillinghast makes these projections, it determines the aggregate funding requirement of FIIL for the year.  See Exhibit P-14 at p. 7.  These projections account for expected loss cost values plus administrative costs.  Tr. at 227-28.

68.     Once the aggregate funding requirement is determined by Tillinghast, the captive insurance program assessments are allocated to CHI hospitals based upon a standard allocation formula.  Tr. at 222.  Based on these estimations, CHI collects insurance premiums from its individual hospitals.

D.      **Studies Of Alternatives**

69.     CHI has commissioned three investment allocation studies since the inception of FIIL in 1997.  Exhibits P-2, P-6 and P-25 ; Tr. at 113-20.  An asset allocation study is undertaken approximately every three years in order to ensure an appropriate allocation of fund assets.  Tr. at 113-14.

70.     When FIIL was first established in 1997, a study was conducted to determine the appropriate investment allocation of FIIL's assets.  Exhibit P-2.  FIIL's consultants reviewed investment options to determine the optimum allocation that would satisfy liquidity needs and maximize investment return with an appropriate level of risk.  Tr. at 115-16.  The investment consultants recommended, and FIIL adopted, a 40% allocation of assets in diversified equities.  Exhibit P-2 at p. 7.  These equities were large, mid, and small cap stocks as well as domestic and

international equities.  Exhibit P-5 at p. 10; Tr. at 117-18.  The investments were intentionally

diversified among all types of equities because diversification reduces the risk of loss.  Tr. at

117-20.

71.     The first investment allocation analysis indicated that the net benefit of adopting a

40% equity allocation versus a 10% allocation would be $25 million between 1997 and 2002.

Exhibit. P-2 at p. 9.  Accordingly, an allocation of 40% equities and 60% fixed income securities

was recommended and FIIL implemented this recommendation.

72.     After the initial 1997 study, two more asset allocation studies were conducted –

one in 2000 and one in 2003.

73.     In February 2000, the second asset allocation study was performed and approved

by FIIL's board of directors.  Exhibit. P-9 at p. 7.  The primary recommendation of this study

was to increase the captive's equity allocation from 40% to 50% of total assets.  FIIL adopted

this recommendation and the allocation remained at approximately 50% equities and 50% fixed

income securities throughout the period at issue.  Exhibit P-8 at p. 3; Tr. at. 120.

74.     A third asset allocation study was performed in August 2003.  Exhibit P-25.  The

2003 study modeled the impact of Medicare's 10% equity limitation as compared to the captive's

existing 50% allocation to equity securities.  Tr. at 121-28.  The 2003 study showed that at

expected levels of return, the Medicare limitation would reduce investment income and therefore

increase premium cost, by approximately $38 million over five years.  Exhibit P-25 at p. 13; Tr.

at 126-29, 205-08.  The reduction in investment earnings would have to be added to premium

assessments in order to fund expected loss costs.  Id.

75.     CHI was well aware from the outset that FIIL's investment policy did not comply with the requirements set forth in the PRM.  Tr. at 205-08, 221-24.  CHI allowed FIIL to move forward with its investment policy, however, because the cost of complying with the Manual's restrictions was too great.  Tr. at 121-28, 205-08.

76.     CHI annually employs Aon to examine the full cost of the captive insurance program, including claims administration and reinsurance costs,  as compared to the cost of purchasing comparable insurance coverage through commercial insurers.  Tr. at 130-33.  For fiscal year 2000 alone, Aon determined that CHI would have paid $15 million (or 17 percent) more to purchase comparable commercial insurance coverage.  Exhibit P-7 at p. 1; Tr. at 131-33.

**E.     Captive's Assets**

77.     FIIL's total assets on June 30, 2000 were $356.7 million, of which $343.9 million were invested assets.  Exhibit P-13 at p. 2.  The investment pool for FIIL generally consists of cash, fixed income investments and equity securities.  Exhibit P-3 at p. 7.

78.     The actual market value returns on FIIL investments were consistent with market benchmarks which determine, on average, what market investments should return in a given year.  Exhibit P-25 at p. 4;  Tr. at 210-14.

**F.     Amount In Controversy And Claims Paid By FIIL**

79.     The amount in controversy in this case exceeds $ 6 million for the 1997-2002 years at issue.  See PRRB Dec., App. Schedule of Providers.  That amount is Medicare's approximate share of the actuarially-determined premium assessments paid by plaintiff hospitals

for the periods at issue; but, the Medicare program has not reimbursed the plaintiff hospitals for any of premium assessments paid to FIIL.

80.    The Medicare program also has not reimbursed CHI or the plaintiff hospitals for the administrative expenses attributable to the program, or for the claims paid by FIIL.  Tr. at 228-32, 244-51.

81.    Claims paid by CHI, and refunded by FIIL, total tens of millions of dollars per year.  FIIL's audited financial statements for three of fiscal years at issue, for example, show paid claims in the amounts of $39.8 million for fiscal year 2000, $57.6 million for fiscal year 1999 and $31.5 million for fiscal year 1998.  Exhibit P-13 at pp. 13, 391 and 403.

82.    The Secretary's failure to reimburse the plaintiff hospitals for any costs related to the captive insurance has had a significant adverse impact on the plaintiff hospitals, particularly those that are critical access hospitals, because it has deprived the hospitals of funds that could otherwise be put to patient care in furtherance of the hospitals' charitable mission.  Tr. at 226-27.

   **G.    PRRB Hearing**

83.    The PRRB conducted a hearing on November 4, 2004.  Five members of the Board were present at the hearing on November 4, 2004:  Suzanne Cochran, Esq., Gary B. Blodgett, D.D.S., Elaine Crews Powell, C.P.A., Anjali Mulchandani-West, and Martin W. Hoover, Jr., Esq.

84.    The principal witness for the Secretary at the November 2004 hearing was Sandra Cavanaugh, a CMS analyst.  Cavanaugh testified that she was responsible for interpreting the Medicare rules regarding cost reimbursement for self-insurance, among other things.  Tr. at 255,

290-91.  Her immediate predecessor in this role was Ward Plinus [sic, Pleinus], who had worked

for the CMS program for many years.  Tr. at 294-95.  Ms. Cavanaugh took over

the responsibilities of her predecessor in this area when he retired in 2001.  Tr. at 298.

85.     At the hearing, Ms. Cavanaugh admitted that neither she nor her predecessor has

or had experience with insurance underwriting, the regulation of the business of insurance, or

investment risk.  Tr. at 290-97.

86.     Cavanaugh was unable to identify or explain characteristics of and differences

between types of insurance risk – i.e., life and health insurance risk versus property and casualty

insurance – or how and why these differences lead State insurance regulators to adopt differing

investment limitations on insurers that cover different types of insurance risk.  Tr. at 310-11,

321-26.

87.     Cavanaugh also was unable to identify or explain the characteristics of and

differences between types of insurers – commercially licensed insurers versus captives and

mutual insurance companies – that lead State insurance regulators to adopt different limitations

on investment by different types of insurers.  Tr. at 311-18, 346-49.

88.     Cavanaugh testified that the foregoing factors and differences in State regulations

governing different types of insurance risk and different types of insurers do not "really make

sense to me" because she is "not a specialist" in the area of insurance regulation or investment

risk.  Tr. at 323.

89.    Cavanaugh also was unable to identify any factors considered by CMS in connection with the establishment and continuing application of the investment restrictions section 2162.2.A.4 of the PRM.  Tr. at 323-24, 346-49.

90.    The record evidence also shows that the investment restriction in PRM § 2162.2.A.4 is both overbroad and under-inclusive.  See Tr. at 300-02; see also Tr. at 152-53, 192-95.  For example, the Manual precludes any investment at all in a company which does not pay dividends, PRM § 2162.2.A.4, but the Secretary presented no evidence showing that there is any correlation between payment of dividends and the financial strength of a company and the Secretary's own witness, Cavanaugh, admitted that a financially strong company (like Microsoft) might not pay dividends on its stock.  Tr. at 300-01.  Conversely, while Cavanaugh testified that the Manual's investment restrictions are intended to insure prudent management of a captive insurer's assets, Tr. at 258, 268, 299, nothing in the Manual requires any degree of diversification in a captive's investment, Tr. at 301-02, and Cavanaugh admitted that she did not even know whether there is any correlation between diversification and investment risk, because she had failed ever to consider this important aspect of the issue.  Tr. at 302.  The undisputed record evidence shows, however, that there is a clear risk associated with lack of diversification in investment.  Tr. at 152-53, 192-95; see also 29 U.S.C. § 1104(a)(1)(C) (while not limiting investment in equities, the ERISA statute mandates that plan fiduciaries must "diversify . . . the investments of the plan so as to minimize the risk of large losses").

91.    Cavanaugh admitted that approximately 50% of all Medicare providers with offshore captives do not comply with the Manual's investment restrictions.  Tr. at 288-89.  This level of noncompliance by the hospital industry underscores the fact that the investment restrictions in PRM § 2162.2 are not adequately or suitably tailored to accomplish CMS' intent

to ensure prudent management of a captive's investments because Medicare providers, who like the plaintiff hospitals may have hundreds of millions of their own money at stake to cover expected losses, are more inclined to follow the far more seasoned advice of their expert advisors.

92.     While the PRM restricts investment in equities by an offshore captive, it imposes no similar restriction on investment by domestically-domiciled captives.  PRM § 2162. Cavanaugh, the Secretary's witness, testified that the main reason for the Manual's disparate regulation of investments by domestic and offshore captive insurers was that some unspecified "research" allegedly showed that state regulators generally limit an insurer's investment in equities to 10-15% of the insurer's assets.  Tr. at 257-59, 294-95, 399.  On cross-examination, however, Cavanaugh admitted she had never seen such research, Tr. at 297-98, and she did not know which State laws or what factors, if any, were actually considered in the formulation of the Manual's restrictions on investment by offshore captives.  Tr. at 297-99.

93.     Upon further cross-examination, Cavanaugh admitted that the State limitations she discussed in her direct testimony did not reflect States' regulation of investments by insurers covering property and casualty insurance, like the coverage provided by CHI's captive, as opposed to life and health insurance, which CHI's captive does not cover.  See Tr. at 313-15 & Exhibit I-7 (Colorado laws); Tr. at 320 & Exhibit I-7 (Vermont laws); Tr. at 324-25 & Exhibit I-8 (Arkansas laws); Tr. at 326-30 & Exhibits I-13, p. 8 and P. 30, p. 9  (Illinois laws); Tr. at 335-36 & Exhibit I-13, p. 3 (NAIC).

94.     Further cross-examination of Cavanaugh also revealed that the State limitations discussed in her direct testimony did not reflect actual State regulation of investments by captive

or mutual insurance companies, like CHI's captive, as opposed to a commercial insurance

carrier.  See Tr. at 315-18 & Exhibit P-28 (Colorado); Tr. at 321-24 & Exhibit P-27 (Vermont);

Tr. at 330-32 & Exhibit P-31, pp. 1 & 12 (Illinois).  As pointed out in questioning by the Board

Chair, Cochran, Cavanaugh's direct testimony on this point had been something less than a

candid assessment of the manner in which States actually regulate the investments of captive

insurers:

> [Board Chair]: . . . . I understood you to say on your direct examination when you were testifying about various states that you went through individually, going through these exhibits, that for the most part had limitations of 10 percent, some to 20 percent, and most of those were for life insurance company[ies].  I thought I understood you to say that those same limitations were applicable to other types of insurance companies.
>
> [Cavanaugh]  In some states, yes.  In some states, no.
>
> [Board Chair]:  Okay.
>
> [Cavanaugh]:  I hope I didn't . . .
>
> [Board Chairman]:  Well, that seemed – but you knew at the time you were testifying about those that the state captives did not necessarily have those limitations?
>
> [Cavanaugh]:  Yes.

Tr. at 365-66.

      95.     The record evidence shows that the great majority of States that regulate captives

(17 of 23) do not restrict a captive's investment in equities to any fixed, stated percentage.  See

Provider's Post-Hearing Brief at 29 & n.13 (listing State laws); see also Tr. at 70-71, 87, 337.

The majority of States that regulate captives but do not restrict investment in equities includes

both Colorado, which was the domicile of the two captives of the predecessors that merged to

create CHI in 1996, Tr. at 70-71, 87, and Vermont, where the vast majority of domestic captive

insurers are domiciled.  Tr. at 87, 337.  Employing a regulatory oversight approach similar to that

of the Cayman Islands Monetary Authority, which regulates FIIL, Tr. at 140-45, 149-50; Exhibit

P-29, the States that regulate domestic captives generally allow considerable flexibility in the

investment of a captive's assets and determine on a case-by-case basis whether a particular

investment allocation may threaten solvency or financial health.  See, e.g. Colo. Rev. St. Ann.

§ 10-6-121(2)(a), Exhibit P-28; Vt. Stat. Ann. tit. 8, § 6010(b), Exhibit P-27.

96.     The record evidence shows that the average investment allocation in equities

ranges from 45-50% for a mutual insurance company (an insurer owned by policyholders) that

underwrites property and casualty risks.  See Exhibit P-32; Tr. at 340-49.  In the case of a captive

or mutual insurance company (an insurance company owned by policyholders), regulators

typically have less concern about promoting policyholder confidence, because in these cases

policyholders and shareholders have a commonality of interest.  See Exhibit P-29 at p. 2.

97.     The Secretary's own witness, Cavanaugh, admitted that if FIIL had been

domiciled domestically in any of the majority States that do not restrict investment in equities by

a captive insurer, Medicare would have reimbursed the plaintiff hospitals for the premium

assessments paid to FIIL:

> [Board Member Mulchandani-West]:  Mr. Keough pointed [in cross-examination]
> to some state regulations. . . where the state doesn't impose any limits on a
> captive's investment allocations.  So if [FIIL] had been domiciled in one of those
> states and had maintained its investment allocation. . . would those premiums
> have been reimbursed by the Medicare program?
>
> [Cavanaugh]:  Yes.
>
> [Board Member Mulchandani-West]:  So the only reason it wouldn't be allowed
> by the Medicare Program is because it was offshore, and Medicare imposed the
> 10 percent limitation?
>
> [CMS Witness]:  Yeah. . . .

\* \* \*

[Board Member Mulchandani-West]: . . [I]t would not have had an issue with getting reimbursed from Medicare for the premiums.

[CMS Witness]:  Correct.

[Board Member Mulchandani-West]:  So can you offer any reason why Medicare would want to maintain different limitations than at least two states that I'm aware of for the investment allocation?

[CMS Witness]: . . .  I think it shows that it's probably time for Medicare to revisit the manual procedures.

Tr. at 359-61.

98.    Cavanaugh also suggested in direct testimony that the investments of domestically-domiciled captives are covered by State insurance guaranty funds.  Tr. at 285-86. On cross-examination, however, Cavanaugh acknowledged that she was unaware that State insurance guaranty funds apply only to commercially-licensed insurance companies.  Tr. at 285-86.  In fact, all or virtually all States that regulate captives do not require or <u>permit</u> them to participate in, or benefit from, State insurance guaranty funds.  <u>See</u> Provider's Post-Hearing Brief at 32 & n.16 (citing State laws); <u>see, e.g.</u>, Vermont Stat. Ann. Tit.8 § 6013 ("No captive insurance company shall be permitted to join. . . any plan, pool, association, or guaranty or insolvency fund in this state, nor shall any such captive insurance company. .  receive any benefit from any such plan, pool, association, or guaranty or insolvency fund. . . .").

99.    Cavanaugh also suggested in her direct testimony that offshore captives have lower reserve requirements than domestic captive insurers.  Tr. at 272-73.  On cross-examination, Cavanaugh clarified her perception that the "dollar amount in reserves" is lower, but she admitted that she could not identify in particular any reserve levels that would be required domestically or offshore.  Tr. at 304-05.  She also admitted that there should be no

reason why the actuarially determined reserve for liabilities would be any different for an offshore captive insurer than a domestic captive insurer. Tr. at 305-06. Cavanaugh ultimately admitted on cross-examination that she "can't speak definitively" as to any substantive difference between the oversight and regulation of a captive domiciled in the Caymans and the oversight and regulation of a captive domiciled domestically in Vermont or Colorado, for example. Tr. at 306-08.

100.     Cavanaugh also suggested in her direct testimony that a domestically-domiciled captive's investment in equities is restricted by the Internal Revenue Service or other Federal agencies. Tr. at 276, 278-80. In response to skeptical questions from Board member Hoover, Cavanaugh demonstrated very little genuine understanding of the regulatory oversight by other Federal agencies. Tr. at 278-81, 308.

## E.     PRRB's Decision

101.     More than two years after conclusion of the hearing in November 2004 and submission of Post-Hearing Briefs in December 2004, the Board issued a written decision dated January 24, 2007. The Board issued a 3-2 split decision.

102.     The majority opinion consisted of approximately two pages of findings of fact and conclusions of law. PRRB Dec. at 6-8. The majority acknowledged that the actuarially-determined premium assessments paid to FIIL by the plaintiff hospitals are related to patient care and are reasonable in amount. Id. at 7. Nevertheless, the Board concluded that those premium expenses are not "necessary and proper costs" for a different reason, namely because the captive's investments in equities exceeded the PRM's restrictions applicable only to offshore captive insurers. Id. at 6. The majority ruled that the Manual's restriction on investments by an

offshore captive insurer is "a valid extension" of the Medicare reasonable cost statute and regulations because, the majority asserted, offshore captives "are not subject to the same level of industry regulations applied to onshore agencies by State insurance commissions" and the Manual's restriction on investment in equities "is in line with asset allocations found among domestic insurance companies." Id. at 6. The majority further ruled that notwithstanding unexplained inconsistencies with the absence of similar restrictions on domestically-domiciled captives and CMS' failure to consider important aspects of the issue, the Manual's restrictions on investments by offshore captive insurers are not arbitrary and capricious because, the majority asserts, "there is an inherent risk associated with offshore captives that justifies the investment restrictions." Id. at 7. Finally, the majority concluded that the hospitals are not entitled to reimbursement for actual claims paid by FIIL because "the program is not necessarily obligated to share in a provider's malpractice or other liability losses." Id. at 7.

103.    The Board Chair and one other Board member dissented in a strong opinion. Id. at 9-11. The dissent concluded that the PRM's investment restrictions "are not an appropriate application of Medicare statutory reasonable cost principles" and "are not an appropriate application of Medicare regulatory reasonable cost principles." Id. at 10. The dissent succinctly focused on the fact that the PRM provisions applied by the majority to effect a complete disallowance of all costs related to CHI's insurance program are "devoid of any link to the standards expressed in the regulations in that there is no test relating to reasonableness of premiums." Id. at 10. The dissent further explained (at 10):

> Nothing in the regulation indicates that a comparison of premiums has any relation to investment choices unless it results in premiums that are out of line with other Providers. Even if the premiums were out of line, there is no authority to totally disallow all premium costs.

104.    The dissent also commented on the lack of any substantial evidence supporting or rational basis for the Manual's discriminatory treatment of providers with offshore captive insurers. Id. at 10-11. The dissent found:

> The CMS witness . . . could not articulate what criteria is appropriate or what was used to establish the policy stated in the manual. She testified that the discriminatory treatment was based on the belief that States' limited the investments of onshore captives but she did not know which States were considered in the formulation of the limitation of offshore captives' investments. Evidence elicited at the hearing demonstrated that the majority of States that regulate captives do not limit investments to a fixed, stated percentage. She did not understand the different risks and pertinent criteria between commercial policies and mutual/captive policies or between different types of risks, e.g. life and health versus property and casualty. The evidence also proved wrong several other assumptions CMS believed supported the disparate treatment of offshore captives. The assumption that investments for offshore captives were more limited because there were no state guaranty funds to protect policyholders was wrong in that guaranty funds were not available to domestic captives either. The assumption that IRS or ERISA would exercise oversight of equity investments for domestic captives was wrong and CMS' witness could not explain why Agency's investment limits in other areas were substantially different from ones imposed on offshore [captives].

105.    One of the Board members in 2007, Yvette C. Hayes, who is listed among the three-member majority in the Board's written decision below, was not sitting on the Board until early 2006 and was not present at the hearing conducted in 2004.

106.    One of the Board members in 2004, Martin Hoover, who is not listed as having participated in the written decision below, was present at the hearing conducted in 2004. Mr. Hoover last appeared as a participant in a Board decision dated February 3, 2006, in PRRB decision number 2006-D15.

107.    In view of the fact that the Board is required by law to render a decision "as soon as practicable after the conclusion of its hearing," 42 C.F.R. § 405.1871(a), and upon information and belief, the plaintiff hospitals allege that the members of the Board ordinarily

meet and reach a decision by vote within a few months after a hearing is completed and post-hearing briefs are submitted.

108.    Generally, as in this case, the Board orders parties to submit post-hearing briefs within 45 days after completion of the hearing.

109.    In other cases that were heard by the Board after November 2004 (when this case was heard), the PRRB issued written decisions in which Board member Hoover participated and those decisions were issued before Hoover departed from the Board.  For example, PRRB decision number 2005-D67 was issued on September 13, 2005, with Board member Hoover participating, and the hearing in that case was held on December 17, 2004.  Similarly, PRRB decision number 2005-D68 was issued on September 16, 2005, with Board member Hoover participating, and the hearing in that case was held "on the record" on June 23, 2005.  Upon information and belief, plaintiffs allege that the Board members held a decision conference and reached a decision by a vote of the majority of the members who heard this case before they held decision conferences and reached decisions in the other cases, mentioned above, that were heard after this case.

110.    Upon information and belief, plaintiff hospitals allege that in early 2005, the Board reached a decision in this case by a vote of the majority of the Board members, including Hoover, who heard this case in November 2004.

111.    Upon information and belief, plaintiff hospitals further allege that because the Board, or the CMS employees who serve as the Board's staff, did not timely prepare a written opinion reflecting the Board's initial decision before Hoover departed from the Board, another

vote was taken and a different decision was rendered later, after Hayes joined the Board, sometime in 2006.

112.     Upon information and belief, plaintiff hospitals allege that new Board members ordinarily do not participate in cases that were previously heard and decided, even if the written opinion setting for the Board's findings and conclusions is not issued until after the new Board member has joined.

113.     Board member Hayes did not participate in decisions in other cases that were heard at about the same time, or even after, the Board heard this case in November 2004, even though the Board issued written decisions in those cases after Hayes joined the Board in early 2006.  For example, PRRB decision number 2006-D26 was issued on June 6, 2006, when Hayes was sitting on the Board, but Hayes did not participate in the decision in that case, which was heard in November 2004 (the same month when this case was heard).  Several other written decisions also were issued after Hayes joined the Board, but Hayes did not participate in those decisions either, apparently because the case was heard and decided before Hayes joined the Board.  See, e.g., PRRB Dec. Nos. 2006-D20, 2006-D22, 2006-D23, 2006-D29, 2006-D30.

114.     On March 9, 2007, the Acting Deputy CMS Administrator declined to review the PRRB's January 24, 2007 decision.

## VI.     ASSIGNMENT OF ERRORS

115.     The PRRB majority decision dated January 24, 2007 is invalid and should be set aside because the application of the Manual's investment restrictions to disallow the premium costs at issue violates the controlling provisions of the Medicare reasonable cost statute and regulations and exceeds the Secretary's statutory authority for the following reasons:

A.     The application of the Manual's limitations is contrary to the plain meaning and manifest intent of the reasonable cost reimbursement principles established in 42 U.S.C. § 1395x(v)(1)(A) and 42 C.F.R. § 413.9.  The insurance premium expenses at issue are necessary and proper costs related to patient care.  Further, the undisputed evidence demonstrates that the hospitals' self-insurance program and FIIL's prudent investment policies saved millions of dollars as compared to other alternatives. The plaintiff hospitals, therefore, are entitled to their actual costs incurred because these costs have not been shown to be substantially out of line.  See 42 C.F.R. § 413.9(c)(2); Memorial Hospital/Adair County Health Center v. Bowen, 829 F.2d 111, 118 (D.C. Cir. 1987); Home Health Care, Inc. v. Heckler, 717 F.2d 587 (D.C. Cir. 1983); GranCare, Inc. v. Shalala, 93 F.Supp. 24, 30-34 (D.D.C. 2000); LGH, Ltd. v. Sullivan, 786 F.Supp. 1047, 1053-54 (D.D.C. 1992).

B.     The Manual's restrictions on investments by offshore captives is an ultra vires attempt to regulate the business of insurance in a manner that unduly and unlawfully interferes with the operations of the plaintiff hospitals and their captive insurer in violation of 42 U.S.C. § 1395.  As the dissent found, the Manual's effort to regulate this area has nothing to do with cost reimbursement.

116.    The PRRB majority decision dated January 24, 2007 is invalid and should be set aside because the Manual's restrictions on investments by offshore captives, and the PRRB majority's application of those restrictions in this case, are not based upon substantial evidence and are arbitrary and capricious for several reasons:

A.     The record evidence shows that CMS lacks sufficient experience or competence to regulate investments by a captive insurer.  CMS and the PRRB majority

failed to consider relevant factors in the establishment of the Manual's restrictions on

investment by offshore captives and in the application of those restrictions in this case.

See Motor Veh. Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,

463 U.S. 29, 43 (1983) (agency action is arbitrary and capricious if "the agency has relied

on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter

to the evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise.").

B.      The record evidence shows that the Manual's investment limitations are

both overbroad and under-inclusive and lack a rational basis.  While the Manual prohibits

investment in stocks that do not pay dividends, CMS has performed no study and has no

evidence showing a correlation between dividend payments and financial strength.  Conversely,

while CMS' witness contends that the limitations are intended to promote prudent investment,

the Manual requires no diversification in investments, thus permitting a very high-risk

investment portfolio that is allocated entirely to one investment.

C.      The record evidence shows that the Manual arbitrarily and irrationally

provides for discriminatory treatment of premiums paid to onshore and offshore captives.  There

is no Medicare limitation on the allocation of investments by an onshore captive, and the great

majority of States that regulate captive insurers do not limit investments in equities (or other

types of investments) to any stated percentages.  Rather, the majority of these States take a case-

by-case regulatory approach that is comparable to the regulatory approach of the Cayman Islands

Monetary Authority.  CMS' own witness admitted that the premium costs at issue in this case

would be allowed if the captive were domiciled domestically (in Vermont or Colorado, for

example) and implemented the same investment allocations.  See Hooper v. National Transp.

Safety Bd., 841 F.2d 1150, 1151 (D.C. Cir. 1988) (administrative rules must be applied

uniformly); Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996) (it is arbitrary

and capricious for an agency to treat "similar situations differently" unless the agency offers

sufficient reasons for its discriminatory treatment); Garrett v. FCC, 513 F.2d 1056, 1060 (D.C.

Cir. 1975) (same).

> D.    The Manual's restrictions on investment of offshore captives' funds also
> are inconsistent with other Medicare reasonable cost reimbursement principles governing
> deferred compensation and pension plans, funded depreciation, and paid leave.
> Additionally, CMS and the PRRB majority have provided no rational explanation for this
> inconsistency.

117.    Even if the Manual's investment restrictions were not inconsistent with the

governing provisions of the statute and regulations and were not otherwise arbitrary and

capricious (which they are), the PRRB majority decision dated January 24, 2007 is invalid and

should be set aside because the application of those limitations to effect the disallowance of all

costs attributed to FIIL is entirely unreasonable and inconsistent with Medicare reasonable cost

reimbursement provisions.  At a minimum, the plaintiff hospitals should be reimbursed for actual

claims paid by FIIL and administrative expenses associated with the captive.  See Saint Mary of

Nazareth Hosp. Ctr. v. Schweiker, 718 F.2d 459, 467 (D.C. Cir. 1983) (noting that the statutory

proscription against cross-subsidization precludes the Medicare program from determining that a

hospital "may not be reimbursed at all for the costs of rendering care to Medicare patients").

118.    Plaintiffs further contend that the written decision issued on January 24, 2007 for this case is not the true decision that was rendered by a majority of the Board and the Board members who heard this case in November 2004 and who, in accord with CMS regulations, were required to reach a decision as soon as practicable after conclusion of its hearing.  Plaintiff hospitals further contend that the true, legally effective decision of the majority of the Board members, including Hoover, who heard this case in November 2004 was favorable to the plaintiff hospitals, and thus the decision issued on January 24, 2007 should be set aside.

A.    Plaintiffs contend that a full and complete administrative record for this case should reflect the results of all decision conferences and Board member votes in this case.

B.    If and to the extent that the administrative record submitted by the Secretary in his response to this Complaint does not fully and accurately reflect the results of all decision conferences and Board member votes in this case, including any and all conferences and votes in which former Board member Hoover participated, then plaintiff hospitals may move for an order compelling the Secretary to produce information to complete the administrative record for judicial review in this action.

## VII.  RELIEF REQUESTED

WHEREFORE, Plaintiffs request:

(1)    A declaration that the Secretary's disallowances of actuarially-determined premiums paid to CHI's offshore captive insurer are invalid;

(2)    An order reversing the PRRB majority decision dated January 24, 2007 and requiring the Secretary to promptly pay Plaintiffs all sums due as a result of the reversal of that decision, plus interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2);

(3)    An order requiring the Secretary to pay legal fees and costs of suit incurred by Plaintiffs; and

(4)    Such other relief as the Court may consider appropriate.

Respectfully Submitted,

Christopher L. Keough
DC Bar No. 436567
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

Dated:  March 20, 2007

DC 659498v3