## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CATHOLIC HEALTH INITIATIVES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No.: 07-0555 (PLF) |
| | ) | |
| MICHAEL O. LEAVITT, Secretary of | ) | |
| Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, plaintiffs' respectfully move for summary judgment in their favor on the grounds that there are no material facts in dispute and that plaintiffs are entitled to judgment as a matter of law.  In support of this motion, the Court is respectfully referred to the accompanying Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment, and Plaintiffs' Statement of Material Facts As To Which There Is No Genuine Dispute.  A proposed order setting the relief requested by this motion is also attached.

Respectfully Submitted,

   /s/ Christopher L. Keough
Christopher L. Keough
DC Bar No. 436567
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

702186_1.DOC

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CATHOLIC HEALTH INITIATIVES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No.: 07-0555 (PLF) |
| | ) | |
| MICHAEL O. LEAVITT, Secretary of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Christopher L. Keough
  DC Bar No. 436567
John M. Faust
  DC Bar No. 433553
J. Harold Richards (Admission Pending)
  DC Bar No. 469524
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

August 31, 2007

# TABLE OF CONTENTS

I.  STATUTORY AND REGULATORY BACKGROUND ...................................................... 4

    A.  Medicare Payment for Reasonable Costs ................................................... 4

    B.  Medicare Cost Reporting and Appeals ...................................................... 6

II.  SUMMARY OF FACTS ................................................................................................... 8

III.  STANDARD OF REVIEW ............................................................................................ 11

IV.  SUMMARY OF ARGUMENT ...................................................................................... 13

V.  ARGUMENT .................................................................................................................. 15

    A.  The Board's Application of the Secretary's Manual Guideline Violates the Plain Meaning and Manifest Intent of Controlling Provisions of the Medicare Statute and Regulations and Conflicts With Circuit Precedent ............................................. 15

        1.  The Hospitals' Premium Costs Were Necessary and Proper and Not Substantially Out of Line. ............................................................. 15

        2.  The Manual Cannot Be Applied To Disallow Costs That Are Allowed By the Statute and Regulations. ........................................................ 18

    B.  The Board's Application of the Manual's Investment Limitations is Not Supported By Substantial Evidence and is Arbitrary and Capricious ...................... 21

    C.  The Secretary Must At Least Reimburse the Hospitals for Medicare's Fair Share of the Claims Paid and Administrative Expenses of the Insurance Program ............ 32

VI.  CONCLUSION ............................................................................................................... 36

# TABLE OF AUTHORITIES

## Cases

Advocates for Highway and Auto Safety v. FMCSA,
    429 F.3d 1136 (D.C. Cir. 2005) ................................................................ 32

AT&T Corp. v. FCC, 86 F.3d 242 (D.C. Cir. 1996) ................................................... 12

Baystate Health System v. Thompson, 309 F.Supp. 2d 89 (D.D.C. 2004) ................................ 4, 6

BellSouth Telecomm., Inc. v. FCC, 469 F.3d 1052 (D.C. Cir. 2006) ........................................... 23

Bethesda Hospital Ass'n v. Bowen, 485 U.S. 399 (1988) ......................................................... 10

Biloxi Reg'l Med. Ctr. v. Bowen, 835 F.2d 345 (D.C. Cir. 1987) .................................... 12, 13, 30

*Burlington Northern and Santa Fe Ry. Co. v. Surface Trans. Bd.,
    403 F.3d 771 (D.C. Cir. 2005) ............................................................. 2, 12, 22, 36

Burlington Truck Lines, Inc. v United States, 371 U.S. 156 (1962) ....................................... 13, 30

Charter Peachford Hosp., Inc. v. Bowen, 803 F.2d 1541 (11th Cir. 1986) .................................... 19

Chemical Mfrs. Ass'n v. EPA, 217 F.3d 861 (D.C. Cir. 2000) ................................................ 24

D&F Alfonso Realty Trust v. Garvey, 216 F.3d 1191 (D.C. Cir. 2000) ................................ 30, 31

Duggan v. Bowen, 691 F.Supp. 1487 (D.D.C. 1988) ...................................................... 20

Eagle Healthcare, Inc. v. Shalala, 52 F.Supp. 2d 1 (D.D.C. 1999) .......................................... 24, 26

Garrett v. FCC, 513 F.2d 1056 (D.C. Cir. 1975) ......................................................... 22

GCI Health Care Ctrs., Inc. v. Thompson, 209 F.Supp. 2d 63 (D.D.C. 2002) ................................ 6

General Elec. Co. v. United States Envtl. Prot. Agency,
    53 F.3d 1324 (D.C. Cir. 1995) .................................................................. 34

GranCare, Inc. v. Shalala, 93 F.Supp.2d 24 (D.D.C. 2000) ........................................ 12, 15, 19, 33

Home Health Care, Inc. v. Heckler, 717 F.2d 587 (D.C. Cir. 1983) ............................................ 16

---

[*] Denotes authorities principally relied upon.

Home Health Svcs. of Greater Philadelphia, Inc. v. Harris,
    530 F.Supp. 1236 (E.D. Pa. 1982) ........................................................................ 16

Hooper v. Nat'l Transp. Safety Bd., 841 F.2d 1150 (D.C. Cir. 1988) ........................... 22

Lakeland Bus Lines, Inc. v. NLRB, 347 F.3d 955 (D.C. Cir. 2003) ............................... 24

*LGH, Ltd. v. Sullivan, 786 F.Supp. 1047 (D.D.C. 1992) ............................. 2, 5, 13, 18

Linoz v. Heckler, 800 F.2d 871 (9th Cir. 1986) ............................................................ 20

Maximum Home Health Care, Inc. v. Shalala, 272 F.3d 318 (6th Cir. 2001) ............... 20

*Memorial Hospital/Adair County v. Health Center, Inc. v. Bowen,
    829 F.2d 111 (D.C. Cir. 1987) ......................................................................passim

Morall v. DEA, 412 F.3d 165 (D.C. Cir. 2005) ....................................................... 12, 23

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm
    Mut. Auto. Ins. Co., 463 U.S. 29 (1983) ................................... 12, 23, 26, 32

Nat'l Fuel Gas Supply Corp v. FERC, 468 F.3d 831 (D.C. Cir. 2006) ........................... 23

Petroleum Communications Inc. v. FCC, 22 F.3d 1164 (D.C. Cir. 1994) ..................... 22

Pub. Citizen v. FMCSA, 374 F.3d 1209 (D.C. Cir. 2004) ............................................. 32

*Saint Mary of Nazareth Hosp. Ctr. v. Schweiker,
    718 F.2d 459 (D.C. Cir. 1983) ................................................................ 3, 14, 35

Thomas Jefferson Univ. v. Shalala, 512 U.S. 504 (1994) .............................................. 12

Transactive Corp. v. United States, 91 F.3d 232 (D.C. Cir. 1996) ............................... 22

United States v. Mead, 533 U.S. 218 (2001) .................................................................. 12

Vencor, Inc. v. Shalala, 988 F.Supp. 1467 (N.D. Ga. 1997) ......................................... 20

Vista Hill Found., Inc. v. Heckler, 767 F.2d 556 (9th Cir. 1985) ................................. 19

## Statutes

5 U.S.C. § 553 ................................................................................................................ 20
5 U.S.C. § 706 ................................................................................................................ 11
5 U.S.C. § 706(2)(C) ...................................................................................................... 21
29 U.S.C. § 1104(a)(1)(C) .............................................................................................. 30

42 U.S.C. § 1395 ....................................................................................................... 21
42 U.S.C. §§ 1395c-1395i-5 ...................................................................................... 4
42 U.S.C. § 1395d(a)(1) ............................................................................................ 4
42 U.S.C. § 1395f(*l*) ................................................................................................ 4
42 U.S.C. §§ 1395j-1395w-4 ..................................................................................... 4
42 U.S.C. § 1395k(a)(2)(B) ....................................................................................... 4
42 U.S.C. § 1395*l*(a)(2)(B) ...................................................................................... 4
42 U.S.C. § 1395m(g)(1) ........................................................................................... 4
42 U.S.C. § 1395oo(a) ............................................................................................... 7
42 U.S.C. § 1395oo(d) ............................................................................................... 7
42 U.S.C. § 1395oo(f) ............................................................................................... 11
42 U.S.C. § 1395oo(f)(1) ........................................................................................ 7, 8
42 U.S.C. § 1395oo(h) ............................................................................................... 7
42 U.S.C. § 1395x(v)(1)(A) .............................................................................. passim

## Regulations

42 C.F.R. § 405.1803 ................................................................................................ 6
42 C.F.R. § 405.1835 ................................................................................................ 7
42 C.F.R. § 405.1871(a) ....................................................................................... 7, 23
42 C.F.R. § 405.1877(a) ........................................................................................ 7, 8
42 C.F.R. § 405.1877(f) ............................................................................................ 8
42 C.F.R. § 413.9 ......................................................................................... 2, 15, 19
42 C.F.R. § 413.9(a) .................................................................................................. 5
42 C.F.R. § 413.9(b)(2) ..................................................................................... 5, 17, 18
42 C.F.R. § 413.9(c)(2) .............................................................................................. 5
42 C.F.R. § 413.17 ..................................................................................................... 7

## State Statutes

Ariz. Rev. Stat. Ann. § 20-1098.10.B ..................................................................... 27
Ark. Code Ann. § 23-63-1610(b)(1) ......................................................................... 27
Del. Code Ann. tit. 18, § 6910(b) .............................................................................. 27
Ga. Code Ann. § 33-41-18(2) .................................................................................... 27
Kan. Stat. Ann. § 40-4310 .......................................................................................... 27
Ky. Rev. Stat. Ann. § 304.49-100(2) ........................................................................ 27
Mont .Code Ann. § 33-28-202(2) .............................................................................. 28
N.Y. Insurance Law (McKinney's Insurance Law), § 7009(a) ................................. 28
Nev. Rev. Stat. Ann. § 694C.340(2) ......................................................................... 28
Okla. Stat. Ann. tit. 36 § 6470.15.B .......................................................................... 28
S.C. Code Ann. § 38-90-100(B) (Law Co-op 1976) ................................................. 28
S.D. Codified Law § 58-46-19 ................................................................................... 28
Ut. Code Ann. 1953, § 31A-37-302(2)(a) ................................................................. 28
W. Va. Code Ann., § 33-31-10(b) ............................................................................. 28

## **Other Authorities**

1965 U.S.C.C.A.N. 1943................................................................................. 5, 16, 17, 34

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CATHOLIC HEALTH INITIATIVES, et al.,      )
                                             )
           Plaintiffs,                     )
                                             )
               v.                         )      Civil No.: 07-0555 (PLF)
                                             )
MICHAEL O. LEAVITT, Secretary of         )
   Health and Human Services,             )
                                             )
           Defendant.                    )
_____ )

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

        This is an action for judicial review of a final decision of the Secretary of the Department of Health and Human Services ("Secretary") in a 3-2 ruling issued by the Secretary's Provider Reimbursement Review Board ("PRRB" or "Board") nearly 2.5 years after the hearing in this case. Administrative Record ("AR") 6-16. In that decision, a majority of the Board denied the 55 non-profit plaintiff hospitals any reimbursement at all for the liability insurance premium costs incurred, the liability claims paid, and all other administrative costs incurred in connection with their liability insurance program from 1997 through 2002. In short, the Board majority denied reimbursement for Medicare's fair share of any of these costs relating to the care of the hospitals' patients. That decision is wrong, and must be reversed, for three fundamental reasons.

        First, under the plain language of the Medicare Act, its implementing regulations, and precedent in this Circuit, the hospitals are entitled to reimbursement for Medicare's share of the hospitals' insurance costs because they were "necessary and proper" costs related to patient care and were not shown to be "substantially out of line" with the costs of comparable providers. See

42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.9; <u>Memorial Hosp./Adair County v. Health Ctr.,</u> <u>Inc. v. Bowen,</u> 829 F.2d 111 (D.C. Cir. 1987) (holding that the Secretary cannot apply a manual provision to disallow costs that the statute and regulations allow); <u>LGH, Ltd. v. Sullivan</u>, 786 F.Supp. 1047 (D.D.C. 1992) (malpractice insurance costs are necessary and proper costs related to patient care).  The Secretary did not carry his burden to prove otherwise; nor did he even attempt to counter the undisputed record evidence showing that the hospitals' prudent decisionmaking *saved* Medicare *millions of dollars* in the years at issue.

<u>Second</u>, the final decision below is based on the application of a guideline in the Secretary's Provider Reimbursement Manual ("PRM" or "Manual") that admittedly lacks the force and effect of law, and the majority's decision to apply that guideline here is not supported by the record evidence.  The Manual provision in question provides for disparate treatment of premiums paid to "captive" insurers (<u>i.e.</u>, insurers owned by the health care providers they insure) that are domiciled in and those that are domiciled outside of the United States.  For those domiciled outside of the United States, the Manual disallows all premiums if the captive invests more than 10% of its admitted assets in equity securities.  No limit applies to investment by captives that are domiciled domestically.  Absent a reasoned explanation supported by substantial evidence in the record, this disparate treatment is arbitrary and capricious and must be reversed.  <u>See</u> <u>Burlington Northern and Santa Fe Ry. Co. v. Surface Trans. Bd.</u>, 403 F.3d 771, 776-77 (D.C. Cir. 2005).

Testimony by the Secretary's own witness confirmed that the Manual's investment limitation rests on nothing more than the page it is written on – it is entirely unsupported by any insurance-related expertise or data, and it is not based on substantial record evidence in this case. The decision of the Board majority stands on the supposition that captives domiciled in the

United States are subject to comparable limitations imposed by the States, but the undisputed record evidence, including the testimony of the Secretary's own witness, confirms that States ordinarily do not limit domestic captives' investments in equity securities. She could not identify any substantive difference between the regulation of the hospitals' captive and the regulation of a captive domiciled in a State like Vermont, which is the "onshore" domicile for the largest number of captives in the health industry and which imposes no limitation on their investment in equity securities. She further admitted that Medicare would reimburse the hospitals for the premium costs at issue if their captive were domiciled in a State like Vermont, regardless of the percentage of the captive's assets that were invested in equities. Ultimately, in response to skeptical examination by the Board members who were present at the hearing in 2004 (which was apparently overlooked by the differently composed Board majority that ruled over two years later), the Secretary's witness admitted that "it's probably time for Medicare to revisit the manual procedures." AR 275-76. The time is now.

Third, and finally, the denial of reimbursement for the liability claims paid and related administrative expenses incurred in connection with the hospitals' insurance program - if not the premium expenses incurred - is contrary to the Medicare statute's prohibition on cross-subsidization. Circuit precedent establishes that the statutory prohibition on cross-subsidization precludes the Secretary from determining precisely what the Board majority decided in this case, that the plaintiff hospitals "may not be reimbursed at all for the costs of rendering care to Medicare patients." Saint Mary of Nazareth Hosp. Ctr. v. Schweiker, 718 F.2d 459, 467 (D.C. Cir. 1983).

## I.    STATUTORY AND REGULATORY BACKGROUND

The Federal Medicare program provides health insurance to the aged, blind and disabled under title XVIII of the Social Security Act (the "Act"). Part A of the Medicare Act, 42 U.S.C. §§ 1395c-1395i-5, covers hospital services furnished to inpatients, while Part B, 42 U.S.C. §§ 1395j-1395w-4, covers hospital outpatient services. See 42 U.S.C. §§ 1395d(a)(1) (inpatient); 1395k(a)(2)(B) (outpatient). The Secretary administers the Medicare program. The Centers for Medicare and Medicaid Services ("CMS"), a component of the Department of Health and Human Services, is responsible for operations of the program.

### A.    Medicare Payment for Reasonable Costs

Medicare reimburses most hospitals through a prospective payment system for the operating costs of inpatient hospital services. See Baystate Health System v. Thompson, 309 F.Supp.2d 89, 92 (D.D.C. 2004). That system is not at issue in this case.

During the period at issue, Medicare paid for critical access hospital services and general hospital outpatient services on a reasonable cost reimbursement basis. See 42 U.S.C. §§ 1395f(*l*), 1395m(g)(1), 1395*l*(a)(2)(B). The dispute in this case involves the Secretary's application of the Medicare reasonable cost reimbursement rules to determine reimbursement for the critical access hospital services and hospital outpatient services furnished by the plaintiff hospitals.

The Medicare statute defines "reasonable cost" as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). The intent of the reasonable cost statute, which has been in place since the beginning of the Medicare program in 1965, is "to meet the *actual costs*, however widely they may vary from one institution to another, except where a particular

institution's costs are found to be *substantially out of line* with those of institutions similar in size, scope of services, utilization, and other relevant factors." S. Rep. No. 404, 89th Cong., 1st Sess. (1965), reprinted in 1965 U.S.C.C.A.N. 1943, 1976 (emphasis added). See also PRM § 2102.1 ("It is the intent of the program that providers are reimbursed the actual costs of providing high quality care, regardless of how widely they may vary from provider to provider, except where a particular institution's costs are found to be substantially out of line with other institutions in the same area which are similar in size, scope of services, utilization and other relevant factors.")[1]

Consistent with the statute's intent to reimburse providers for their actual costs incurred, the implementing regulation provides that "reasonable cost" includes "all necessary and proper costs incurred in furnishing the services," 42 C.F.R. § 413.9(a), and it broadly defines the term "necessary and proper costs" to mean "costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities." 42 C.F.R. § 413.9(b)(2). The Secretary's Manual categorically recognizes liability insurance as a necessary and proper cost related to patient care. PRM § 2160.A (Pl. Exh. 1); accord LGH, Ltd. v. Sullivan, 786 F.Supp. 1047, 1053 (D.D.C. 1992) (holding assessments voluntarily paid by hospitals for incurred but not reported malpractice losses are necessary and proper costs related to patient care).

The reasonable cost reimbursement regulation further provides for payment of "actual costs" incurred "however widely they may vary from one institution to another," subject only to a limitation on costs that are shown to be "substantially out of line with other institutions." 42 C.F.R. § 413.9(c)(2) (emphasis added). It is the *Secretary's* burden to show that costs are

---

[1]    The pertinent provisions of the Manual that are cited in this brief are reproduced in Plaintiffs' Exhibit 1 ("Pl. Exh. 1").

substantially out of line.  See, e.g., Mem'l Hosp./Adair County Health Ctr., Inc. v. Bowen, 829 F.2d 111 (D.C. Cir. 1987) ("Memorial Hospital").

This case involves the application of a Manual guideline that does not directly address the reasonableness of insurance premium costs related to patient care, but instead denies reimbursement for premiums paid to a captive insurer that is domiciled outside of the United States and that invests more than 10% of its assets in equity securities.  PRM § 2162.2.A.4 (Pl. Exh. 1).  The Manual further provides that an offshore captive's investments in equity securities must be in "dividend paying equity securities listed on a United States stock exchange."  Id. Neither of these investment limitations applies to a captive insurer that is domiciled in any State. Id.

By its own terms, the Secretary's Manual does not have the force and effect of law.  The Foreword to the Manual explains that it "provides guidelines and policies to implement Medicare regulations which set forth principles for determining the reasonable cost of provider services." (Pl. Exh. 1).  The Foreword also acknowledges that the Manual guidelines do not "have the effect of regulations."  This Court has specifically noted that the Manual "contain[s] informal interpretive rules that do not carry the force of law."  GCI Health Care Ctrs., Inc. v. Thompson, 209 F.Supp. 2d 63, 70-71 (D.D.C. 2002).

### B.    Medicare Cost Reporting and Appeals

Medicare payments to hospitals are determined by fiscal intermediaries, private firms (usually insurance companies) that contract with the Secretary.  After the close of each fiscal year, a hospital submits a cost report to the fiscal intermediary to identify its costs and the portion of those costs to be allocated to Medicare.  See Baystate, 309 F.Supp.2d at 92.  The intermediary analyzes the cost report and issues a Notice of Program Reimbursement, or "NPR,"

that informs the hospital of the intermediary's final determination of the hospital's Medicare reimbursement for the cost reporting period. Id.; see also 42 C.F.R. § 405.1803.

When a hospital purchases items or services from or through a related parent company or "home office," the hospital is entitled to reimbursement only for the cost to the home office of the items and services furnished to the hospital. 42 C.F.R. § 413.17; PRM § 2150. Home offices, therefore, also submit cost reports to the Medicare program. PRM §§ 2150, 2150.3. Each hospital's allocable share of the allowable home office costs is then included in each hospital's individual cost report. As noted below, the costs at issue in this case were self-disallowed and reported under protest in the home office and hospital cost reports that were submitted for the periods at issue.

A hospital is entitled to a hearing before the Provider Reimbursement Review Board if the hospital is dissatisfied with an intermediary's determination in an NPR as to the amount of Medicare payment due the hospital for a cost reporting period. 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835. The PRRB is an administrative tribunal comprised of five members appointed by the Secretary. 42 U.S.C. § 1395oo(h).

The PRRB is required to issue a written decision based upon the record made at a hearing, and that decision must be supported by substantial evidence in the record. 42 U.S.C. § 1395oo(d); 42 C.F.R. § 405.1871(a). The Board's written decision must be rendered "as soon as practicable after the conclusion of its hearing." 42 C.F.R. § 405.1871(a). A decision of the PRRB reversing, affirming, or modifying an intermediary's determination is final unless the Secretary reverses, affirms, or modifies the Board's decision within 60 days after the provider is notified of the PRRB's decision. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877(a). A hospital that is dissatisfied with the final decision of the PRRB or the CMS Administrator may appeal to

this Court within 60 days after the provider receives notice of the decision.    42 U.S.C.

§ 1395oo(f)(1); 42 C.F.R. §§ 405.1877(a) and (f).

## II.    SUMMARY OF FACTS

The 55 plaintiff hospitals in this action participate in the Medicare program as providers

of services.  Plaintiffs' Statement of Material Facts as to Which There Is No Genuine Dispute

("Pl. Stmt.") ¶¶ 11-12.   These non-profit hospitals operate under the common ownership or

control of Catholic Health Initiatives ("CHI"), a nonprofit charitable purpose corporation.  Pl.

Stmt. ¶¶ 13-14.  CHI also wholly owns and controls a subsidiary "captive" insurer, called First

Initiatives Insurance, Ltd. ("FIIL").  Pl. Stmt. ¶ 15.  FIIL serves as a funding mechanism for

payment of liability claims against the plaintiff hospitals.  Pl. Stmt. ¶¶ 34-36.

CHI created FIIL soon after a 1996 merger of three predecessor health care systems that

consolidated to form CHI.  Pl. Stmt. ¶¶ 22-24, 28.  Prior to the consolidation, the three systems

had obtained primary medical professional and general liability insurance coverage through three

separate programs involving two captive insurers and a trust.  Pl. Stmt. ¶ 23.  After the 1996

merger, CHI consolidated the three liability insurance programs into a single program funded

through FIIL.  Pl.  Stmt. ¶ 24, 34-35.

In connection with its consolidation of the liability insurance programs, CHI solicited and

acted upon the recommendations of independent consultants and an advisory board regarding

several alternative means of obtaining necessary liability coverage for the plaintiff hospitals.  Pl.

Stmt. ¶¶ 25-33.  After careful consideration of other alternatives, CHI decided to consolidate the

programs into a "captive" insurer (*i.e.*, an insurer that is owned by the entities that it insures) that

is funded through premiums paid by the hospitals.  Pl. Stmt. ¶¶ 25-28.  CHI also decided, after

careful consideration of the alternatives, to establish the captive's domicile in the Cayman Islands.  Pl. Stmt. ¶¶ 27-33.

Based on the advice of its independent consultants, CHI determined that this approach would potentially save the hospitals anywhere from $108,980 to $293,475 in administrative expenses in the first year alone.  Pl. Stmt. ¶ 31.  That initial finding was confirmed by subsequent analysis.  A later analysis performed for CHI by an independent consultant, Aon, determined that for fiscal year 2000 alone, CHI would have paid $15 million (or 17 percent) more to purchase comparable coverage from a commercial insurer.  Pl. Stmt. ¶¶ 55-59.

During the period at issue, the plaintiff hospitals paid premiums to fund property and casualty insurance coverage through FIIL.  Pl. Stmt. ¶¶ 16, 34-45.  The hospitals' annual premiums were determined by actuarial projections of liability loss costs and administrative expenses.  Pl. Stmt. ¶¶ 46-49.  FIIL in turn reimbursed CHI for the claims it administered and paid on behalf of the hospitals.  Pl. Stmt. ¶¶ 35, 64-65.  Those amounts are substantial.  FIIL's audited financial statements for three of the fiscal years at issue, for example, show paid claims in amounts ranging from $31.5 million for fiscal year 1998 to $57.6 million for fiscal year 1999. Pl. Stmt. ¶ 65.  The premium assessments paid by the plaintiff hospitals to cover their current and future claims also are substantial.  Pl. Stmt. ¶¶ 60-62.  As of June 30, 2000, FIIL held $356.7 million to cover claims against the CHI hospitals.  Pl. Stmt. ¶ 49.

In view of the considerable funds that the hospitals have paid to FIIL to cover claims against them, FIIL operates under strict corporate governance and oversight by its Board, by CHI, and by several independent consultants and advisors.  Pl. Stmt. ¶¶ 38-45, 50-59.  FIIL also is subject to regulatory oversight by the Cayman Islands Monetary Authority, which annually

approves FIIL's business plan and investment policies in accordance with established guidelines. Pl. Stmt. ¶ 40.

Since FIIL was created in 1997, investment allocation studies have been conducted periodically to evaluate the appropriate allocation of investment of FIIL assets that will satisfy liquidity needs while maximizing investment return (which reduces premium cost) with an acceptable level of risk. Pl. Stmt. ¶¶ 50-59. FIIL initially adopted a 40% allocation of assets in diversified equity securities, based on the findings by outside investment consultants that conducted the first study in 1997, when FIIL was established. Pl. Stmt. ¶¶ 51-52. The consultants found that FIIL could expect to realize a net benefit of $25 million between 1997 and 2002 by adopting a 40% equity allocation versus the 10% allocation that is allowed in the Secretary's Manual. Pl. Stmt. ¶ 53.

A second study was conducted in February 2000. Pl. Stmt. ¶ 54. That study recommended an increase in FIIL's equity allocation from 40% to 50% of total assets, which FIIL adopted. Pl. Stmt. ¶ 54. A third asset allocation study, conducted in August 2003, indicated that at expected levels of return, adherence to the investment limitation in the Secretary's Manual would reduce investment income to FIIL, and therefore increase premium cost to the CHI hospitals, by approximately $38 million over five years. Pl. Stmt. ¶¶ 55-57.

Because FIIL's investment of assets did not comply with the limitations set forth in PRM § 2162.2.A.4, CHI and the plaintiff hospitals disclosed this issue and self-disallowed the premium expense under protest on the cost reports they submitted to the Medicare program for the periods at issue. Complaint & Answer ¶ 44. By invoking this process, CHI and the plaintiff hospitals preserved their right to challenge the application of the program guideline in appeals to the PRRB. See Bethesda Hosp. Ass'n v. Bowen, 485 U.S. 399, 400-01 (1988).

This is an action for review of the final agency decision in the ensuing appeals for cost reporting periods ending 1997 through 2002. The final agency decision was a split decision by a 3-2 vote of the five members of the Secretary's Board. The majority of the Board denied any reimbursement for the Medicare program's share of the hospitals' actuarially-determined premium expenses in fiscal years 1997 through 2002. Pl. Stmt. ¶¶ 1-7; AR 6-16.

Significantly, the Board majority did not find that premium costs actually incurred by the hospitals were unreasonable in amount or were otherwise unrelated to the care of their patients. See AR 12. Applying a Medicare program Manual that by its terms lacks the force and effect of law, Pl. Stmt. ¶ 9, the Board majority instead ruled that premium costs incurred by the hospitals were not "proper" because the captive insurer's investment in equity securities exceeded the Manual's limitation on investment by a captive insurer that is domiciled offshore. AR 11-12. The Board majority also concluded, AR 12-13, that hospitals may not be reimbursed for any of the tens of millions of dollars in liability claims paid on their behalf during the period at issue. Pl. Stmt. ¶ 65.

## III.    STANDARD OF REVIEW

Jurisdiction over this action lies under 42 U.S.C. § 1395oo(f), which provides that the case "shall be tried pursuant to the applicable provisions under" the Administrative Procedure Act ("APA"). The applicable provisions of the APA require the Court to set aside the Board's decision if it is contrary to law, arbitrary, capricious, unsupported by substantial evidence, in excess of the Secretary's statutory authority or otherwise not in accordance with law. 5 U.S.C. § 706.

Although an agency's interpretation of the statute and regulations it administers is generally entitled to deference, the plain language of a statute or regulation is controlling. An

agency interpretation in a program manual, or in the decision in this case, is contrary to law and must be reversed if it conflicts with the plain language of the statute or regulation. See, e.g., United States v. Mead, 533 U.S. 218, 227-31 (2001); Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994); Memorial Hospital, 829 F.2d at 117; GranCare, Inc. v. Shalala, 93 F.Supp.2d 24, 29 (D.D.C. 2000).

The scope of review under the arbitrary and capricious standard entails a careful, searching inquiry as to whether:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("State Farm"). Furthermore, agency action that treats similar situations differently is arbitrary and capricious unless the agency supports the disparate treatment "with a reasoned explanation and substantial evidence in the record." Burlington Northern & Santa Fe Ry. Co. v. Surface Trans. Bd., 403 F.3d 771, 776-77 (D.C. Cir. 2005).

Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" taking into account "whatever in the record fairly detracts from its weight." AT&T Corp. v. FCC, 86 F.3d 242, 247 (D.C. Cir. 1996). Thus, the reviewing court must subject the agency's decision to searching, careful, and close judicial scrutiny. See Biloxi Reg'l Med. Ctr. v. Bowen, 835 F.2d 345, 350-53 (D.C. Cir. 1987). An agency's decision is not based upon substantial evidence when it fails to consider contradictory record evidence. Morall v. DEA, 412 F.3d 165, 167 (D.C. Cir. 2005).

Finally, a reviewing court may uphold agency action only on the basis articulated by the agency in its decision, not on post-hoc rationalizations offered by the agency or its counsel in litigation. See, e.g., Burlington Truck Lines, Inc. v United States, 371 U.S. 156, 168-69 (1962); Biloxi Reg'l Med. Ctr., 835 F.2d at 348 n.12, 351 n.18.

## IV.    SUMMARY OF ARGUMENT

The Board's decision in this case ignores the clear mandate of the Medicare statute and regulations to reimburse the hospitals for their actual costs incurred to obtain liability insurance coverage for their care of patients.    The decision of the Board majority is incorrect and, therefore, must be reversed.

First, as numerous cases in this Circuit uniformly hold, the Secretary's Manual must give way before the Medicare statute and its regulations.    The Board's application of the Manual's investment restrictions in this case violates the plain language and manifest intent of the statute, regulations, and the D.C. Circuit's decision in Memorial Hospital, 829 F.2d 111 (D.C. Cir. 1987) (holding that that the Secretary cannot apply a Manual provision to disallow costs that are allowed by the plain language of the statute and regulations).    Those authorities all require that all costs actually incurred by a Medicare provider must be allowed so long as they are "necessary and proper" and not proven by the Secretary to be "substantially out of line" with the costs of comparable providers.    Insurance costs in particular have been found to be reimbursable as costs necessarily and properly incurred by Medicare hospitals.    See LGH, Ltd. v. Sullivan, 786 F.Supp. 1047 (D.D.C. 1992).    The Board simply has no authority to disregard the clear law in favor of the different standard articulated only in the Secretary's Manual.

Second, the Board has offered no rational explanation supported by substantial evidence in the record for its disparate treatment of premiums paid to captives domiciled domestically and

- 13 -

premiums paid to captives domiciled outside of the United States. The Board majority's primary justification for its decision—that "offshore" captives are subject to a different level of regulation than "onshore" captives—is contradicted by the undisputed record evidence showing that the great majority of State regulations do not limit a captive's investment in equity securities to a fixed percentage of assets. The record evidence also shows that the Secretary failed to consider the relevant factors bearing upon what restrictions, if any, should be placed upon the investments of an insurer. It is evident that over the course of the 811 days that elapsed and the changes in Board membership that occurred between the hearing and the Board's decision in this case, the Board majority lost focus on the undisputed evidence in this case.

Finally, even if the Secretary's disallowance of the hospitals' insurance premium costs were consistent with the statute and regulations and otherwise reasonable (which it is not), the plaintiff hospitals should, at a minimum, be reimbursed for the tens of millions of dollars in actual liability claims paid during the years at issue. Contrary to the Board's conclusion that Medicare is "not necessarily obligated" to reimburse its fair share of the hospitals' malpractice and liability losses, the express intent of the statute is to reimburse hospitals for their *actual* costs related to patient care, and the statute precludes any finding that a hospital "may not be reimbursed at all for the costs of rendering care to Medicare patients." Saint Mary of Nazareth Hosp., 718 F.2d at 467. The cost incurred for paid claims, moreover, has nothing to do with how the captive insurer invested its assets, which is the only matter that the Manual provision at issue purports to regulate.

V.    **ARGUMENT**

    A.    **The Board's Application of the Secretary's Manual Guideline Violates the Plain Meaning and Manifest Intent of Controlling Provisions of the Medicare Statute and Regulations and Conflicts With Circuit Precedent.**

The PRRB's application of the Manual's investment restrictions to deny reimbursement for the hospitals' insurance premiums is inconsistent with the plain meaning and manifest intent of the controlling reasonable cost reimbursement provisions in the Medicare statute, 42 U.S.C. § 1395x(v)(1)(A), and the implementing regulation at 42 C.F.R. § 413.9. The Secretary cannot apply the Manual's guidelines, which admittedly lack the force or effect of law, to effect the disallowance of costs that are allowed by the plain language of the governing statute and regulations. See, e.g., Memorial Hospital, 829 F.2d at 118-19; GranCare, Inc., 93 F.Supp.2d at 29. Accordingly, the PRRB's decision is contrary to law and must be reversed.

The Board majority characterized the Manual's investment limitations as a "valid extension" of the statute and regulation. AR 11. As shown below, however, the dissenting members of the Board were correct to conclude that the Manual's limitations on investment by an offshore captive "are not an appropriate application" of the controlling statute and regulations governing reasonable cost. AR 15. As the dissent makes clear, the application of the Manual's investment allocation limits works to deprive the hospitals "of an entire category of expense that is undisputably considered reasonable and proper." Id.

    1.    The Hospitals' Premium Costs Were Necessary and Proper and Not Substantially Out of Line.

There is no genuine issue that the premium costs incurred by the hospitals were reasonable in amount and related to the care of their patients. See AR 12. The statute defines reasonable cost as "the cost actually incurred" in the efficient delivery of necessary health services. 42 U.S.C. § 1395x(v)(1)(A). The intent of this statute is to provide for the payment of

actual costs incurred, however widely they may vary, and subject only to a limitation on costs

that are shown to be substantially out of line with the costs incurred by comparable providers for

similar services.    See S. Rep. No. 404, 89th Cong., 1st Sess. (1965), reprinted in 1965

U.S.C.C.A.N. 1943, 1976; see also Memorial Hospital, 829 F.2d at 118; Home Health Care, Inc.

v. Heckler, 717 F.2d 587, 591 (D.C. Cir. 1983).[2]

As noted in the dissenting opinion below, "there is no evidence that the [plaintiff

hospitals'] premiums costs were substantially out of line with those of other providers."   AR 16.

In fact, the undisputed record evidence shows that CHI and the plaintiff hospitals saved millions

in insurance costs for the periods at issue. Pl. Stmt. ¶¶ 50-59.   A study by an independent outside

consultant indicates, for example, that CHI saved nearly $15 million for fiscal year 2000 as

compared to the costs it would have incurred to purchase comparable coverage from a

commercial insurer.   Pl. Stmt. ¶ 59.   The undisputed record evidence also shows that adherence

to the Manual's investment allocation limitations would have been expected, during the period at

issue, to reduce investment returns, and thus increase premium expense, by approximately $38

million over a 5-year period. Pl. Stmt. ¶ 57.

All told, the clear evidence shows that at every step, beginning with the inception of the

captive insurance program (when CHI hired one of the top insurance services firms in the nation

to perform a feasibility study) the plaintiff hospitals and CHI were diligent to ensure that their

captive insurance program operated in a careful, prudent and cost-effective manner.   Pl. Stmt.

¶¶ 22-59.   In short, the record evidence makes clear that the plaintiff hospitals fully complied

with the Medicare program requirements for reasonable cost reimbursement, including the

---

[2]    See also Home Health Svcs. of Greater Philadelphia, Inc. v. Harris, 530 F.Supp. 1236 (E.D. Pa. 1982); Vermilion Home Health Agency, Inc. v. Sec'y of HHS, [1990 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 38,377 at 22,125 (W.D. La. 1989).

program's "[i]mplicit expectation that the provider seeks to minimize its costs."  PRM § 2102.1 (Pl. Exh. 1).

Tellingly, the majority's decision takes no issue with the fact that "the costs incurred for the insurance coverage purchased from the offshore captives [sic] are related to patient care and are not substantially out of line with premiums paid by similar institutions . . . ."  AR 12.  The majority instead took a different tack in this case, attempting to moor its application of the Manual to a different term of the regulation.  Specifically, the majority's decision suggests that the Manual's limitation on investment by an offshore captive insurer is a "valid extension" of the regulation's provision for reimbursement of costs that are "necessary and proper."  AR 11 (emphasis in original).

Oddly, the majority's decision does not grapple with the regulation's definition of "necessary and proper costs," 42 C.F.R. § 413.9(b)(2), nor does it explain how the Manual's limitation on an offshore captive's investment fits within that definition.  See AR 11-12.  Indeed, the majority's underscoring of the word "proper" constitutes the full extent of its analysis of the regulation's text on this central point of the majority's decision in this case.

Unlike the majority's decision, however, the controlling regulation itself sets out a clear definition of "necessary and proper costs."  42 C.F.R. § 413.9(b)(2).  Consistent with the statutory intent to provide for the reimbursement of actual costs incurred, however widely they may vary from one provider to another, 42 U.S.C. § 1395x(v)(1)(A); S. Rep. No. 404, 89th Cong., 1st Sess. (1965), reprinted in 1965 U.S.C.C.A.N. 1943, 1976, the regulation broadly defines "necessary and proper costs."  Specifically, the regulation defines this term to mean "costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities."  42 C.F.R. § 413.9(b)(2).  The regulation further elaborates that

these costs "usually are common and accepted occurrences in the field of the provider's activity." Id. In other words, even expenses that are not common and accepted may be necessary and proper if they are "appropriate and helpful in developing and maintaining the operation of patient care facilities and activities."

There is no evidence that the costs at issue here are neither "appropriate and helpful" nor "common and accepted." The Manual itself recognizes that insurance premium costs are necessary and proper costs related to patient care. See, e.g., PRM § 2160.A (Pl. Exh. 1). Moreover, the Secretary's own witness admitted that property and casualty insurance premiums are "common and accepted," AR 274, and it is clear that these costs are "appropriate and helpful" in the operation of a hospital. AR 244.

> 2.   The Manual Cannot Be Applied To Disallow Costs That Are Allowed By the Statute and Regulations.

This Court has previously ruled that malpractice insurance premium expenses are "necessary and proper" costs of a Medicare-participating hospital. LGH, Ltd. v. Sullivan, 786 F.Supp. 1047 (D.D.C. 1992). In LGH, as in this case, the Secretary applied the program instructions in the agency's Manual to disallow reimbursement for assessments that hospitals paid into a fund to cover actuarial projections for malpractice incidents that had taken place but not yet been reported (so-called "incurred but not reported" claims). The Secretary argued to the Court, as the Board majority asserts in this case, that the malpractice insurance premium costs at issue were not "necessary and proper." This Court reversed, concluding that these expenses are necessary costs related to patient care. Id. at 1052-53.

Similarly, the Ninth and Eleventh Circuits reversed the Secretary's application of another section of the same chapter of the Manual (PRM § 2104.5) to disallow actual costs incurred by psychiatric hospitals to provide adolescent education programs because the Secretary's

application of the Manual was inconsistent with the plain meaning of the controlling regulations. Vista Hill Found., Inc. v. Heckler, 767 F.2d 556, 560-62 (9th Cir. 1985); Charter Peachford Hosp., Inc. v. Bowen, 803 F.2d 1541, 1546-47 (11th Cir. 1986). The Ninth Circuit specifically ruled that the Secretary's disallowance was contrary to the definition of "necessary and proper" costs in 42 C.F.R. § 413.9, noting that under the regulation's broad definition of that term, even costs "that merely encourage prospective patients to seek treatment have been considered sufficiently related to patient care to be reimbursable." Vista Hill, 767 F.2d at 560-62 & n.3.

The decision at issue in this case applies another page out of the same chapter of the Manual (chapter 21 of the PRM) to effect another disallowance of costs that the statute and regulation allow. Here again, the Secretary's application of the Manual's program instructions is inconsistent with the plain language of the statute and regulations and must be reversed.

The law in this Circuit is clear on that point. In Memorial Hospital and GranCare, the Secretary disallowed reimbursement for Medicare providers' pharmacy and therapy costs, respectively, that were not shown to be substantially out of line. In each of those cases, the Secretary invoked other sections of the same Chapter 21 of the Manual to effect the disallowance of the providers' actual costs on the ground that the providers had not shown that they met all the "prudent buyer" requirements set forth in section 2103 of the Manual. In each case, the Secretary's disallowances were reversed because the agency's application of the program guidelines in the Manual violated the plain language of the statute and regulations governing reasonable cost reimbursement. Memorial Hospital, 829 F.2d at 118-19; GranCare, 93 F.Supp.2d at 33 (overturning the Secretary's interpretation of the agency's prudent buyer guidelines in section 2103 of the Manual to permit the disallowance of costs that are not substantially out of line).

Other courts have reached the same conclusion.[3]  In reversing yet another application of the Manual guidelines requiring competitive bids as the basis for disallowing management costs that were not shown to be substantially out of line, the Sixth Circuit wrote:

> A fundamental requirement of the Administrative Procedures Act is that interested persons be given notice of proposed 'substantive' or 'legislative' regulations, and an opportunity to comment. . . . If the Secretary wants to add a competitive bidding requirement consistent with the Administrator's interpretation, she should do so, absent emergency or other justification, in accordance with the notice and comment rulemaking procedures mandated by 5 U.S.C. § 553.  Until such an amendment is made, application of the manual provisions to require competitive bidding and as a result disallow costs that are not substantially out-of-line with comparable institutions cannot be sustained.

Maximum Home Health Care, Inc. v. Shalala, 272 F.3d 318, 322 (6th Cir. 2001) (internal citations omitted).  By the same token, the application of the Manual's investment limitations to disallow the hospitals' premium costs in this case is invalid, and must be reversed, because the Secretary has not shown that the hospitals' costs were substantially out of line.

The Manual provision that the Board majority applied in this case has nothing to do with the reasonableness, necessity or propriety of the premium expenses incurred by the plaintiff hospitals.  The Manual provision limits an offshore captive insurer's investment of assets in equity securities.  That limitation does not deal with the reasonableness, necessity or propriety of premiums paid to the captive.  By the agency's own admission, the limitation represents the

---

[3]  See, e.g., Vencor, Inc. v. Shalala, 988 F.Supp. 1467, 1472 (N.D. Ga. 1997) (holding that a proximity requirement established in a CMS memorandum is invalid under the APA because it is inconsistent with the governing provisions of the statute and regulations and departed from prior long-standing policy); Linoz v. Heckler, 800 F.2d 871, 877-78 (9th Cir. 1986) (holding that a Medicare manual provision is invalid because it is inconsistent with the governing regulation and was not adopted in accordance with the APA); Duggan v. Bowen, 691 F.Supp. 1487, 1514 & n. 44 (D.D.C. 1988) (noting that a policy adopted in a letter from a CMS official to its fiscal intermediaries is invalid under the APA because it has the effect of creating new law).

agency's attempt to ensure that offshore captives "prudently manage their investments."  AR 252; see also AR 250, 260.

There is a clear logical disconnect, therefore, between the Manual's investment allocation limitation and the Board majority's application of that limitation to effect a complete disallowance of reimbursement for the premium expenses paid by the hospitals.  Because the Manual's investment allocation limitation has nothing to do with the reasonableness of the premium costs at issue, the PRRB's application of that limitation in this case should be set aside on the ground that it exceeds the Secretary's statutory authority to establish regulations identifying the reasonable costs of services furnished to Medicare patients.  See 5 U.S.C. § 706(2)(C) (directing a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority or limitations"); 42 U.S.C. § 1395x(v)(1)(A) (authorizing the Secretary to establish regulations establishing the methods used and items included in determining a hospital's reasonable costs).  The reasonable cost reimbursement provisions of the statute are not intended to grant the Secretary carte blanche authority to exercise regulatory control over the administration or operation of the hospitals or their captive insurer.  See 42 U.S.C. § 1395 (nothing in the Medicare statute "shall be construed to authorize any Federal officer or employee . . . to exercise any supervision or control over the administration or operation of any such institution" that provides services under the Medicare program).  The application of the Manual's provision in this case, therefore, should be reversed.

**B.    The Board's Application of the Manual's Investment Limitations is Not Supported By Substantial Evidence and is Arbitrary and Capricious.**

The Secretary's authority to establish regulations determining the reasonable cost of services furnished by a provider is limited, and for good reason.  The undisputed record evidence in this case shows that the agency's clumsy foray into the regulation of investment by an insurer

is particularly misguided. The record is clear on the agency's lack of experience or competence in this area. <u>See</u> Pl. Stmt. ¶¶ 68-103. Even if the Secretary could regulate the investment of a captive insurer by virtue of his statutory authority to establish regulations determining the reasonable cost of services furnished by a provider, the record in this case underscores several good reasons, which the dissent noted and which are discussed further below, why the Secretary should be compelled to follow the APA's notice and comment rulemaking procedures. AR 14-16. As the Secretary's witness admitted in response to difficult questions from the Board, "it's probably time for Medicare to revisit the manual procedures." Pl. Stmt. ¶ 97.

As discussed above, the Manual provision at issue in this case (PRM § 2162.2.A.4) limits investment in equity securities by a captive insurer that is domiciled offshore but imposes no limit on investment by a captive insurer that is domiciled in any State. Absent a rational explanation for this inconsistency, the Secretary's dissimilar treatment of similar situations is arbitrary and capricious and must be reversed.

It is well established that administrative rules must be applied uniformly. <u>Hooper v. Nat'l Transp. Safety Bd.</u>, 841 F.2d 1150, 1151 (D.C. Cir. 1988). When an agency treats similar situations differently, it must "support this disparate treatment with a reasoned explanation and substantial evidence in the record." <u>See Burlington Northern and Santa Fe Ry. Co. v. Surface Trans. Bd.</u>, 403 F.3d 771, 776-77 (D.C. Cir. 2005); <u>see also Transactive Corp. v. United States</u>, 91 F.3d 232, 237 (D.C. Cir. 1996); <u>Petroleum Communications Inc. v. FCC</u>, 22 F.3d 1164, 1172 (D.C. Cir. 1994); <u>Garrett v. FCC</u>, 513 F.2d 1056, 1060 (D.C. Cir. 1975).

In this case, the majority of the PRRB offered alleged justifications for the Manual's dissimilar treatment of investments by offshore captives, but those alleged justifications fly in the face of undisputed record evidence that is entirely ignored in the majority's decision. Perhaps

due to the extraordinary amount of time that passed and changes in the composition of the Board that occurred between the conduct of the hearing before the Board in November 2004 and the issuance of its decision in 2007 (Pl. Stmt. ¶¶ 1, 68-69, 104), there is a clear disconnect between the conclusions reached by the narrow Board majority in this case and the undisputed record evidence.[4]

The undisputed record evidence shows, and the dissenting Board decision found, however, that less than half of the States impose any sort of regulation on captives, and the great majority - 17 out of 23 – of the States that regulate captives do not restrict a captive's investment in equities to any fixed, stated percentage. Pl. Stmt. ¶ 91. Cf. Eagle Healthcare, Inc. v. Shalala, 52 F.Supp.2d 1, 9-10 (D.D.C. 1999) (holding that the Secretary's disallowance of costs based on a comparison of dissimilar services is arbitrary and capricious and not based upon substantial evidence because it failed to consider relevant factors).

Accordingly, the decision of the Board majority must be reversed because it "offered an explanation for its decision that runs counter to the evidence." State Farm, 463 U.S. at 43; see also Nat'l Fuel Gas Supply Corp. v. FERC, 468 F.3d 831, 839 (D.C. Cir. 2006) (invalidating agency action where agency's claimed reasoning for its action was contradicted by the record evidence and finding that theoretical rationale was insufficient to support agency action); BellSouth Telecomm., Inc. v. FCC, 469 F.3d 1052, 1058-60 (D.C. Cir. 2006) (although an agency's "predictive judgments" are entitled to deference, they must still be overturned if the agency fails to support its decision with record evidence); Morall v. Drug Enforcement Admin.,

---

[4]    By law, the Board is required to issue a written decision "as soon as practicable after the conclusion of its hearing." 42 C.F.R. § 405.1871(a). Because the Board did not meet that requirement in this case, the decision at issue was made by a 3-2 majority including one Board member who was not on the Board when the evidence was heard in November 2004. One Board member who heard the evidence in 2004 was no longer sitting on the Board when the decision issued in 2007, and he did not participate in that decision. Pl. Stmt. ¶¶ 105-06.

412 F.3d 165, 178 (D.C. Cir. 2005) (an agency's decision cannot withstand review when the decisionmaker entirely ignored relevant evidence in the record); <u>Lakeland Bus Lines, Inc. v. NLRB</u>, 347 F.3d 955, 962 (D.C. Cir. 2003) (an agency's decision is not based upon substantial evidence if it "fails to take account of contradictory evidence and is not supported on the record as a whole"); <u>Chemical Mfrs. Ass'n v. EPA</u>, 217 F.3d 861, 865-66 (D.C. Cir. 2000) (agency action was arbitrary and capricious where agency not only failed to show a rational connection between the facts found and the choice made, but also offered an explanation that ran counter to the evidence in the record).

As shown below, the principal basis for the majority's decision is its finding that the Manual's investment limitations are reasonable because offshore captives "are not subject to the same level of industry regulations applied to onshore agencies by State insurance commissions," Pl. Stmt. ¶¶ 109-10; AR 11-12, but the undisputed evidence shows that the States ordinarily do not limit a captive's investment in equity securities. Pl. Stmt. ¶¶ 90-96.

Indeed, the Secretary's witness admitted that if the hospitals' captive, FIIL, had been domiciled in any of the majority of States that do not restrict investment in equities by a captive insurer, then the Medicare program would have reimbursed the plaintiff hospitals for the premium assessments paid to FIIL notwithstanding its investment of 40-50% of its assets in investment securities. Pl. Stmt. ¶ 96. This point was summed succinctly at the Hearing in questioning of CMS' witness by one of the two dissenting Board members:

> [Board Member Mulchandani-West]:  Mr. Keough pointed [in cross-examination] to some state regulation[s] . . . where the state doesn't impose any limits on a captive's investment allocations. So if [FIIL] had been domiciled in one of those states and had maintained its investment allocation . . . would those premiums have been reimbursed by the Medicare program?

> [Secretary's Witness (Cavanaugh)]:  Yes.

> [Board Member]: So the only reason it wouldn't be allowed by the Medicare Program is because it was offshore, and Medicare imposes the 10 percent limitation?
>
> [Secretary's Witness]: Yeah. . . .
>
> .                    * * *
>
> [Board Member]: . . . [I]t would not have had an issue with getting reimbursed from Medicare for the premiums?
>
> [Secretary's Witness]: Correct.
>
> [Board Member]: So can you offer any reason why Medicare would want to maintain different limitations than at least two states that I'm aware of for the investment allocation?
>
> [Secretary's Witness]: . . . I think it shows that it's probably time for Medicare to revisit the manual procedures.

AR 275-76.

The undisputed evidence also shows that both the Cayman Islands Monetary Authority, which regulates FIIL, and the States that regulate domestic captives generally allow considerable flexibility in the investment of a captive's assets and determine on a case-by-case basis whether a particular investment allocation may threaten solvency or financial health. Pl. Stmt. ¶¶ 77-93. In fact, the Secretary's witness admitted that she "can't speak definitively" as to any substantive difference between the oversight and regulation of FIIL by the Caymans Authority and the oversight and regulation of a captive insurer domiciled in a State like Vermont or Colorado, for example, where the greatest numbers of domestic health care captives are domiciled. Pl. Stmt. ¶ 102.

Similarly, while the Board majority asserted that the Manual's 10% limitation on investment in equity securities "is in line with the asset allocations found among domestic insurance companies," AR 11, the undisputed record evidence shows that this is not true among domestic insurers that are truly comparable to FIIL. The record evidence shows that for mutual

- 25 -

insurance companies that underwrite property and casualty risks for the policyholders that own

them – like FIIL - the average investment allocation in equity securities ranges from 45-50%  Pl.

Stmt. ¶ 94.  Thus, contrary to the majority's assertion in this case, the Manual's limitation is not

in line with the average investment allocation by domestic insurers that are comparable to FIIL

in terms of ownership structure and types of insurance risk they underwrite.  Cf. Eagle

Healthcare, 52 F.Supp.2d at 9-10.

   In summary, the Manual's limitation on investment by offshore captives and the Board

majority's application of that limitation in this case fail the Supreme Court's seminal test for

arbitrary and capricious agency action in every respect.  As articulated by the Court, the test for

arbitrary and capricious agency action involves a careful, searching inquiry as to whether:

> the agency has relied on factors which Congress has not intended it
> to consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter
> to the evidence before the agency, or is so implausible that it could
> not be ascribed to a difference in view or the product of agency
> expertise.

See State Farm, 463 U.S. at 43.

   As was made crystal clear during the Board hearing, no expertise or careful analysis

underlies the Manual limitation at issue.  The only witness that the Secretary could muster in his

defense in this case admitted that she had no substantial experience with insurance underwriting,

the regulation of the business of insurance, or investment risk.  Pl. Stmt. ¶ 75.  Indeed, the

Secretary's witness was unable to identify or explain any of the relevant factors bearing upon the

restrictions, if any, that should be placed upon the investments of an insurer.  Pl. Stmt. ¶¶ 76-78.

   That same witness testified (on direct) that the Manual's limitation was based on some

unspecified "research" into State restrictions on investment.  Pl. Stmt. ¶ 86.  On cross-

examination, however, the witness admitted that she had never seen that "research" and did not

know what it found, if anything. Pl. Stmt. ¶ 87. Moreover, the Secretary's witness could not identify which factors, if any, were ever considered by the agency in connection with its establishment and continuing application of the Manual's investment restrictions. Pl. Stmt. ¶¶ 79, 86-88.

Moreover, the evidence is clear that State insurance regulators apply differing limitations, or no limitations at all, on investments by insurers, depending upon the type of insurer that is being regulated and the type of risk that is being underwritten by the insurer. Pl. Stmt. ¶¶ 89-90. States usually do not limit investments by captive or mutual insurance companies that cover the sort of property and liability insurance that FIIL provides to the plaintiff hospitals. Pl. Stmt. ¶¶ 89-93. The Secretary's witness testified that only 23 States and the District of Columbia regulate captive insurers at all. Tr. at 254. And, the majority of States that regulate captives do not restrict investment in equities. This is true not only in Vermont, which is the domiciliary jurisdiction for the largest number of domestic health care captives, AR 207, 270, and in Colorado, the domiciliary jurisdiction for two of the three predecessors that merged to create CHI in 1996, AR 203, 207, but in several other States as well.[5]

The Secretary's witness, however, was unable even to identify the differences between the types of risk underwritten by an insurance company – life and health versus property and casualty – that lead State regulators to adopt differing limitations on investment by insurers:

---

[5]  See Arizona, Ariz. Rev. Stat. Ann. § 20-1098.10.B; Arkansas, Ark. Code Ann. § 23-63-1610(b)(1); Delaware, Del. Code Ann. tit. 18, § 6910(b); Georgia, Ga. Code Ann. § 33-41-18(2); Kansas, Kan. Stat. Ann. § 40-4310; Kentucky, Ky. Rev. Stat. Ann. § 304.49-100(2); Montana, Mont. Code Ann. § 33-28-202(2); Nevada, Nev. Rev. Stat. Ann. § 694C.340(2); New York, N.Y. Insurance Law (McKinney's Insurance Law), § 7009(a); Oklahoma, Okla. Stat. Ann. tit. 36 § 6470.15.B; South Carolina, S.C. Code Ann. § 38-90-100(B) (Law Co-op 1976); South Dakota, S.D. Codified Law § 58-46-19; Utah, Ut. Code Ann. 1953, § 31A-37-302(2)(a); West Virginia, W. Va. Code Ann., § 33-31-10(b).

> [Plaintiffs' Counsel]: What are the differences between the types
> of risks written by a life insurer as contrasted with the type of risks
> assumed by a casualty, property casualty insurer that would justify
> a state imposing differing limitations on equity investment?
>
> [Secretary's Witness]: I can't answer that question.
>
> [Plaintiffs' Counsel]: What are the differences in the risk assumed
> by a life insurance company versus a property casualty company?
>
> [Secretary's Witness]: I don't think I can answer that question.

AR 263; see also AR 266-67. Likewise, the Secretary's witness was unable to identify the differences between different types of insurers – commercially-licensed versus a captive or mutual insurance company – that lead State regulators to adopt different limitations on investment by these companies:

> [Plaintiffs' Counsel]:   What are the differences between, for
> example, a commercially-licensed domestic insurance company
> and a mutual company that would justify differing percent
> limitations on investment into equities by those two different types
> of companies?
>
> [Secretary's Witness]:  I can't answer that.  I'm not an insurance or
> financial specialist in that, in the insurance industry.

AR 263; see also AR 264-65, 272-73.  In fact, the Secretary's witness admitted that the differences in State regulations governing different types of insurance risk and different types of insurers do not "really make much sense to me" because she is "not a specialist" in the area of insurance regulation or investment risk. Pl. Stmt. ¶ 78; AR 266.

The record evidence also shows that the Manual's investment limitations are both overbroad and under-inclusive. On the one hand, the Manual (PRM § 2162.2.A.4) precludes any investment at all in a company (like Microsoft) that did not pay dividends during the period at issue. But, the Secretary has not conducted any study, and does not have any empirical evidence, to show that there is any correlation between dividend payments and the financial strength of a

company, and there is no dispute that a financially strong company might not pay dividends on its stock. Pl. Stmt. ¶¶ 80-81.

On the other hand, the Manual's restrictions are ostensibly intended to insure prudent management of a captive insurer's investments, but nothing in the Manual requires any degree of diversification in an investment portfolio. Pl. Stmt. ¶ 82. What is more, the Secretary's witness admitted to not even knowing whether there is any correlation between diversification and risk because she has not considered this important aspect of the issue:

> [Plaintiffs' Counsel]:  What is the correlation between risk and diversification of an investment portfolio?
>
> [Secretary's Witness]:  I can't answer that question.
>
> [Plaintiffs' Counsel]:  Okay.  Is that something you've considered in formulating or reviewing the efficacy of the limitations in [the Provider Reimbursement Manual]?
>
> [Secretary's Witness]:  No.

AR 261. Yet, the undisputed record evidence shows that there is a risk associated with the lack of diversification in investments. Pl. Stmt. ¶ 84. For example, the ERISA statute, while not limiting investment in equities, specifically mandates that plan fiduciaries must "diversify[] . . . the investments of the plan so as to minimize the risk of large losses." 29 U.S.C. § 1104(a)(1)(C).

Startlingly, the Secretary's witness also admitted that about 50% of all providers with offshore captive insurers currently do not comply with the Manual's investment restrictions. Pl. Stmt. ¶ 74. This statistic alone speaks volumes about the reasonableness of the Manual's investment limitations. If the Manual guidelines were truly adequately tailored to insure prudent management of captive assets, it is hard to believe that half of the hospital industry would be out of compliance. The truth of the matter is that the Secretary's clumsy attempt to regulate in this

area does not align with prudent insurance investment policies. Organizations like CHI and the plaintiff hospitals - with more than $350 million of their own money at stake (Pl. Stmt. ¶ 49) - are more inclined to follow the far more seasoned guidance of their expert advisors.[6]

The D.C. Circuit's decision in D&F Alfonso Realty Trust v. Garvey, 216 F.3d 1191 (D.C. Cir. 2000) is instructive here. In that case, a construction company decided to build a house near a privately-owned airport. The Federal Aviation Administration determined that the house violated one of its air navigation obstruction standards, in that the roof of the house would extend above one of the "imaginary surfaces" around the airport.[7] Id. at 1192. Among the Court's bases for invalidating the agency's action was that the agency had "inexplicably refused to take into consideration trees and other structures in the vicinity" that also penetrated the imaginary surface. Id. at 1196. The Court found that the agency "should have considered the landscape in its entirety when making its...determination" and that the agency had "adopted an ipse dixit approach to making [its] determination: the house creates a navigational hazard because the agency says so." Id. at 1196.

The Board majority took a similar approach in reaching its decision in this case: there are "inherent" risks justifying the Manual's limitation on investment by the plaintiffs' offshore captive insurer because the agency says so. Indeed, as in D&F Alfonso Realty Trust, the Secretary has failed to consider the 'landscape' of insurance regulation in its entirety, ignoring a

---

[6] At the hearing, the Secretary's witness also posited three other possible reasons for the Secretary's discriminatory treatment of offshore and domestically-domiciled captives. Each of those lacked merit and is unsupported by the record evidence. See Pl. Stmt. ¶¶ 98-103. In any event, the Board majority did not rely upon any of these justifications for the Manual's limitation on investment, and its decision cannot be sustained on those bases. A reviewing court may uphold agency action *only* on the basis articulated by the agency in its decision. See, e.g., Burlington Truck Lines, Inc. v United States, 371 U.S. 156, 168-69 (1962); Biloxi Reg'l Med. Ctr. v. Bowen, 835 F.2d 345, 348 n.12, 351 n.18 (D.C. Cir. 1987).

[7] The Court stated that an "imaginary surface" is "essentially an artificial engineering boundary 'drawn' in the air around airports." 216 F.3d at 1192-93.

number of important aspects of the problem in this case. While the Secretary's witness claimed that the investment restrictions were adopted to ensure prudent investments by offshore captives, the undisputed evidence in this case shows that the Secretary was not aware of, nor did he consider, the different types of risk and the different types of insurers that lead States to adopt different limitations, or no limitation, on their investment in equity securities. And, in particular, the final decision in this case takes no account of the undisputed record evidence showing that States ordinarily impose no limit on investment in equity securities by a captive insurer domiciled domestically. Furthermore, the Secretary, and the majority of the Board, failed to consider the importance of diversification in ensuring prudent investments by a captive insurer. Finally, the evidence also shows that the Secretary and the Board considered *irrelevant* factors— whether a stock pays dividends, for instance—in adopting and applying the Manual's investment limitations to effect the disallowance of the premium expenses at issue.

This "lack of reasoned analysis on the record" in this case is the very essence of arbitrary and capricious agency action. Id. at 1196-97. Accordingly, the Board's decision must be overturned as arbitrary and capricious, because the final decision "entirely failed to consider . . . important aspects of the problem." State Farm, 463 U.S. at 43; see also Advocates for Highway and Auto Safety v. FMCSA, 429 F.3d 1136, 1147 (D.C. Cir. 2005) (invalidating agency action because agency "entirely failed to consider important aspects" of the problem where it "largely ignored the evidence" before it); Pub. Citizen v. FMCSA, 374 F.3d 1209, 1216-17 (D.C. Cir. 2004) (invalidating agency action because agency failed to consider impact of new driving restrictions on health of drivers).

C.   **The Secretary Must At Least Reimburse the Hospitals for Medicare's Fair Share of the Claims Paid and Administrative Expenses of the Insurance Program.**

Even if the Secretary's disallowance of the hospitals' premium costs were consistent with the Medicare statute and regulations and were otherwise reasonable (which it is not), the decision in this case should be reversed for a different reason.   Even assuming <u>arguendo</u> that the Secretary had legitimate reservations about reimbursing the hospitals for premiums paid to FIIL because their investments exceeded the Manual's limitations, the plaintiff hospitals must be reimbursed at a minimum for the actual liability claims paid during the years at issue, and they have not been.

In addition to disallowing all of the premiums paid to FIIL, the Secretary has not reimbursed CHI or the plaintiff hospitals for any of the liability claims paid, nor for any administrative or other costs incurred, in connection with hospitals' insurance program. Pl. Stmt. ¶¶ 62-63, 66.   The claims paid by CHI, and refunded by FIIL, are substantial, totaling tens of millions of dollars per year for the period at issue. Pl. Stmt. ¶¶ 64-65.   The Medicare program has not reimbursed the plaintiff hospitals for any of that actual cost incurred relating to the care of Medicare patients.   This is clearly wrong, even if the disallowance of the premium expense were otherwise proper.

The Board majority reasoned that the hospitals are not entitled to any reimbursement for claims paid or premium expenses because the Medicare program "is not necessarily obligated to share in a provider's malpractice or other liability losses." AR 12.   Quoting from yet another section of chapter 21 of the Manual, the majority wrote: "[PRM] § 2162.13 states that 'where a provider has no insurance protection for malpractice or comprehensive general liability in conjunction with malpractice, either in the form of a limited purpose [<u>i.e.</u>, captive] or commercial insurance policy or a self-insurance fund . . . , any losses and related expenses incurred are not

- 32 -

allowable.'" AR 12-13. The majority's reasoning on this point is indefensible, and should be reversed, for three principal reasons.

First, the Manual provision the majority relied upon does not say what the majority apparently read it to mean. The Manual provision that the majority relied upon applies by its terms only when a provider "has no insurance protection." PRM § 2162.13. There is no dispute, however, that the plaintiff hospitals had liability insurance through the captive, FIIL.

As applied, the majority apparently construed the Manual to mean something different than what it actually says – that claims paid and related expenses are not allowable even if a provider has insurance protection through a captive, but the captive's investments do not comply with the Manual's limitation on investment by a captive insurer. That construction of the Manual is not readily apparent from the plain text of the guideline. As a result, the plaintiff hospitals did not have fair notice of the majority's interpretation of the Manual in this case, and they should not be penalized based on the Board's retrospective application of the Manual to the fiscal years at issue in this case. See GranCare Inc., 93 F.Supp.2d at 31-33 (holding that providers should not be subject to financial penalties under the Secretary's interpretation of the Manual when its provisions "'could not have fairly informed [Plaintiffs] of the agency's perspective'") (quoting General Elec. Co. v. United States Envtl. Prot. Agency, 53 F.3d 1324, 1330 (D.C. Cir. 1995)).

Second, the Board majority's reasoning that "the program is not necessarily obligated to share in a provider's malpractice or other liability losses" is contrary to the plain meaning and manifest intent of the controlling statutory provision governing reasonable cost reimbursement. The Board majority essentially concluded that the Medicare program is "not necessarily obligated" to reimburse its fair share of the actual costs the hospitals' incurred related to patient

care because the Manual says so.  But, that same reasoning could be applied to any type of expense that the Secretary decides to disallow via a Manual provision.  Taken to its logical conclusion, this line of reasoning would permit the Secretary to deny reimbursement for any or all expenses incurred by a provider if the Manual says so.  And this reasoning is clearly contrary to law.

As discussed supra, the controlling statute generally defines "reasonable cost" to mean the cost actually incurred in the efficient delivery of necessary health services, 42 U.S.C. § 1395x(v)(1)(A), and the clear intent of this provision is to meet the actual costs incurred subject only to the limitation on costs that are shown to be substantially out of line.  S. Rep. No. 404, 89th Cong., 1st Sess. (1965), reprinted in 1965 U.S.C.C.A.N. 1943, 1976; see also PRM § 2102.1 ("It is the intent of the program that providers are reimbursed the actual costs of providing high quality care, regardless of how widely they may vary from provider to provider, except where a particular institution's costs are found to be substantially out of line").  The statute also contains a provision called the prohibition on cross-subsidization.  The prohibition on cross-subsidization provides that in establishing regulations for the determination of reasonable costs, the Secretary must ensure that

> under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this title [i.e., the Medicare Act] will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs.

42 U.S.C. § 1395x(v)(1)(A) (last sentence).

As construed by the Court of Appeals, the statutory proscription against cross-subsidization precludes the Medicare program from determining that a hospital "may not be reimbursed at all for the costs of rendering care to Medicare patients."  Saint Mary of Nazareth

- 34 -

Hosp. Ctr. v. Schweiker, 718 F.2d 459, 467 (D.C. Cir. 1983).  That is the precise result, however, of the Board majority's application of the Manual in this case.

Here, the Board majority applied the Manual to deny any reimbursement at all for premium assessments paid to FIIL by the plaintiff hospitals, for the claims paid by FIIL on behalf of the plaintiff hospitals, and for any related administrative expenses. This complete denial of any reimbursement at all for malpractice and other liability costs relating to the care of Medicare patients violates the statutory proscription against cross-subsidization and must be reversed.

Third, and finally, the Board's mere quotation of a provision of the Manual does not serve to support its application of that provision in this case, particularly when that application of the Manual was shown to be inconsistent with the program's treatment of other similar situations.  As the plaintiff hospitals pointed out to the Board, when the Medicare program denies reimbursement for expense incurred on an accrual basis (like the premium expenses at issue), it consistently (except in this instance) allows for reimbursement on a cash basis when expenses are actually paid (like the liability claims paid).  The hospitals noted in the proceedings below that this is true, for example, with respect to liabilities that are not timely liquidated within the period allowed by the Secretary's rules, see PRM § 2305, and with respect to the costs of sick leave, pension payments, or deferred compensation that do not meet the requirements for reimbursement in the year in which the cost incurred on an accrual basis.  See AR 244, 275.

Confronted with clear and undisputed evidence of inconsistency, then, the Board majority needed to do more than just quote the Manual in support of its application of the Manual in the facts of this case.  Aside from quoting the provision it invoked, the majority's decision sets forth no reasoned analysis as to why that provision should be applied to effect the disallowance at

issue in this case.  AR 12-13.  The majority's failure to support the disparate treatment of similar situations "with a reasoned explanation and substantial evidence in the record" is arbitrary and capricious, and must be reversed.  See, e.g., Burlington Northern & Santa Fe Ry. Co., 403 F.3d at 776-77.

## VI.    CONCLUSION

For all of the reasons discussed above, the plaintiffs conclude that the Secretary's final decision should be reversed with instructions to reimburse the hospitals for Medicare's share of the premiums paid to FIIL, or, alternatively, to reimburse them for Medicare's share of the claims paid by FIIL on the hospitals' behalf, for each of the years at issue, plus interest.  A proposed order is attached.

Respectfully Submitted,


/s/ Christopher L. Keough
Christopher L. Keough
   DC Bar No. 436567
John M. Faust
   DC Bar No. 433553
J. Harold Richards (Admission Pending)
   DC Bar No. 469524
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff


August 31, 2007

DC 703164v1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CATHOLIC HEALTH INITIATIVES, et al.,     )
                                                         )

       Plaintiffs,               )

                                     )

          v.                      )   Civil No.: 07-0555 (PLF)

                                     )

MICHAEL O. LEAVITT, Secretary of       )
  Health and Human Services,          )

                                     )

       Defendant.             )

_____)

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), the Plaintiffs submit the following statement of material facts as to which there is no genuine issue.

Plaintiffs state:

1.    More than two years after conducting a hearing in this case in November 2004, the Provider Reimbursement Review Board ("PRRB" or "Board") issued a final decision, dated January 24, 2007.  A copy of that decision is reproduced at pages 6-16 of the Administrative Record ("AR").

2.    The Board is an administrative tribunal established pursuant to 42 U.S.C. § 1395oo.  The Board was established to hear disputes concerning Medicare reimbursements due to providers of services, like the plaintiff hospitals in this case.

3.    The Board is comprised of five members appointed by Defendant, the Secretary of the Department of Health and Human Services ("Secretary"), pursuant to 42 U.S.C. § 1395oo.

4.      The PRRB's decision in this case is a split 3-2 decision, with the Board Chair and one other Board member dissenting.  AR 6-16.

5.      The Board's majority opinion denied the plaintiff hospitals any Medicare reimbursement at all for the premiums they paid during the fiscal years at issue to obtain liability insurance coverage through an offshore captive insurer.  Plaintiffs' Complaint for Declaratory and Injunctive Relief and For Sums Due Under the Medicare Act ("Complaint") and Defendant's Answer to Complaint ("Answer") ¶ 1.

6.      The Board's majority decision also denied the plaintiff hospitals any Medicare reimbursement at all for the liability claims paid by the captive insurer on behalf of the hospitals. Id.

7.      The Board's majority decision applied a Medicare guideline in section 2162.2.A.4 of the Secretary's Provider Reimbursement Manual ("PRM" or "Manual").  AR  11-13.

8.      PRM section 2162.2.A.4 deals with investment in equity securities by an offshore captive insurer.  See id.

9.      The Foreword to the Manual states that it "provides guidelines and policies to implement Medicare regulations which set forth principles for determining the reasonable cost of provider services."   The Foreword also acknowledges that the Manual itself "does not have the effect of law."

10.      The PRRB majority's decision constitutes the final decision of the Secretary in this case.

**B.**    **The Parties and the Nature of Their Dispute**

11.    The plaintiffs in this action include 55 hospitals, Complaint and Answer ¶ 12, and Catholic Health Initiatives ("CHI"), Complaint and Answer ¶ 11.

12.    Each of the plaintiff hospitals participates in the federal Medicare program as a provider of hospital services.  Complaint and Answer ¶ 2.

13.    CHI  is a nonprofit charitable purpose corporation with its headquarters in Denver, Colorado.  Complaint and Answer ¶ 11.

14.    For the 1997-2002 period at issue in this case, the 55 plaintiff hospitals in this case operated under the common ownership or control of CHI.  Complaint and Answer ¶¶ 12, 41; Stipulations of the Parties ("Stipulations") ¶¶ 1-2, AR 279.

15.    CHI also wholly owns and controls a subsidiary "captive" insurer, First Initiatives Insurance, Ltd. ("FIIL"), that provides liability insurance coverage for the plaintiff hospitals.  Complaint and Answer ¶ 2.

16.    During the period at issue, the hospitals paid insurance premiums to obtain liability insurance coverage through FIIL, an offshore captive insurer owned and controlled by CHI.  Complaint and Answer ¶ 42; see AR 8-9.

17.    Because FIIL's investment of assets did not comply with the limitations set forth in PRM § 2162.2.A.4, CHI and the plaintiff hospitals disclosed and self-disallowed this expense under protest on the cost reports they submitted to the Medicare program for the periods at issue.  Complaint and Answer ¶ 44; AR 241-42, 279.

18.     Defendant Michael O. Leavitt is Secretary of the United States Department of Health and Human Services ("HHS"), the federal agency that administers the Medicare program. Complaint and Answer ¶ 13.

19.     The Centers for Medicare and Medicaid Services ("CMS") is a component of HHS.  Complaint and Answer ¶ 14.

20.     CMS is responsible for day-to-day operation and administration of the Medicare program.  Id.

21.     CMS was formerly known as the Health Care Financing Administration ("HCFA") during the periods at issue.  Id.

**C.     Formation of FIIL**

22.     Three Catholic healthcare systems merged to create CHI in 1996.  Complaint and Answer ¶ 45; AR 203.

23.     Prior to the merger, the three predecessor healthcare systems obtained primary medical professional and general liability insurance coverage through three separate programs involving two captive insurers and a trust. Complaint and Answer ¶¶ 46-47.

24.     After the 1996 merger, CHI consolidated the three liability insurance programs. Complaint and Answer ¶ 49.

25.     CHI formed an Advisory Board and engaged Alexander & Alexander ("A&A"), a predecessor to Aon Corporation, to advise CHI in the consolidation of the liability insurance programs.  See Complaint and Answer ¶ 51; AR 204-05.

26.     CHI and A&A considered several alternative business structures for CHI's consolidated risk and insurance program, including the acquisition of a licensed commercial insurer and the formation of a risk retention group, trust, pure captive insurer and group captive. Complaint and Answer ¶ 52; AR 206-07, 2722-32.

27.     A "captive" is an insurance company that is owned by its insureds; it is funded through an insurance policy where the captive's owner pays premiums and assessments into it and the money is held there until the owner incurs covered losses.  Complaint and Answer ¶ 52. A group captive has multiple insured owners.  Id.

28.     Based upon A&A's recommendation, CHI formed a captive insurer, FIIL. Complaint and Answer ¶ 53; AR 207-09, 2731-32.

29.     A&A reviewed, and CHI considered, several alternative domestic and offshore domiciliary jurisdictions for the captive insurer, including Vermont, which was the domicile for the largest number of domestic healthcare captive insurers.  See Complaint & Answer ¶ 54; AR 207, 270, 2732-39.

30.     Following A&A's recommendation, CHI established an offshore captive, Complaint and Answer ¶ 55, because an offshore captive would be less costly than other alternatives.  AR 207-09, 2731-32, 2742.

31.     Based on a feasibility study, A&A found that an offshore captive would save CHI and the plaintiff hospitals anywhere from $108,980 to $293,475 in administrative expenses in its first year alone, as compared to a captive domiciled in various domestic jurisdictions.  Complaint and Answer ¶ 55; AR 2749.

32.    Ultimately, CHI decided to domicile FIIL in the Cayman Islands.  Complaint and Answer ¶ 56.

33.    CHI determined that the incorporation of FIIL in the Cayman Islands would meet CHI goals of increased coverage flexibility, the ability to extend coverage to strategic partners, and lower administrative cost.  AR 208-11, 2742.

### D.    Operation and Oversight of FIIL

34.    FIIL operates as a centralized funding mechanism for the malpractice and other liability lines of coverage for CHI and its hospitals.  Complaint ¶ 59 and Answer ¶¶ 57-61; AR 208-09, 211.

35.    CHI administers and pays claims and seeks reimbursement from FIIL.  Complaint ¶ 59 and Answer ¶¶ 57-61; AR 211-13.

36.    FIIL writes coverage for CHI on property and casualty risks.  It does not cover life or health insurance.  Complaint ¶ 60 and Answer ¶¶ 57-61; AR 208-09.

37.    No employees of CHI or FIIL work in the Cayman Islands.  Complaint ¶ 61 and Answer ¶¶ 57-61; AR 211.

38.    A subsidiary of Aon keeps the books and business plan of FIIL and deals on FIIL's behalf with the Cayman Islands Monetary Authority.  Complaint ¶ 61 and Answer ¶¶ 57-61; AR 211.

39.    All claims administration and risk management functions are performed by CHI employees in Erlanger, Kentucky.  Complaint ¶ 61 and Answer ¶¶ 57-61; AR 213.

40.    FIIL is subject to regulatory oversight by the Cayman Islands Monetary Authority, which must annually approve FIIL's business plan and investment policies in accordance with established guidelines. Complaint ¶ 58 and Answer ¶¶ 57-61; AR 223, 3342-48.

41.    FIIL's board of directors is comprised of CHI executives and external members who are insurance experts and leaders from other health care systems. Complaint and Answer ¶ 62; AR 211-13, 2834. The FIIL board of directors approves all business plans and investment policies of FIIL. Id.

42.    Mellon Bank ("Mellon") acts as custodian for all assets in the FIIL portfolio. Complaint and Answer ¶ 63; AR 212, 2834. FIIL receives monthly statements from Mellon identifying the holdings as of month end, the net changes for the month and a detail of all transactions during the month. Complaint and Answer ¶ 63; AR 212.

43.    FIIL's investments are managed by several (approximately 13) professional money managers. Complaint and Answer ¶ 63; AR 212, 2834. CHI and FIIL regularly compare the managers' investment results with industry standards to ensure that FIIL's investments are performing appropriately. Complaint & Answer ¶ 64; AR 225.

44.    FIIL is also supported by CHI's Investment Committee. Complaint and Answer ¶ 63; AR 212-13. Most of the members of the Investment Committee are independent of CHI and are experienced in investment matters. Complaint and Answer ¶ 63; AR 213, 2878-99, 3332.

45.    FIIL's books are audited annually. Complaint and Answer ¶ 66; AR 211, 213, 3084-99.

E.    **Actuarially-Determined Premium Funding**

46.    CHI employs Tillinghast-Towers Perrin ("Tillinghast"), a leader in actuarial science, to conduct annual actuarial studies of the plaintiff hospitals' expected loss costs for each year. Complaint and Answer ¶ 67; AR 213.

47.    Tillinghast's projections determine FIIL's aggregate funding requirement for each year. Complaint and Answer ¶ 67; AR 213, 3107. These projections account for expected loss cost values plus administrative costs. Complaint and Answer ¶ 67; AR 242.

48.    Once the aggregate funding requirement for a year is determined based on Tillinghast's projections, premium assessments are allocated to and collected from CHI hospitals. Complaint and Answer ¶ 68; AR 241.

49.    FIIL's total assets on June 30, 2000 were $356.7 million, of which $343.9 million were invested assets. Complaint and Answer ¶ 77; AR 3087. The investment pool for FIIL generally consists of cash, fixed income investments and equity securities. Complaint and Answer ¶ 77; AR 2818.

F.    **Plaintiffs' Periodic Evaluations of the Captive Insurance Program**

50.    CHI has commissioned three investment allocation studies approximately every three years since the inception of FIIL in 1997 in order to evaluate appropriate allocation of fund assets. Complaint ¶ 69 and Answer ¶¶ 69-70; AR 214-15, 2800-09, 2830-68, 3282-3330.

51.    The first study was conducted by outside consultants when FIIL was first established in 1997 to determine the appropriate investment allocation to satisfy liquidity needs

and maximize investment return with an appropriate level of risk.  Complaint ¶ 70 and Answer ¶¶ 69-70; AR 214, 2830-46.

52.    Based on the findings by the investment consultants, FIIL adopted a 40% allocation of assets in diversified equities.  Complaint ¶¶ 70, 71 and Answer ¶¶ 69-70, 71; AR 215, 2806, 2836, 2839.  The investments were intentionally diversified among different types of equities because diversification reduces the risk of loss.  Complaint ¶ 70 and Answer ¶¶ 69-70; AR 215.

53.    The findings by the consultants based on the results of their investment allocation analysis indicated that FIIL could expect to realize a net benefit of $25 million between 1997 and 2002 by adopting a 40% equity allocation versus the 10% allocation allowed by the limitation in CMS' Manual.  Complaint and Answer ¶ 71; AR 2846.

54.    In February 2000, a second asset allocation study, recommending an increase in FIIL's equity allocation from 40% to 50% of total assets, was performed for, and approved by, FIIL's board of directors.  Complaint and Answer ¶ 73; AR 215, 2863, 2880, 2908.

55.    A third asset allocation study was performed in August 2003.  Complaint and Answer ¶ 74; AR 3282-3330.

56.    The 2003 study modeled the impact of the 10% equity limitation in the CMS Manual as compared with the captive's existing 50% allocation to equity securities.  Complaint and Answer ¶ 74; AR 216-18, 237, 3294-95.

57.     The 2003 study indicated that at expected levels of return, the Medicare limitation would reduce investment income and therefore increase premium cost, by approximately $38 million over five years.  Id.

58.     CHI annually employs Aon to examine the full cost of its captive insurance program, including claims administration and reinsurance costs, as compared to the cost of purchasing comparable insurance coverage through commercial insurers.  Complaint and Answer ¶ 76; AR 218-19.

59.     Aon determined that for fiscal year 2000 alone, CHI would have paid $15 million (or 17 percent) more to purchase comparable commercial insurance coverage than the cost incurred for the captive insurance program.  Complaint and Answer ¶ 76; AR 218-19, 2870-71.

G.     **Impact of Secretary's Denial**

60.     The amount in controversy in this case exceeds $6 million for the 1997-2002 years at issue.  Complaint and Answer ¶ 79; AR 17-38.

61.     The above-stated amount in controversy is Medicare's approximate share of the actuarially-determined premium assessments paid by plaintiff hospitals for the periods at issue. Complaint and Answer ¶ 79.

62.     The Medicare program has not reimbursed the plaintiff hospitals for any of the premium assessments paid to FIIL.  Complaint and Answer ¶ 79.

63.     The Medicare program also has not reimbursed CHI or the plaintiff hospitals for any claims paid by CHI and refunded by FIIL.  Complaint ¶ 80 and Answer ¶¶ 80-81.

64.     Claims paid by CHI, and refunded by FIIL, total tens of millions of dollars per year.  Complaint ¶ 81and Answer ¶¶ 80-81.

65.     FIIL's audited financial statements for three of the fiscal years at issue, for example, show paid claims in the amounts of $39.8 million for fiscal year 2000, $57.6 million for fiscal year 1999 and $31.5 million for fiscal year 1998.  Complaint and Answer ¶ 81; AR 736, 3098.

66.      The Medicare program also has not reimbursed CHI or the plaintiff hospitals for administrative expenses attributable to the captive insurance program.  Complaint ¶ 80 and Answer ¶¶ 80-81.

67.     The Secretary's failure to reimburse the plaintiff hospitals for any costs related to the captive insurance program has had a significant adverse impact on the plaintiff hospitals, particularly those that are critical access hospitals, because it has deprived the hospitals of funds that could otherwise be put to patient care in furtherance of the hospitals' charitable mission.  Complaint and Answer ¶ 82; AR 242.

### H.    PRRB Hearing and Record Evidence

68.     The PRRB conducted a hearing on November 4, 2004.  Complaint and Answer ¶ 83.

69.     Five members of the Board were present at the hearing on November 4, 2004: the Board Chairperson, Suzanne Cochran, Esq., Gary B. Blodgett, D.D.S., Elaine Crews Powell, C.P.A., Anjali Mulchandani-West, and Martin W. Hoover, Jr., Esq.  Complaint and Answer ¶ 83.

70.    The principal witness for the Secretary at the November 2004 hearing was Sandra Cavanaugh, a CMS analyst.  Complaint ¶ 84 and Answer ¶¶ 84-89.

71.    Cavanaugh testified that she was responsible for interpreting the Medicare rules regarding cost reimbursement for self-insurance, among other things.  Complaint ¶ 84 and Answer ¶¶ 84-89; AR 249, 258.

72.    Cavanaugh testified that her immediate predecessor in this role was Ward Plinus [sic, Pleinus].  Complaint ¶ 84 and Answer ¶¶ 84-89; AR 259.

73.    Cavanaugh testified that she took over the responsibilities of her predecessor, Pleinus, in this area when he retired from the agency in 2001.  Complaint ¶ 84 and Answer ¶¶ 84-89; AR 260.

74.    Cavanaugh admitted that approximately 50% of all Medicare providers with offshore captives do not comply with the Manual's limitation on investment.  Complaint and Answer ¶ 91; AR 257-58.

75.    Cavanaugh admitted that neither she nor her predecessor has or had experience with insurance underwriting, the regulation of the business of insurance, or investment risk. Complaint ¶ 85 and Answer ¶¶ 84-89; AR 258-60.

76.    Cavanaugh testified that she could not identify or explain characteristics of and differences between types of insurance risk – i.e., life and health insurance risk versus property and casualty insurance – or how and why these differences lead State insurance regulators to adopt differing investment limitations on insurers that cover different types of insurance risk. Complaint ¶ 86 and Answer ¶¶ 84-89; AR 263, 266-67.

77.    Cavanaugh testified that she could not identify or explain the characteristics of and differences between types of insurers – commercially licensed insurers versus captives and mutual insurance companies – that lead State insurance regulators to adopt different limitations on investment by different types of insurers.  Complaint ¶ 87 and Answer ¶¶ 84-89; AR 263-65, 272-73.

78.    Cavanaugh testified that the foregoing factors and differences in States' regulation of different types of insurance risk and different types of insurers do not "really make sense to me" because she is "not a specialist" in the area of insurance regulation or investment risk.  Complaint ¶ 88 and Answer ¶¶ 84-89; AR 266.

79.    Cavanaugh testified that she could not identify any factors considered by CMS in connection with the establishment and continuing application of the investment limitation section 2162.2.A.4 of the Manual.  Complaint ¶ 89 and Answer ¶¶ 84-89; AR 266, 272-73.

80.    The record evidence shows that the Manual limitation in PRM § 2162.2.A.4, precludes any investment at all in the stock of a company that does not pay dividends, but the Secretary presented no evidence, and there is no record evidence, showing any correlation between payment of dividends and the financial strength of a company.  Complaint and Answer ¶ 90.

81.    Conversely, Cavanaugh admitted that a financially strong company (like Microsoft) might not pay dividends on its stock.  Complaint and Answer ¶ 90; AR 260-61.

82.    Although Cavanaugh testified that the Manual's investment restrictions are intended to insure prudent management of a captive insurer's assets, AR 250, 252, 260, she

admitted that the Manual does not require any degree of diversification in a captive's investments. Complaint and Answer ¶ 90; AR 261.

83.    Cavanaugh admitted that she had never considered whether there is any correlation between diversification and investment risk. Complaint and Answer ¶ 90; AR 261.

84.    The undisputed record evidence shows, however, that there is a clear risk associated with lack of diversification in investment. Complaint and Answer ¶ 90; AR 223-24, 233-34. See also 29 U.S.C. § 1104(a)(1)(C) (while not limiting investment in equities, the ERISA statute mandates that ERISA plan fiduciaries must "diversify . . . the investments of the plan so as to minimize the risk of large losses").

85.    While the Secretary's Manual limits investment in equities by an offshore captive, the Secretary imposes no limitation on investment by domestically-domiciled captives. Complaint and Answer ¶ 92; PRM § 2162.

86.    Cavanaugh, the Secretary's witness, testified that the basis for the Manual's different treatment of investments by domestic and offshore captive insurers is some unspecified "research" that allegedly showed that States limit an insurer's investment in equities to 10-15% of the insurer's assets. Complaint and Answer ¶ 92; AR 250, 259-60.

87.    On cross-examination, Cavanaugh admitted she had never seen the aforementioned "research." Complaint and Answer ¶ 92;  AR 260.

88.    Cavanaugh also admitted that she did not know which State laws or what factors, if any, were actually considered in the formulation of the Manual's limitation on investment by offshore captives. Id.

89.     On cross-examination, Cavanaugh admitted that the State limitations she discussed in her direct testimony did not reflect States' regulation of investments by insurers covering property and casualty insurance, like the coverage provided by CHI's captive, as opposed to life and health insurance, which CHI's captive does not cover.  Complaint ¶ 93 & Answer ¶¶ 93-94; AR 264 & 5518-19; AR 265 & 5495-5503; AR 266-67 & 5521-24; AR 267-68 & 5505-12; AR 269 & 5514-16.

90.     On further cross-examination, Cavanaugh acknowledged that the State limitations discussed in her direct testimony did not reflect State regulation of investments by captive or mutual insurance companies, like CHI's captive, as opposed to a commercial insurance carrier. Complaint ¶ 94 & Answer ¶¶ 93-94;  AR 264-65 & 3337-38; AR 266 & 3334-35; AR 268 & 3370, 3381; AR 277.

91.     The record evidence shows, and the dissenting Board decision found, that the great majority (17 out of 23) of States that regulate captives do not restrict a captive's investment in equities to any fixed, stated percentage.  Complaint & Answer ¶ 95; AR 15-16, 147, 203-04, 207, 270.

92.     The majority of States that regulate captives but do not restrict investment in equities includes both Colorado, which was the domicile of the two captives of the predecessors that merged to create CHI in 1996, and Vermont, where the vast majority of domestic captive insurers are domiciled.  Complaint & Answer ¶ 95; AR 203-04, 207, 270.

93.     Like the Cayman Islands Monetary Authority, the States that regulate domestic captives generally allow considerable flexibility in the investment of a captive's assets and determine on a case-by-case basis whether a particular investment allocation may threaten

solvency or financial health.  Complaint & Answer ¶ 95; AR 220-23; 3342-48; Colo. Rev. St. Ann. § 10-6-121(2)(a), AR 3337-38; Vt. Stat. Ann. tit. 8, § 6010(b), AR 3334-35.

94.     The record evidence shows that the average investment allocation in equities ranges from 45-50% for a mutual insurance company (an insurer owned by policyholders), like FIIL, that underwrites property and casualty risks.  Complaint & Answer ¶ 96; AR 270-73, 3388.

95.     The record evidence shows that regulators typically have less concern about promoting policyholder confidence in a captive or mutual insurance company, like FIIL, because in these cases policyholders and shareholders have a commonality of interest.  Complaint & Answer ¶ 96; AR 3343.

96.     Cavanaugh admitted that if FIIL had been domiciled domestically in any of the majority of States that do not restrict investment in equities by a captive insurer, Medicare would have reimbursed the plaintiff hospitals for the premium assessments paid to FIIL.  Complaint & Answer ¶ 97; AR 275-76.

97.     In response to questioning from a Board member regarding the inconsistency in CMS' limitation of investments by offshore captives but not by domestically domiciled captives, Cavanaugh admitted that the inconsistency "shows that it's probably time for Medicare to revisit the manual procedures."  Complaint & Answer ¶ 97; AR 275-76.

98.     In her direct testimony, Cavanaugh said that the investments of domestically-domiciled captives are covered by State insurance guaranty funds, but on cross-examination, she acknowledged that she was unaware that State insurance guaranty funds apply only to commercially-licensed insurance companies.  Complaint & Answer ¶ 98; AR 257, 262.

99.    All or virtually all States that regulate captives do not require or permit them to participate in, or benefit from, State insurance guaranty funds.  Complaint & Answer ¶ 98.  See AR 150 (citing State laws).  See, e.g., Vermont Stat. Ann. Tit.8 § 6013 ("No captive insurance company shall be permitted to join. . . any plan, pool, association, or guaranty or insolvency fund in this state, nor shall any such captive insurance company. .  receive any benefit from any such plan, pool, association, or guaranty or insolvency fund. . . .").

100.    In her direct testimony, Cavanaugh suggested that offshore captives are subject to lower reserve requirements than domestic captive insurers, but on cross-examination, she clarified her perception and admitted that she could not identify in particular any reserve levels that would be required of a captive domiciled domestically or offshore.  Complaint ¶ 99 & Answer ¶¶ 99-100; AR 253-54, 261-62.

101.    Cavanaugh admitted that there should be no reason why the actuarially-determined reserve for liabilities would be any different for an offshore captive insurer than a domestic captive insurer.  Complaint ¶ 99 & Answer ¶¶ 99-100; AR 262.

102.    On cross-examination, Cavanaugh admitted that she "can't speak definitively" as to any substantive difference between the oversight and regulation of a captive domiciled in the Caymans and the oversight and regulation of a captive domiciled domestically in Vermont or Colorado, for example.  Complaint ¶ 99 & Answer ¶¶ 99-100; AR 262.

103.    Cavanaugh suggested in her direct testimony that a domestically-domiciled captive's investment in equities is regulated by the Internal Revenue Service or other Federal agencies, but in her answers to skeptical questioning from one Board member, she revealed little

or no understanding of the regulatory oversight of captive insurers by other Federal agencies. Complaint ¶ 100 & Answer ¶¶ 99-100; AR 254-56, 262.

## I.    **Decisions Below**

104.    More than two years after it conducted its hearing in this case, in November 2004, the Board majority issued its decision consisting of two pages of findings of fact and conclusions of law.  Complaint and Answer ¶¶ 101-02; AR 11-13.

105.    One of the three Board members, Yvette C. Hayes, who joined in the majority opinion in this case was not sitting on the Board until early 2006 and was not present at the hearing the Board conducted in 2004.  Complaint ¶ 105 & Answer ¶¶ 105-06.  Board member Hayes did not participate in decisions in other cases that were heard at about the same time, or even after, the Board heard this case in November 2004, even though the Board issued written decisions in those cases after Hayes joined the Board in early 2006.  Complaint & Answer ¶ 113.

106.    A former Board member, Martin Hoover, who was present at the hearing conducted in 2004, did not participate in the written Board decision issued in this case in 2007. Complaint ¶ 106 & Answer ¶¶ 105-06.

107.    The three-member Board majority did not take issue with the fact, or with the hospitals' assertion of the fact, that the actuarially-determined premium assessments paid to FIIL by the plaintiff hospitals are related to patient care and reasonable in amount.  Complaint & Answer ¶ 102; AR 12.

108.    Nevertheless, the Board majority concluded that those premium expenses are not "necessary and proper costs" because FIIL's  investments in equities exceeded the Manual limitation on investments by offshore captive insurers.  Complaint & Answer ¶ 102; AR 11.

109.    The Board majority concluded that the Manual's limitation on investments by an offshore captive insurer is "a valid extension" of the Medicare reasonable cost statute and regulations.  AR 11.  This conclusion is based on the majority's finding that offshore captives "are not subject to the same level of industry regulations applied to onshore agencies by State insurance commissions" and the Manual's restriction on investment in equities "is in line with the asset allocations found among domestic insurance companies."  AR 11.  These findings by the Board majority are not supported by substantial record evidence and are inconsistent with undisputed record evidence, including the testimony of the Secretary's witness, as discussed in paragraphs 70-103, supra.

110.    The Board majority also concluded that the Manual's inconsistent limitation on investments only by offshore captives, and not domestically domiciled captives, is justified because "there is an inherent risk associated with offshore captives that justifies the investment restrictions."  AR 12.  This finding is not supported by substantial record evidence and is inconsistent with the undisputed record evidence, including the testimony of the Secretary's witness, as discussed in paragraphs 70-103, supra.

111.    The Board majority also concluded that the plaintiff hospitals are not entitled to reimbursement for actual claims paid by FIIL because "the program is not necessarily obligated to share in a provider's malpractice or other liability losses."  AR 12.

112.    The Board Chair and one other Board member issued a dissenting opinion.  AR 14-16.

113.    The dissenters concluded that Manual's limitations on investment by offshore captives "are not an appropriate application of Medicare statutory reasonable cost principles" and "are not an appropriate application of Medicare regulatory reasonable cost principles."  AR 15.

114.    The dissenters concluded that the Manual guidelines applied by the majority to effect a complete disallowance of all costs related to CHI's insurance program are "devoid of any link to the standards expressed in the regulations in that there is no test relating to reasonableness of premiums."  AR 15.

115.    The dissenters also found that there is no substantial evidence or rational basis for the Manual's dissimilar treatment of providers with offshore captive insurers.  AR 15-16.

116.    On March 9, 2007, the Acting Deputy CMS Administrator declined to review the PRRB's January 24, 2007 decision.  Complaint and Answer ¶ 114.

Respectfully Submitted,

 /s/ Christopher L. Keough
Christopher L. Keough
DC Bar No. 436567
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

August 31, 2007

DC 691535v7

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CATHOLIC HEALTH INITIATIVES, et al.,      )
     )
     Plaintiffs,      )
     )
     v.      )      Civil No.: 07-0555 (PLF)
     )
MICHAEL O. LEAVITT, Secretary of      )
     Health and Human Services,      )
     )
     Defendant.      )
_____)

## PLAINTIFFS' EXHIBIT 1

## FOREWORD

This manual provides guidelines and policies to implement Medicare regulations which set forth principles for determining the reasonable cost of provider services furnished under the Health Insurance for the Aged Act of 1965, as amended. These "Principles of Reimbursement for Provider Costs" have been published in HIRM-l. The provisions of the law and the regulations are accurately reflected in this manual, but it does not have the effect of regulations.

The Social Security Administration (SSA) also publishes quarterly the "Social Security Rulings" under the authority of the Commissioner of Social Security for the purpose of making available official rulings relating to the health insurance program and the other programs under his jurisdiction. The rulings contain appeals case decisions, as well as statements of policy and interpretations of the law (title XVIII of the Social Security Act-Medicare) and regulations which have precedential effect.

Rulings are intended to exemplify general manual instructions and do not alter existing policy guidelines. However, they may place more emphasis on a particular program are that has been identified as a problem. The rulings do not have the force and effect of a statute or regulations, but provide illustrative case material useful in interpreting and applying policies and procedures contained in instructional issuances.

The procedures and methods set forth in this manual have been devised to accommodate program needs and the administrative needs of providers and their intermediaries and will assure that the reasonable cost regulations are uniformly applied nationally without regard to where covered services are furnished. The manual contains informational and procedural material on various aspects of the determination of cost and to assist provider in preparing annual cost reports. The provider's intermediary will issue any necessary supplementary instructions as appropriate for local guidance on items relating to cost determination. For any cost situation that is not covered by the manual's guidelines and policies, generally accepted accounting principles should be applied.

Under generally accepted accounting principles, or under the "Principles of Reimbursement for Provider Costs" there may be more than one method for handling a particular cost item; in such case the method elected by the provider must be consistently followed in subsequent reporting periods. A change of method must be approved by the intermediary (or SSA for providers dealing directly with the Government) on a prospective and not retrospective basis. Where the manual sets a time limit for requesting such change, or limits the number of changes, the provider and intermediary will be guided by the manual instructions.

I

The manual accommodates new pages or revisions as further interpretations of the regulations and changes in procedures and methods are made.  Accordingly, revised sections, pages, or chapters are issued as necessary.  Brackets in the margin of the page indicate new or changed material.

Questions by a provider on cost policies and procedures in the program should be referred to the provider's intermediary.

II

2100.   PRINCIPLE

All payments to providers of services must be based on the reasonable cost of services covered under title XVIII of the Act and related to the care of beneficiaries or, in the case of acute care hospitals, the prospective payment system (PPS).  (See Chapter 28 on PPS.)  Reasonable cost includes all necessary and proper costs incurred in rendering the services, subject to principles relating to specific items of revenue and cost.

2102.   DEFINITIONS

2102.1   Reasonable Costs.--Reasonable costs of any services are determined in accordance with regulations establishing the method or methods to be used, and the items to be included.  Reasonable cost takes into account both direct and indirect costs of providers of services, including normal standby costs.  The objective is that under the methods of determining costs, the costs for individuals covered by the program are not borne by others not so covered, and the costs for individuals not so covered are not borne by the program.

Costs may vary from one institution to another because of scope of services, level of care, geographical location, and utilization.  It is the intent of the program that providers are reimbursed the actual costs of providing high quality care, regardless of how widely they may vary from provider to provider, except where a particular institution's costs are found to be substantially out of line with other institutions in the same area which are similar in size, scope of services, utilization, and other relevant factors. Utilization, for this purpose, refers not to the provider's occupancy rate but rather to the manner in which the institution is used as determined by the characteristics of the patients treated (i.e., its patient mix - age of patients, type of illness, etc.).

Implicit in the intention that actual costs be paid to the extent they are reasonable is the expectation that the provider seeks to minimize its costs and that its actual costs do not exceed what a prudent and cost conscious buyer pays for a given item or service.  (See §2103.)  If costs are determined to exceed the level that such buyers incur, in the absence of clear evidence that the higher costs were unavoidable, the excess costs are not reimbursable under the program.

In the event that a provider undergoes bankruptcy proceedings, the program makes payment to the provider based on the reasonable or actual cost of services rendered to Medicare beneficiaries and not on the basis of costs adjusted by bankruptcy arrangements.

2102.2   Costs Related to Patient Care.--These include all necessary and proper costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities.  Necessary and proper costs related to patient care are usually costs which are common and accepted occurrences in the field of the provider's activity.   They include personnel costs, administrative costs, costs of employee pension plans, normal standby costs, and others. Allowability of costs is subject to the regulations prescribing the treatment of specific items under the Medicare program.

2102.3   Costs Not Related to Patient Care.--Costs not related to patient care are costs which are not appropriate or necessary and proper in developing and maintaining the operation of patient care facilities and activities.  Costs which are not necessary include costs which usually are not common or accepted occurrences in the field of the provider's activity.

Such costs are not allowable in computing reimbursable costs and include, for example:

> o   Cost of meals sold to visitors;
>
> o   Cost of drugs sold to other than patients;
>
> o   Cost of operation of a gift shop;

     o    Cost of alcoholic beverages furnished to employees or to others regardless of how or where furnished, such as cost of alcoholic beverages furnished at a provider picnic or furnished as a fringe benefit;

     o    Cost of gifts or donations;

     o    Cost of entertainment, including tickets to sporting and other entertainment events;

     o    Cost of personal use of motor vehicles;

     o    Cost of fines or penalties resulting from violations of Federal, State, or local laws;

     o    Cost of educational expenses for spouses or other dependents of providers of services, their employees or contractors, if they are not active employees of the provider or contractor;

     o    Cost of meals served to executives that exceed the cost of meals served to ordinary employees due to the use of separate executive dining facilities (capital and capital-related costs), duplicative or additional food service staff (chef, waiters/waitresses, etc.), upgraded or gourmet menus, etc.; and

     o    Cost of travel incurred in connection with non-patient care related purposes.

2103.    PRUDENT BUYER

    A.    General.--The prudent and cost conscious buyer not only refuses to pay more than the going price for an item or service, he/she also seeks to economize by minimizing cost. This is especially so when the buyer is an institution or organization which makes bulk purchases and can, therefore, often gain discounts because of the size of its purchases. In addition, bulk purchase of items or services often gives the buyer leverage in bargaining with suppliers for other items or services. Another way to minimize cost is to obtain free replacements or reduced charges under warranties for medical devices. Any alert and cost conscious buyer seeks such advantages, and it is expected that Medicare providers of services will also seek them.

    B.    Application of Prudent Buyer Principle.--Intermediaries may employ various means for detecting and investigating situations in which costs seem excessive. Included may be such techniques as comparing the prices paid by providers to the prices paid for similar items or services by comparable purchasers, spotchecking, and querying providers about indirect, as well as direct, discounts. In addition, where a group of institutions has a joint purchasing arrangement which seems to result in participating members getting lower prices because of the advantages gained from bulk purchasing, any potentially eligible providers in the area which do not participate in the group may be called upon to justify any higher prices paid. Also, when most of the costs of a service are reimbursed by Medicare (for example, for a home health agency which treats only Medicare beneficiaries), examine the costs with particular care. In those cases where an intermediary notes that a provider pays more than the going price for a supply or service or does not try to realize savings available under warranties for medical devices or other items, in the absence of clear justification for
the premium, the intermediary excludes excess costs in determining allowable costs under Medicare.

    C.    Examples of Application of Prudent Buyer Principle.--

      1.    Provider A consistently purchases supplies from supplier R and makes no effort to obtain the most advantageous price for its supplies.

Supplier W sells identical or equivalent supplies at a lower cost and is also convenient to A. Unless the provider can clearly justify its practice of purchasing supplies from R rather than W, the intermediary excludes any excess of R's charges over W's charges.

2.    Supplier L supplies drugs to skilled nursing facility B and rents space from B to store the drugs to be used there. The rental paid by L to B for the space would generally constitute an indirect discount on the cost of drugs and must be reflected as a reduction of the cost of drugs supplied.

3.    Dr. C, a hospital-based radiologist, purchases radiology equipment which he then leases to the provider where he is a staff member. Costs to the provider in this case are higher than if the equipment had been leased through competitive bidding from an outside source. The intermediary reimburses the provider only for those costs which a prudent and cost conscious buyer would pay. Therefore, those costs which the provider pays for the equipment leased from the staff radiologist which are in excess of costs for equivalent equipment obtained through competitive bidding are denied.

4.    Provider B purchases cardiac pacemakers or their components for use in replacing malfunctioning or obsolete equipment, without asking the supplier/manufacturer for full or partial credits or payments available under the terms of the warranty covering the replaced equipment. The credits or payments that could have been obtained must be reflected as a reduction of the cost of the equipment supplied.

2104.    UNALLOWABLE COSTS RELATED TO PATIENT CARE

2104.1    Ambulance Service.--Ambulance service is covered under Part B of the Medicare program. A provider may furnish ambulance service directly or it may furnish the service under arrangements with a supplier of ambulance services. The cost the provider incurs to furnish ambulance service is paid by Medicare on a reasonable cost basis.

If a provider furnishes ambulance services with its own equipment and staff, the cost it incurs (depreciable cost of equipment, supplies, employee compensation, overhead, etc.) is its cost of the service for Medicare payment purposes. If it furnishes the service under arrangements, the charge to the provider by the ambulance company becomes the provider's direct cost of furnishing the service.

Medicare Part B carriers have established reasonable charge screens for a wide range of ambulance services furnished by suppliers of ambulance services for which claims are billed to the carriers. Medicare expects that the costs incurred by a provider for ambulance services furnished under arrangement with a supplier of ambulance services will not exceed the amount a carrier would pay the ambulance supplier for the same service. Therefore, if a provider furnishes ambulance service under arrangements, to the extent the provider's total costs of the services, direct costs and any indirect costs, exceeds what a carrier would pay a supplier of ambulance services for the same services in the same locality, the costs are unreasonable and cannot be paid by the provider's intermediary.

The next page is 21-3.2

03-85 COSTS RELATED TO PATIENT CARE 2105.3

by providers. Consultative services may include, for example, participating in the staff development program for nursing and other personnel and recommending policies relating to oral hygiene or dietary matters. For a detailed explanation of the coverage of inpatient services in connection with dental procedures, see §210.7 of the Hospital Manual (HCFA Pub. 10).

2104.5    Vocational and Scholastic Training Expense.-- The costs attributable to vocational, scholastic, or similarly oriented training activities conducted by providers on behalf of patients are not allowable costs. For example, costs incurred by a psychiatric facility in operating an elementary or secondary school for patients are unallowable costs.

## 2105.    UNALLOWABLE COSTS NOT RELATED TO PATIENT CARE

2105.1    Noncompetition Agreement Costs.--Amounts paid to the seller of an ongoing facility by the purchaser to acquire an agreement not to compete are considered capital expenditures. Where the agreement covers a stated number of years and the provider amortizes the amount paid over the agreed number of years, the amortized costs for such agreements are not allowable costs under the program.

2105.2    Cost of Meals for Other Than Provider Personnel.--The cost of meals for other than provider personnel, whether served in a cafeteria, coffee shop, canteen, etc., is unallowable under the program because it is not related to patient care. (See §2102.3) Providers must maintain adequate cost data in order to determine the cost of these meals. (See §2300ff.)

2105.3    Cost of Reserving Beds or Services.--

A.    Provider Making Payment to Reserve Beds or Services.--Providers may incur costs pursuant to a reserved bed agreement with another health care facility under which the provider receives guaranteed or priority placement for its discharged patients. For example, a hospital may pay a skilled nursing facility (SNF) to set aside a certain number of beds for the hospital's discharged patients. The cost incurred by a provider under a reserved bed agreement is not related to that provider's care of its patients and, therefore, is not an allowable cost.

B.    Provider Receiving Payment for Reserving Beds or Services.--The revenue received by a provider for reserving its beds or services is not considered related to patient care. Therefore, the payments received are not required to be offset against the provider's operating costs.

C.    Payment-In-Kind for Reserving Beds or Services.--If, under the terms of the agreement, a provider agrees to compensate another facility for reserving its beds by providing free or discounted services rather than by cash payments, neither the provider furnishing the services nor the provider receiving the services as payment-in-kind, is entitled to be reimbursed by Medicare for the cost of the services. (See §2328 F.)

2150.    HOME OFFICE COSTS--CHAIN OPERATIONS

A chain organization consists of a group of two or more health care facilities which are owned, leased, or through any other device, controlled by one organization. Chain organizations include, but are not limited to, chains operated by proprietary organizations and chains operated by various religious, charitable, and governmental organizations. A chain organization may also include business organizations which are engaged in other activities not directly related to health care. (See §§1002.2 and 1002.3 for definitions of common ownership and control.)

Home offices of chain organizations vary greatly in size, number of locations, staff, mode of operations, and services furnished to the facilities in the chain. The home office of a chain is not a provider in itself; therefore, its costs may not be directly reimbursed by the program. The relationship of the home office to the Medicare program is that of a related organization to participating providers. Home offices usually furnish central management and administrative services such as centralized accounting, purchasing, personnel services, management direction and control, and other services. To the extent the home office furnishes services related to patient care to a provider, the reasonable costs of such services are includable in the provider's cost report and are reimbursable as part of the provider's costs. Where the home office of the chain provides no services related to patient care, neither the costs nor the equity capital of the home office may be recognized in determining the allowable costs of the providers in the chain.

Very often the home office of a chain organization charges the providers in the chain a management fee for the services the home office furnishes. Management fees charged between related organizations are not allowable costs, except where §1010 is applicable, and such fees must be deleted from the provider's cost report. However, where management fees between related organizations are disallowed, the home office's reasonable costs for providing the services related to patient care are includable as allowable costs of the provider. The instructions for preparation of a home office cost statement containing schedules for the determination of home office costs and equity capital, and their allocation, are set forth in §2153.

Section 2150 is not applicable to franchise fees (see §2135ff), management fees or fees for other services paid by a provider where there is no common ownership or control between the provider and the franchisor or other service organization, or where the exception to the related organization principle applies (see §1010).

2150.1    General Limitation on Allowability of Costs.--Where a provider is furnished services, facilities, or supplies from an organization related to it by common ownership or control, the costs allowed are subject to the provisions of chapter 10. Thus, allowable cost is limited to the lower of (1) allowable costs properly allocated to the provider, except as indicated in §1010, or (2) the price for comparable services, facilities, or supplies that could be purchased elsewhere, taking account of the benefits of effective purchasing that would accrue to each member provider because of aggregate purchasing on a chainwide basis.

2150.2    Determination of Allowable Costs.--

A.    General.--Home office costs directly related to those services performed for individual providers which relate to patient care, plus an appropriate share of indirect costs (overhead, rent, administrative salaries, etc.) are allowable to the extent they are reasonable (see §2102.1). Home office costs that are not otherwise allowable costs when incurred directly by the provider cannot be allowable as home office costs to be allocated to providers. For example, certain advertising costs (see §2136.2), some franchise taxes and other similar taxes (see §2122.4), costs of noncompetition agreements (see §2105.1), certain life insurance premiums (see §2130), certain membership costs (see §§2138.3 and 2138.4) or those costs related to nonmedical enterprises are not considered allowable home office costs. In addition, where an owner of the provider, as defined in chapter 9, received compensation for services provided by the home office, the compensation is allowable only to the extent that it is related to patient care (see §902.2) and to the extent that it is reasonable (see §902.3).

B.    Organization, Start-Up, and Other Corporate Costs.--

1.    Organization Costs.--The organization costs of a home office (except those referred to below) are considered allowable costs under the Medicare program and must be amortized in accordance with the provisions in §2134ff. Section 2134.1B describes costs which are not considered allowable organization costs. In addition, reorganization costs (see §2134.10) and stockholder servicing costs (see §2134.9) are not allowable organization costs. These unallowable organization costs are excluded from the computation of the home office equity capital.

2.    Start-Up Costs.--Start-up costs of a home office are considered allowable costs under the Medicare program and must be amortized in accordance with the provisions of §2132ff.

3.    Costs of Corporate Acquisitions.--Costs related to the acquisition of the capital stock of a provider, whether or not such facilities are participating or subsequently will participate in the Medicare program, are not allowable (see §2134.11). Additionally, costs connected with the transfer of assets to a chain are not allowable as organization costs but instead must be capitalized as part of the cost of the asset (see §104.10).

C.    Interest on Loans Between Home Office and Components of Chain.--Where the home office makes a loan to, or borrows money from, one of the components of the chain, the interest paid is generally not an allowable cost and the interest income earned from such a loan is not used to reduce allowable interest expense. (See §218 for the general rule and §§218.2 and 220 for exceptions to the general rule.)

D.  Interest on Loans From Unrelated Sources.--Interest expense (see §200ff) is allowable to the extent that the proceeds of the related loan, mortgage, bond issue, etc., are used either to acquire assets for use in patient care activities (capital related) or to provide funds for operations related to patient care (noncapital related).  The interest expense must be reduced by investment income as defined in §202.2.  For the allocation of interest expense and investment income, refer to §2150.3.E.  Where proceeds of a loan, mortgage, bond issue, etc., are used to acquire stock ownership (as opposed to assets and liabilities) of additional facilities, the interest expense is not allowable.

E.  Home Office Planning Costs.--This policy is effective for all cost reporting periods beginning on or after June 1, 1976.

1.  Expanding, Rebuilding, or Relocating Existing Providers.--When a home office incurs planning costs as described in §§2154.1 and 2154.2 to purchase or construct a new facility, to expand, rebuild, or relocate a provider which is a member of a chain organization, such costs are allowable when:

a.  They are reasonable and prudent as defined in §2103;

b.  They have been included in the historical cost of the completed facility;

c.  The facility has been certified to participate in the Medicare program; and

d.  The facility has been approved under §1122 of the Social Security Act. (See §2422ff.)

Any planning costs incurred to purchase land become part of the historical cost of the land and are not included in the historical cost of the depreciable assets of the completed facility. If a home office incurs planning costs for both land and a facility, and such costs cannot be specifically identified with either the land or facility, the planning costs must be allocated between the land and facility based on the cost of each to the total cost.

If a home office abandons plans, the abandoned planning costs are treated as provided for in §2154.4.  Any allowable abandonment costs must be directly allocated to the appropriate provider.

2.  Expansion of the Chain Operation.--

a.  Allowable.--If a home office incurs planning costs to construct a new facility or to purchase an existing facility (excluding land) to expand a chain organization and not to expand an existing provider, such costs are recognized when the requirements enumerated in subsection 1. above are met.

b.  Nonallowable.--If a home office abandons plans described in a. above, the costs of the abandoned plans are considered an investment loss and are not allowable. Also, where plans involving the acquisition of land are abandoned, the costs of such plans are not allowable.

F. __Malpractice and Comprehensive General Liability, Unemployment and Workers'
Compensation Insurance Coupled with Second Injury Coverage.__--Payments by a home office of a
chain for its providers, or individually by members of a chain to an independent fiduciary for
malpractice and comprehensive general liability insurance coverage, as well as unemployment and
workers' compensation, coupled with second injury coverage, will be recognized if made to a fund
established in accordance with the requirements in §2162ff.

2150.3  Allocation of Home Office Costs to Components in Chain.--

A.  __Procedure.__--Starting with its total costs, including those costs paid on behalf of providers
(or other components in the chain), the home office must delete all costs which are not allowable in
accordance with program instructions.  The remaining costs (total allowable costs) will then be
identified as capital-related costs and noncapital-related costs and allocated as stated below to all the
components--both providers and nonproviders--in the chain which received services from the home
office.

Where the home office incurs costs for activities not related to patient care in the chain's
participating providers, the allocation bases used must provide for the appropriate allocation of costs
such as rent, administrative salaries, organization costs, and other general overhead costs which are
attributable to nonpatient care activities, as well as to patient care activities.  All activities and
functions in the home office must bear their allocable share of home office overhead and general
administrative costs.

B.  __Costs Directly Allocable to Components.__--The initial step in the allocation process is the
direct assignment of costs to the chain components.  Allowable costs incurred for the benefit of, or
directly attributable to, a specific provider or nonprovider activity must be allocated directly to the
chain entity for which they were incurred.  For example, where such costs are paid by the home
office, interest expense is allocated to the facility for which the loan was made; salaries are allocated
to the facility to whose employees they apply; etc.  Home offices may simplify the allocation of costs
to the chain components in the cost finding process by transferring the costs which are directly
allocable to the components through the intercompany accounts.  The transfers should be made at the
time the costs are incurred.

C.  __Costs Allocable on a Functional Basis.__--The allowable home office costs that have not
been directly assigned to specific chain components must be allocated among the providers (and any
nonprovider activities in which the home office may be engaged) on a basis designed to equitably
allocate the costs over the chain components or activities receiving the benefits of the costs.  This
allocation must be made in a manner reasonably related to the services received by the entities in the
chain.  Chain home offices may provide certain centralized services, such as central payroll or central
purchasing, to the chain components.  Where practical and the amounts are material, these costs must
be allocated on a functional basis.  For example, costs of a central payroll operation could be
allocated to the chain components based on the number of checks issued; the costs of a central
purchasing function could be allocated based on purchases made or requisitions handled.  Any
residual allowable home office costs remaining after a functional cost allocation has been completed
must be included as pooled costs and allocated as described in subsection D. below.  The functions,
or cost centers used to allocate home office costs,

and the unit bases used to allocate the costs, including those for the pooled costs described in subsection D., must be used consistently from one home office accounting period to another.

However, if the home office wishes to change its allocation bases and believes the change will result in more appropriate and more accurate allocations, the home office must make a written request, with its justification, to the intermediary responsible for auditing the home office cost for approval of the change no later than 120 days after the beginning of the home office accounting period to which the change is to apply.

The intermediary's approval of a home office request will be furnished to the home office in writing. Where the intermediary approves the home office request, the change must be applied to the accounting period for which the request was made, and to all subsequent home office accounting periods unless the intermediary approves a subsequent request for change by the home office. The effective date of the change will be the beginning of the accounting period for which the request was made.

   D.   Pooled Costs in Home Office.--In each home office there will be a residual amount, or "pool," of costs incurred for general management or administrative services which cannot be allocated on a functional basis. For home office accounting periods beginning before November 1, 1976, these costs may be allocated to the components in the chain on the basis of beds, bed days, or other basis, provided the basis used equitably allocate such costs. Revenues are not generally appropriate for distributing these costs. Where the home office cannot determine its costs by functions and allocate them on a functional basis, the home office must allocate its costs as one cost center of pooled costs.

   1.   For home office accounting periods beginning on or after November 1, 1976, but beginning before January 1, 1983, the pooled costs of the home office must be allocated to the chain components in accordance with the following:

      a.   Where the chain consists solely of health care facilities, the pooled costs must be allocated to the components based on either inpatient days or total costs. If inpatient days are used, each facility would share in the pooled costs in the same proportion that its inpatient days bear to the total inpatient days of all the facilities in the chain. The basis of inpatient days can be used only if the entire chain consists solely of inpatient health care facilities. If the chain consists of both inpatient and noninpatient type of facility, total costs must be used as the basis of allocation. If total costs are used, each facility would share in the pooled costs in the same proportion that its total costs (excluding home office costs) bear to the total costs of all facilities in the chain. Total costs are costs before Medicare adjustments are made.

      b.   Where the chain consists of health care facilities and organizations carrying on other types of activities, such as pharmacies, construction companies, etc., the pooled costs may be allocated to the health care facilities and nonhealth care organizations on an appropriate basis, depending upon the organization of the chain. The

intermediary would be responsible for reviewing and approving the basis used. After this initial allocation, the pooled costs allocated to the health care facilities must then be allocated to each separate facility as set forth in a. above.

    2.   For home office accounting periods beginning on or after January 1, 1983:

        a.   Pooled home office costs must be allocated on the basis of inpatient days, provided the entire chain consists solely of comparable inpatient health care facilities (e.g., the entire chain is composed solely of short term inpatient hospitals). Where this situation exists, each facility in the chain would share in the pooled costs in the same proportion that its total inpatient days bears to the total inpatient days of all the facilities in the chain.

        b.   Pooled home office costs must be allocated to chain components on the basis of total costs if the chain is composed of either unlike health care facilities (e.g., a combination of short-term hospitals, long-term hospitals, and home health agencies) or a combination of health care facilities and nonhealth care facilities (i.e., facilities engaged in activities other than the provision of health care). Under this basis, all chain components will share in the pooled home office costs in the same proportion that the total costs of each component (excluding home office costs) bear to the total costs of all components in the chain. Total costs are costs before Medicare adjustments are made.

Where a chain consists of health care facilities and organizations carrying on other types of activities, pooled costs can be initially allocated to the health care facilities and nonhealth care facilities on an appropriate basis depending upon the organization of the chain, subject to intermediary approval as explained in the following paragraph. After this initial allocation has been performed, the pooled costs allocated to the health care facilities must then be distributed to these chain components in accordance with the requirements of paragraphs a. or b. above, as appropriate.

If evidence indicates that the use of a more sophisticated allocation basis would provide a more precise allocation of pooled home office costs to the chain components, such basis can be used in lieu of allocating on the basis of either inpatient days or total costs. However, intermediary approval must be obtained before any substitute basis can be used. The home office must make a written request with its justification to the intermediary responsible for auditing the home office cost for approval of the change no later than 120 days after the beginning of the home office accounting period to which the change is to apply.

The intermediary's approval of a home office request will be furnished to the home office in writing. Where the intermediary approves the home office request, the change must be applied to the accounting period for which the request was made, and to all subsequent home office accounting periods, unless the intermediary approves a subsequent request for change by the home office. The effective date of the change will be the beginning of the accounting period for which the request was made.

    E.   Allocation of Interest Expense and Investment Income of Chain Operations.--Interest expense incurred by the home office must be appropriately assigned and/or allocated in accordance with subsections 2150.3.A-D. As required in §2150.3.A., interest expense must be separately identified between capital-related and noncapital-related.

Similarly, all home office investment income which is subject to offset (see §202.2) against allowable interest expense must be appropriately assigned and/or allocated in accordance with the methodology of subsections 2150.3.A-C, and separately identified between capital-related and noncapital-related. Any investment income which cannot be allocated in accordance with subsections A-C must be allocated in the same proportion that the total capital related or noncapital related interest expense of each component bears to the total interest expense of all components in the chain. The net amount of capital-related interest expense and investment income (whether positive or negative) so determined, at the home office level for each chain provider, must be appropriately included with that chain provider's costs as described in F. below. Also, the net amount of noncapital-related interest expense and investment income (whether positive or negative) so determined at the home office level, for each chain provider, must be appropriately included with that chain provider's costs as described in F., below.

   F.    Inclusion in Provider Costs.--Home office costs directly allocated to the chain providers should be included in each appropriate account in the provider's trial balance and then allocated through the provider's cost-finding process. The provider's share of the home office's allowable costs is included in the provider's adjusted trial balance with the provider's own allowable costs. This amount, like other costs, must be allocated between
patient care and nonpatient care activities.

The provider's share of the net amount of home office capital-related interest expense and investment income is subject to offset by the provider's own capital-related investment income and included with the provider's capital-related costs. If the provider's share is a negative amount, it should be added to the provider's capital-related investment income and the combined amount used to reduce the provider's capital-related interest expense.

The provider's share of the net amount of home office noncapital-related interest expense and investment income is subject to offset by the provider's own noncapital-related investment income and included with the provider's Administrative and General costs. If the provider's share is a negative amount, it should be added to the provider's noncapital-related investment income and the combined amount used to reduce the provider's noncapital-related interest expense.

Although the share of the home office costs allocated to each provider may thereby become allowable costs under the program, the allowed costs of providers in a chain should not exceed the cost allowed for similar institutions not so affiliated. Thus, the costs of a chain provider (including any allowable home office costs) are not recognized or allowed to the extent they are found to be out of line with similar institutions in the same area. (See §2102ff.)

   G.    Interperiod Allocation of Home Office Costs.--When the home office accounting period differs from the cost reporting period of a chain provider, the allowable home office costs of the provider for the period covered by the home office cost statement should be included in the provider's cost report as indicated above and then allocated through the cost-finding process. An amount of allowable home office costs and equity capital for the provider for the portion of its reporting year not covered by the home office statement will be tentatively projected at a rate not in excess of the previous year's home office costs and equity capital as set forth in the applicable home office cost statement.

Example:

The home office has an accounting year ending August 31, 1974. For that year, home office costs of $120,000 were allocated to Provider A and $84,000 to Provider B. Provider A's reporting year ends on December 31; Provider B's reporting year ends on March 31.

Of the $120,000 costs allocated to Provider A, $40,000 applies to its reporting year ended 12/31/73, covering the period from 9/1/73 to 12/31/73; and $80,000 applies to its reporting year ending 12/31/74, covering the period from 1/1/74 to 8/31/74. Therefore, in its cost report for the year ending 12/31/74, Provider A may include home office costs of $40,000 projected for the period 9/1/74 to 12/31/74, which is not covered by the home office cost statement ($10,000 per month x 4 months).

Of the $84,000 allocated to Provider B, $49,000 applies to its reporting year ending 3/31/74, covering the period from 9/1/73 to 3/31/74; and $35,000 applies to its reporting year ending 3/31/75, covering the period from 4/1/74 to 8/31/74. Therefore, in its cost report for the year ending 3/31/75, Provider B may include home office costs of $49,000 projected for the period 9/1/74 to 3/31/75, which is not covered by the home office cost statement ($7,000 per month x 7 months).

A similar procedure would be followed for projecting an amount of home office equity capital. Then, the following year, when actual costs and equity capital are determined, the projected amounts will be adjusted to agree with the actual amounts, and appropriate adjustments made to the provider's reimbursement.

2160.    LOSSES ARISING FROM OTHER THAN SALE OF ASSETS

   A.    General.--A provider participating in the Medicare program is expected to follow sound and prudent management practices, including the maintenance of an adequate insurance program to protect itself against likely losses, particularly losses so great that the provider's financial stability would be threatened.  Where a provider chooses not to maintain adequate insurance protection against such losses, through the purchase of insurance, the maintenance of a self-insurance program described in §2161B, or other alternative programs described in §2162, it cannot expect the Medicare program to indemnify it for its failure to do so.  Where a provider chooses not to file a claim for losses covered by insurance, the costs incurred by the provider as a result of such losses may not be included in allowable costs.

If a provider is unable to obtain a particular type of insurance coverage, excluding malpractice and comprehensive general liability coverage in conjunction with malpractice coverage or malpractice liability coverage only (see §2162A), and it sustains losses at a time of noninsured status, the cost of such losses will be considered allowable costs where the provider submits evidence to establish the unavailability of the coverage.  If a provider is unable to obtain malpractice coverage, it must select one of the self-insurance alternatives in §2162 to protect itself against such risks.  If one of these alternatives is not selected and the provider incurs losses, the cost of such losses and related expenses are not allowable.

   B.    The Deductible Clause.--Certain types of insurance policies are subject to a customary deductible.  To purchase these policies without the deductible feature would result in a substantially higher premium and thus would not be in keeping with sound business practice.  Therefore, losses incurred for such amounts attributable to the customary deductible clause are considered allowable costs under the Medicare program except for deductibles for malpractice and comprehensive general liability in conjunction with malpractice coverage or for malpractice liability only or for unemployment and workers' compensation insurance coupled with second injury coverage which are subject to certain funding requirements as described in §2162.5.

2160.1    Net Operating Losses.--Because operating losses are not costs, a net operating loss sustained by a provider is not an allowable cost.

2160.2    Liability Losses.--Liability damages paid by the provider , either imposed by law or assumed by contract, which should reasonably have been covered by liability insurance, are not allowable.  Insurance against a provider's liability for such payments to others would include, for example, automobile liability insurance; professional liability (malpractice, negligence, etc.); owners, landlord and tenants liability; and workers' compensation.  Any settlement negotiated by the provider or award resulting from a court or jury decision of damages paid by the provider in excess of the limits of the provider's policy, as well as the reasonable cost of any legal assistance connected with

08-98 COSTS RELATED TO PATIENT CARE 2162.2

o    The administrative cost for the arrangements, including the cost for the maintenance of a fund by a fiduciary, legal cost, cost of a risk management program, cost of claims management program, actuarial costs, and other related costs.

o    The necessary contributions to the fund based on an actuarial determination (as described in §2162.7C) of anticipated losses for malpractice, comprehensive general liability coverage in conjunction with malpractice, unemployment compensation, workers' compensation, and employee health care insurance. The determination of necessary contributions to the fund may also be made by a governmental agency for unemployment compensation and workers' compensation.

o    The cost of any insurance to supplement self-insurance, like stop-loss insurance.

o    The comparative commercial insurance premium.

2162.1    Insurance with a Deductible or Coinsurance Provision.--If you purchase an insurance policy with a deductible or coinsurance provision from a commercial insurance company, the cost of the insurance coverage for losses in excess of the deductible or coinsurance is an allowable cost, to the extent that the amount of coverage is consistent with sound management practices. (See §2162.5 for the discussion of losses related to deductibles or coinsurance.)

2162.2    Insurance Purchased From a Limited Purpose Insurance Company.--

A.    Premium Costs.--Some providers, groups of providers, and State hospital associations have established limited purpose insurance companies (often known as captive insurance companies) to insure themselves against malpractice and, in some instances, comprehensive general liability losses as well as unemployment and workers' compensation insurance and employee health care costs. The regular premiums (other than the supplemental premiums) paid to such companies for provider malpractice and comprehensive general liability coverage in conjunction with malpractice coverage, or for malpractice liability coverage only, as well as unemployment insurance costs paid to the Federal Government and to the States, workers' compensation insurance costs paid to commercial insurance companies, and employee health benefit premiums paid to such companies are allowable costs if they are not in excess of the cost of available comparable commercial insurance premiums and meet the reasonable cost provisions of §2100. If comparable insurance premiums are not available, the captive insurance company must obtain an evaluation of the adequacy and reasonableness of its insurance premium by an independent actuary, commercial insurance company, or broker as described in §2162.7 C. The allowable premium may not exceed the amount which such evaluation determines to be reasonable.

Rev. 406 21-42.3

In addition, supplemental premiums which are assessed by limited purpose insurers to build reserves against contemplated losses, as distinguished from capital costs, are allowable costs if, when added to the regular premium, the total premium costs do not exceed a commercial insurance premium for comparable coverage. The supplemental premiums must have the essential characteristics of normal insurance premiums, i.e., they must stand at risk against potential losses and must be available to support losses. Any excess premiums are allowed in a subsequent cost reporting period to the extent that, when added to premiums paid to the captive insurance company in that period for comparable coverage, the total premium costs do not exceed the comparable commercial insurance premiums for that period. Premiums paid to a limited purpose insurance company are recognized in your allowable costs only if all of the conditions of this section are met.

Any funds returned to the insured by the insurer (rebates, distributions, etc.) must be offset against the costs in the year you receive them. Such returned funds must be offset against the costs of the Employee Health and Welfare Cost Center for employee health care and against the costs of the Administrative and General Cost Center for other than employee health care. However, if a captive insurance company is liquidated, no offset is required for the return of capitalization costs previously paid by providers receiving the rebate. If payments are made to other than providers, e.g., the home office of a chain organization, appropriate adjustment of your cost is still necessary. Proper allocation of distributions by the home office to you must be made based on the appropriate facts in each situation.

The premium paid by you for hospital-based physicians is subject to the requirements in §2162 B.

The captive insurance company must have an adequate claims management and risk management program and, in cases where the captive insurance company is designed to cover employee health care insurance, it is suggested that a coordination of benefits program be employed as described in §2162.7 D. In cases where a limited purpose insurance company has both Medicare and non-Medicare participating providers paying premiums, such premiums must be determined so that Medicare providers do not share in premium costs that must be borne by the non-Medicare providers, and non-Medicare providers do not share in premium costs that must be borne by Medicare providers.

If a provider or group of providers is related to the insurer through ownership or control, as defined in Chapter 10, the following additional provisions apply:

1.      The captive insurance company must be established in and meet the appropriate insurance laws of one of the United States, District of Columbia, or foreign government, if it is formed offshore.

2.      The excess of actuarially determined loss reserves and related operating expenses over actual losses and related operating expenses and gains and losses from investments must be taken into account in establishing reasonable premium levels which do not reflect a profit factor.

3.    If you terminate from the Medicare program, you must obtain a final determination of the adequacy of premium reserves as of the date of termination. This determination must be obtained from an independent actuary, commercial insurance company or broker as described in §2162.7. Any reserves that are deemed excessive at the date of termination must be offset against your allowable costs in your final cost report. If reserves are deemed inadequate, additional premium payments subsequent to the date of termination are not allowable provider costs.

4.    In the case of offshore captives, investments by a related captive insurance company are limited to low risk investments in United States dollars such as bonds and notes issued by the United States Government; debt securities issued by United States corporations or governmental entities within the United States rated in the top two classifications by United States recognized securities rating organizations at the time of investment; debt securities of foreign subsidiaries of United States corporations rated in the top two classifications by United States recognized securities rating organizations at the time of investment where the parent United States corporations guaranteed (on the face of the securities) payment of the subsidiaries' securities; and deposits (including Certificates of Deposit) in United States banks or their foreign subsidiaries, and foreign banks rated in the top two short term classifications by United States recognized securities rating organizations. Low risk investments may also include investments of non-United States issuers including foreign governments and corporations and supranational agencies rated in the top two classifications by United States recognized securities rating organizations (effective with investments made on or after 10/11/91). Effective for investments made on or after 10/06/95, the limitation on related offshore captive insurance company investments is extended to include the above described low risk investments rated in the top three classifications by United States recognized securities rating organizations. Additionally, investments may include dividend paying equity securities listed on a United States stock exchange provided that the investment in equity securities does not exceed 10 percent of the company's admitted assets, with the investment in any specific equity issue further limited to 10 percent of the total equity security investment. (All such captives are required to annually submit to a designated intermediary a certified statement from an independent certified public accountant or actuary attesting to compliance or non-compliance with these requirements for the previous period.) These investments cannot be pledged or used as collateral for loans obtained by the captive or parties related to the captive either directly or indirectly, nor may investments be made in a related organization.

Recognizing that a captive's portfolio may presently contain other than low risk United States based investments and that possible losses in converting a captive's current portfolio to acceptable investments may result, the Medicare program allows any investments owned by the captive on July 31, 1978 to be considered acceptable investments under this section. As investments held by the captive on July 31, 1978 subsequently mature, are exchanged for other types of investments or sold, any proceeds that are reinvested must be invested in accordance with the provisions of this section.

5.    Loans or any transfer of funds by the insurance company to policy holders, owners of providers, or parties related to them are prohibited.

C.  Employee Health Care Insurance.--The provisions of this section related to insurance purchased from a limited purpose insurance company (captive), total self-insurance or a combination of purchased insurance and self-insurance are effective with cost reports settled on or after January 15, 1983, and cost reports under appeal as of or subsequent to January 15, 1983.  Prior to this date, payments made to a captive insurance company or to a self-insurance fund designed to provide employee health care coverage shall not be considered an allowable cost at the time the payment was made.  Cost recognition for periods prior to the effective date shall be limited to the premium cost of commercial insurance purchased to provide this coverage or to the actual cost of the health expenses paid on behalf of the employee at the time such expenses were actually incurred.

2162.12  Buy-Out Cost to Convert from a State-Administered Fund to a Self-Insurance Fund for Unemployment Compensation or Workers' Compensation Insurance.--The charge made by a governmental agency for the cost of pending and expected claims of employees of a business entity which discontinues purchasing insurance coverage from the governmental agency is considered a buy-out cost.  Where a provider or group of providers or chain of providers incurs a liability representing a "buy-out" cost to enable those providers to set up their own self-insurance fund for unemployment compensation or workers' compensation coverage, the liability is an allowable cost of the year incurred to be proportionately spread among the providers which are part of the buy-out arrangement in an amount directly related to the provider's claims to be assumed by the State.  Where the State permits payment over a period greater than 1 year and issues an annual assessment of the amount due, then the amount to be included in allowable costs cannot exceed the assessment.  This assessment establishes the annual liability which the provider must pay to the State.  See §2305 where the amount is accrued on the books.

2162.13  Absence of Coverage.--Where a provider, other than a governmental (Federal, State, or local) provider, has no insurance protection against malpractice or comprehensive general liability in conjunction with malpractice, either in the form of a limited purpose or commercial insurance policy or a self-insurance fund as described in §2162.7, any losses and related expenses incurred are not allowable.

2162.14  Governmental Providers.--For all governmental providers (Federal, State, or local), Medicare will reimburse its proportionate share of actual losses in the year paid, without funding or subject to the deductible provisions of §2162.5, but only if the provider demonstrates to its intermediary that it has a claims management and risk management program as described in §2162.7D.

2302.16  Hospital-based Skilled Nursing Facility Cost Centers.--Cost centers established to accumulate the routine costs applicable to the care and treatment of those patients receiving skilled nursing services.

2302.17  Hospital- or SNF-based Home Health Agency Cost Centers.--Cost centers established to accumulate costs applicable to the care and treatment of those patients receiving home health agency services.

## 2304.    ADEQUACY OF COST INFORMATION

Cost information as developed by the provider must be current, accurate, and in sufficient detail to support payments made for services rendered to beneficiaries.  This includes all ledgers, books, records and original evidences of cost (purchase requisitions, purchase orders, vouchers, requisitions for materials, inventories, labor time cards, payrolls, bases for apportioning costs, etc.), which pertain to the determination of reasonable cost, capable of being audited.

Financial and statistical records should be maintained in a consistent manner from one period to another.  However, a proper regard for consistency need not preclude a desirable change in accounting procedures, provided that full disclosure of significant change is made to the intermediary.

2304.1    Availability of Records of Providers.--A participating provider of services must make available to its intermediary its fiscal and other records for the purpose of determining its ongoing record keeping capability.  The intermediary's examination of such records and documents are necessary to ascertain information pertinent to the determination of the proper amount of program payments due the provider.  (See §2404ff.)

## 2305.    LIQUIDATION OF LIABILITIES

A.    General.--A short term liability must be liquidated within 1 year after the end of the cost reporting period in which the liability is incurred, subject to the exceptions specified in §§2305.1 and 2305.2.  Liquidation must be made by check or other negotiable instrument, cash or legal transfer of assets such as stocks, bonds, real property, etc. Where liquidation is made by check or other negotiable instrument, these forms of payment must be redeemed through an actual transfer of the provider's assets within the time limits specified in this section.  Where the liability (1) is not liquidated within the 1-year time limit, or (2) does not qualify under the exceptions specified in §§2305.1 and 2305.2, the cost incurred for the related goods and services is not allowable in the cost reporting period when the liability is incurred, but is allowable in the cost reporting period when the liquidation of the liability occurs.

B.    Effective Date.--The policy for liquidation of short term liabilities as specified in §§2305-2305.2 is effective for costs incurred during cost reporting periods beginning on or after April 1, 1978.  Any short term liabilities for costs that exist before this effective date must be liquidated by the end of the provider's first effective cost reporting period under this policy.

2305.1    Exception to 1-Year Time Limit.--If, within 1 year following the end of a provider's cost reporting period, the provider furnishes to the intermediary sufficient written justification (based upon documented evidence) for nonpayment of the liability, the intermediary may grant an extension for good cause. This extension must not extend beyond 3 years after the end of the cost reporting period in which the liability was incurred. Examples of valid justification, i.e., good cause, would include, but are not limited to, insufficient cash flow, or accounting error in the receipt and processing of bills for the cost of goods and services.

2305.2    Application and Exceptions.--The policy for liquidation of liabilities as specified in §2305ff applies to all costs except those described in the PRM sections listed below:

    A.    Section 220 - Interest paid to The Mother House or other governing body of a religious order;

    B.    Section 704.5 - Members of organizations having arrangements with provider;

    C.    Section 2146.2 - Reimbursement for costs of vacation;

    D.    Sections which mandate liquidation within 75 days after the end of the cost reporting period in which the liability was incurred.

2306.    COST FINDING METHODS

Departments within a provider are usually divided into two types: 1) Those that produce patient care revenue (e.g., routine services, radiology), and 2) Those that do not directly generate patient care revenue but are utilized as a service by other departments (e.g., laundry and linen, dietary). The two types of departments are commonly referred to as "revenue-producing cost centers" and "nonrevenue-producing cost centers," respectively.

Although nonrevenue-producing cost centers do not directly produce patient care revenue, they contribute indirectly to patient care revenue generated by "serving" as a service to the revenue-producing centers and also to other nonrevenue-producing centers. Therefore, for the purpose of proper matching of revenue and expenses, the cost of the revenue-producing centers should include both its direct expenses and its proportionate share of the costs of each nonrevenue-producing center (indirect costs) based on the amount of services received. The process of allocating the cost of a particular nonrevenue-producing center to other nonrevenue-producing centers and revenue-producing centers is performed by utilizing a set of statistics (e.g., pounds of laundry for allocating "laundry and linen" costs, square feet for allocating "depreciation building" costs).

Every nonrevenue-producing cost center has the potential of being allocated to every other nonrevenue-producing cost center in addition to the revenue-producing cost centers. This precludes a simple allocation of the direct expense of the nonrevenue-producing cost center because the indirect costs derived from allocation of other nonrevenue-producing cost centers must be computed in determining the "full cost" (direct and indirect costs) of the nonrevenue-producing cost center being allocated. All cost finding methods employ this computation in determining the full costs of departments.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CATHOLIC HEALTH INITIATIVES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No.: 07-0555 (PLF) |
| | ) | |
| MICHAEL O. LEAVITT, Secretary of | ) | |
| Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER AND JUDGMENT

Having considered the parties' cross-motions for summary judgment, it is hereby

ORDERED that plaintiffs' motion for summary judgment is GRANTED; it is

FURTHER ORDERED that defendant's motion for summary judgment is DENIED; it is

FURTHER ORDERED that defendant's final decision in PRRB decision number 2007-D14, dated January 24, 2007, is reversed and vacated; it is

FURTHER ORDERED that the plaintiff hospitals are entitled to prompt reimbursement from defendant for the Medicare program's allocable share of the premium assessments incurred by the hospitals during the cost reporting periods at issue for liability insurance coverage obtained through the captive insurer owned and operated by plaintiff Catholic Health Initiatives; it is

FURTHER ORDERED that defendant shall make a determination of its share of that expense in accordance with this Order and make payments to the plaintiff hospitals of the additional sums due them for the Medicare program's share of those expenses for the cost reporting periods at issue by not more than 180 days from the date of this Order; it is

FURTHER ORDERED that defendant shall pay the plaintiff hospitals interest computed in accordance with 42 U.S.C. § 1395(f)(2); it is

FURTHER ORDERED that JUDGMENT is entered for plaintiffs; and, it is

FURTHER ORDERED that this Order and Judgment shall constitute a FINAL JUDGMENT in this case.

SO ORDERED.


_____
PAUL L. FRIEDMAN
United States District Judge

DATE:_____


DC 702330v.1