## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CATHOLIC HEALTH INITIATIVES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 07-0555 (PLF) |
| | ) | |
| MICHAEL O. LEAVITT, Secretary of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(b), Defendant, Michael O. Leavitt, Secretary of Health and Human Services, by and through his undersigned counsel, respectfully moves this Court for summary judgment on the grounds that there are no material facts in dispute and that Defendant is entitled to judgment as a matter of law. In support of the instant motion, the Court is respectfully referred to the accompanying Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment. A proposed order is attached.

Respectfully submitted,

s/Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

s/Peter S. Smith
PETER S. SMITH, D.C. BAR # 465131
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-0372

       s/ Paul E. Soeffing
PAUL E. SOEFFING
Attorney
D.C. Bar No. 459480
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
Room C2-05-23
7500 Security Boulevard
Baltimore, Maryland 21244-1850
410-786-1895

OF COUNSEL:

DANIEL MERON
General Counsel

MARK D. POLSTON
Acting Associate General Counsel

LAWRENCE J. HARDER
Acting Deputy Associate General
    Counsel for Litigation

United States Department of
    Health and Human Services

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CATHOLIC HEALTH INITIATIVES, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Civil No. 07-0555 (PLF) |
| | ) |
| MICHAEL O. LEAVITT, Secretary of | ) |
| Health and Human Services, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

Defendant, Michael O. Leavitt, the Secretary of Health and Human Services, submits the following statement of material facts as to which there is no genuine issue in accordance with Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h).

1.    Plaintiff Catholic Health Initiatives ("CHI") is a non-profit health care organization based in Denver, Colorado.  Administrative Record ("A.R.") 93, 5377.

2.    The Plaintiff hospitals are fifty-five Medicare-participating hospitals.  Complaint ¶ 12; Answer ¶ 12.

3.    First Initiatives Insurance, Ltd. ("FIIL") is an offshore captive insurance company wholly owned by CHI.  A.R. 9, 93, 279, 5377.

4.    During their Medicare cost reporting periods ended in 1997 through 2002, the Plaintiff hospitals paid premiums to FIIL for malpractice, other liability and workers' compensation insurance coverage.  A.R. 8, 93, 5377.

5.    FIIL is domiciled in the Cayman Islands.  A.R. 93, 5377.

6.    FIIL invests forty to fifty percent of its assets in equity securities.  A.R. 9, 93, 279,

5377.

7. Medicare's Provider Reimbursement Manual ("PRM") § 2162.2.A.4, requires that in order to receive reimbursement for their insurance premiums, providers that choose to obtain insurance through offshore captives must have no more than ten percent of assets invested in equity securities.  A.R. 8, 93, 5377.

8. Plaintiffs were aware of this rule and knew that by choosing not to follow it they would forfeit Medicare reimbursement for these costs.  A.R. 12, 229.

9. On their Medicare cost reports, Plaintiffs self-disallowed the premiums they paid to FIIL.  A.R. 8, 93, 279, 5377.

10. In December 2003 and January 2004, the Plaintiff hospitals filed with the Provider Reimbursement Review Board ("PRRB" or the "Board") their requests for hearing challenging their self-disallowed insurance premiums paid to FIIL.  A.R. 6915-53.

11. On January 13, 2004, Plaintiffs' individual PRRB hearing requests were consolidated into a group appeal.  A.R. 6910-14.

12. The Board held a hearing on Plaintiffs' group appeal on November 4, 2004.  A.R. 6.

13. On January 24, 2007, the PRRB issued its decision upholding CMS's disallowance of Plaintiffs' premium costs.  A.R. 6-16.

14. The Board found that "[t]he investment restrictions of [CMS] Pub. 15-1 § 2162.2.A.4 do not serve to supervise or control the business of insurance that would be prohibited by 42 U.S.C. § 1395."  A.R. 11.

15. The PRRB found that "[b]ecause offshore captives are under the control of foreign governments and are not subject to the same level of industry regulations applied to onshore

2

agencies by State insurance commissions, CMS provided guidance and instructions to intermediaries and providers regarding how it would determine the necessary and proper costs with respect to offshore captives set up by related parties." A.R. 11.

16. The Board found that Medicare should not pay any of the hospitals' actual claims because there was nothing in the manual "that allows costs found to be non-allowable, as are the costs in the present case, to surreptitiously become allowable." A.R. 12.

17. On March 9, 2007, the CMS Administrator declined to review the Board decision. A.R. 2.

18. On March 17, 2007, the CMS Attorney Advisor notified the hospitals that the Administrator had declined to review the PRRB's decision and that the hospitals could obtain judicial review of the Board's decision. A.R. 1.

19. The Plaintiff hospitals filed the instant lawsuit on March 20, 2007. Docket #1.

Respectfully submitted,

s/Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

s/Peter S. Smith
PETER S. SMITH, D.C. BAR # 465131
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-0372

s/ Paul E. Soeffing
PAUL E. SOEFFING
Attorney
D.C. Bar No. 459480

U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
Room C2-05-23
7500 Security Boulevard
Baltimore, Maryland 21244-1850
410-786-1895

OF COUNSEL:

DANIEL MERON
General Counsel

MARK D. POLSTON
Acting Associate General Counsel

LAWRENCE J. HARDER
Acting Deputy Associate General
    Counsel for Litigation

United States Department of
    Health and Human Services

4

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CATHOLIC HEALTH INITIATIVES, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil No. 07-0555 (PLF) |
| ) | |
| MICHAEL O. LEAVITT, Secretary of ) | |
| Health and Human Services, ) | |
| ) | |
| Defendant. ) | |
| ——————————————————) | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE

Defendant, Michael O. Leavitt, the Secretary of Health and Human Services, hereby responds to Plaintiffs' Statement of Material Facts As To Which There Is No Genuine Issue ("Plaintiffs' Statement") in accordance with Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h).

Defendant avers that, to the extent that the parties disagree as to the facts underlying the present action, those disagreements are not material. Instead, all material facts are those found in the record, and under the Medicare statute, 42 U.S.C. § 1395oo(f)(1), and the Administrative Procedure Act, 5 U.S.C. § 706(2), the facts found by the agency are reviewed to determine whether they are unsupported by substantial evidence taken as a whole. Nevertheless, responding specifically to the numbered paragraphs of Plaintiffs' Statement and using the same paragraph numbering, Defendant responds to the following specific assertions in Plaintiffs' Statement:

5-7. These paragraphs contain Plaintiffs' characterization and description of the decision of the PRRB, not statements of material fact. Defendant disputes Plaintiffs' characterization and

the Court is respectfully referred to the PRRB decision for a complete and accurate statement of its contents.  Administrative Record ("A.R.") 6-16.

8.  This paragraph contains Plaintiffs' characterization of a manual provision, not statements of material fact.  Defendant disputes Plaintiffs' characterization and the Court is respectfully referred to the manual provision for a complete and accurate statement of its contents.  A.R. 5600-01.

9.  Defendant disputes the second sentence.  The quotation is not accurate.  See Plaintiffs' Motion for Summary Judgment, Exhibit 1 at 2.

41.  Defendant disputes Plaintiffs' statement that FIIL's board of directors is composed of "experts and leaders."  The cited testimony and exhibit to not support this statement, nor does any other record evidence.  A.R. 211-13, 2834.

43.  Defendant disputes Plaintiffs' statements that FIIL uses "approximately 13" money managers and that investment results are compared with "industry standards."  The cited testimony and exhibit to not support these statements, nor does any other record evidence.  A.R. 212, 225, 2834.

46.  Defendant disputes Plaintiffs' characterization that Tillinghast-Towers Perrin is "a leader in actuarial science," which is not a material fact.  A.R. 213.

47.  Defendant disputes the second sentence.  The cited testimony does not support this statement, nor does any other record evidence.  A.R. 242.

48.  Defendant disputes this paragraph.  The cited testimony does not support this statement, nor does any other record evidence.  A.R. 241.

51-53.  Defendant disputes these paragraphs except to agree that FIIL adopted a 40%

2

allocation of assets in securities.  It is ambiguous as to what document Plaintiffs consider to be the "first study."  Plaintiffs cite to the "First Initiatives Insurance, Ltd. Investment Program Review" of September 19, 1997 as the "first study."  A.R. 2830-46.  At the PRRB hearing, however, Plaintiffs' witness referenced Providers' Exhibit 2 (A.R. 2800-09) as the first study.  A.R. 214.

54.  Defendant disputes this paragraph.  It is ambiguous as to what document Plaintiffs consider to be the "second asset allocation study."  Plaintiffs reference a "second asset allocation study" from "February 2000," but cite to documents from both September 1999 (A.R. 2863) and February 2000 (A.R. 2880).  Plaintiffs' witness at the PRRB hearing referenced Providers' Exhibit 6 from 2000 as the second study.  A.R. 215.  However, Providers' Exhibit 6 is from September 1999.  A.R. 2848-68.  Moreover, Plaintiffs' Statement of Material Fact No. 54 appears to conflict with Plaintiffs' Statement of Material Fact No. 50, which purportedly identifies two documents, located at A.R. 2830-68, as a second asset allocation study.

56-57.  Defendant disputes these paragraphs except to agree that the captive had a 50% allocation to equity securities.  The remainder of these paragraphs contain Plaintiffs' characterization of a "third asset allocation study," not statements of material fact.  Defendant disputes Plaintiffs' characterization of the "third asset allocation study" and the Court is respectfully referred to the "third asset allocation study" for a complete and accurate statement of its contents.  A.R. 3282-3330.

61.  Defendant disputes this paragraph.  Plaintiffs rely solely on Complaint ¶ 79 for the statement that the amount in controversy is based on "actuarially-determined premium assessments," and cite no record evidence in support of these claims.

3

67. Defendant disputes this paragraph, which contains a conclusion of law and Plaintiffs' speculation and conjecture as to how they might use additional funds, not statements of material fact.

71-79. These paragraphs contain Plaintiffs' characterization and description of witness testimony before the PRRB, not statements of material fact. Defendant disputes Plaintiffs' characterization of the testimony and the Court is respectfully referred to the hearing transcript for a complete and accurate statement of the testimony. A.R. 249-78.

80. This paragraph contains Plaintiffs' characterization of a manual provision, not statements of material fact. Defendant disputes Plaintiffs' characterization and the Court is respectfully referred to the manual provision for a complete and accurate statement of its contents. A.R. 5597-5610.

81-83. These paragraphs contain Plaintiffs' characterization and description of witness testimony before the PRRB, not statements of material fact. Defendant disputes Plaintiffs' characterization of the testimony and the Court is respectfully referred to the hearing transcript for a complete and accurate statement of the testimony. A.R. 249-78.

84. Defendant disputes this paragraph which contains a conclusion of law, not statements of material fact.

85. This paragraph contains Plaintiffs' characterization of a manual provision, not statements of material fact. Defendant disputes Plaintiffs' characterization and the Court is respectfully referred to the manual provision for a complete and accurate statement of its contents. A.R. 5597-5610.

86-90. These paragraphs contain Plaintiffs' characterization and description of witness

testimony before the PRRB, not statements of material fact. Defendant disputes Plaintiffs'
characterization of the testimony and the Court is respectfully referred to the hearing transcript
for a complete and accurate statement of the testimony. A.R. 249-78.

91-93. These paragraphs contain Plaintiffs' characterizations of State laws that regulate
captive insurers, not statements of material fact. Defendant disputes Plaintiffs' characterizations
and the Court is respectfully referred to the cited State laws for a complete and accurate
statement of their contents. A.R. 249-78.

94. Defendant disputes this paragraph. The record evidence shows a range of 44-51%.
A.R. 271-72, 3388.

95. Defendant disputes this paragraph. There is record evidence in the testimony of the
CMS witness that conflicts with this statement. A.R. 272-73.

96-98. These paragraphs contain Plaintiffs' characterization and description of witness
testimony before the PRRB, not statements of material fact. Defendant disputes Plaintiffs'
characterization of the testimony and the Court is respectfully referred to the hearing transcript
for a complete and accurate statement of the testimony. A.R. 249-78.

99. Defendant disputes this paragraph which contains conclusions of law, not statements
of material fact.

100-03. These paragraphs contain Plaintiffs' characterization and description of witness
testimony before the PRRB, not statements of material fact. Defendant disputes Plaintiffs'
characterization of the testimony and the Court is respectfully referred to the hearing transcript
for a complete and accurate statement of the testimony. A.R. 249-78.

107-08. These paragraphs contain Plaintiffs' characterization and description of the

decision of the PRRB, not statements of material fact.  Defendant disputes Plaintiffs' characterization and the Court is respectfully referred to the PRRB decision for a complete and accurate statement of its contents.  A.R. 6-16.

109.  The first two sentences contain Plaintiffs' characterization and description of the decision of the PRRB, not statements of material fact.  Defendant disputes Plaintiffs' characterization and the Court is respectfully referred to the PRRB decision for a complete and accurate statement of its contents.  A.R. 6-16.  Defendant disputes the third sentence, which contains a conclusion of law and Plaintiffs' legal theories, not statements of material fact.

110.  The first sentence contains Plaintiffs' characterization and description of the decision of the PRRB, not statements of material fact.  Defendant disputes Plaintiffs' characterization and the Court is respectfully referred to the PRRB decision for a complete and accurate statement of its contents.  A.R. 6-16.  Defendant disputes the second sentence, which contains a conclusion of law and Plaintiffs' legal theories, not statements of material fact.

111.  This paragraph contains Plaintiffs' characterization and description of the decision of the PRRB, not statements of material fact.  Defendant disputes Plaintiffs' characterization and the Court is respectfully referred to the PRRB decision for a complete and accurate statement of its contents.  A.R. 6-16.

113-15.  These paragraphs contain Plaintiffs' characterization and description of the dissent to the PRRB decision, not statements of material fact.  Defendant disputes Plaintiffs' characterization and the Court is respectfully referred to the PRRB decision for a complete and accurate statement of its contents.  A.R. 6-16.

Respectfully submitted,

    s/Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

    s/Peter S. Smith
PETER S. SMITH, D.C. BAR # 465131
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-0372

    s/ Paul E. Soeffing
PAUL E. SOEFFING
Attorney
D.C. Bar No. 459480
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
Room C2-05-23
7500 Security Boulevard
Baltimore, Maryland 21244-1850
410-786-1895

OF COUNSEL:

DANIEL MERON
General Counsel

MARK D. POLSTON
Acting Associate General Counsel

LAWRENCE J. HARDER
Acting Deputy Associate General
    Counsel for Litigation

United States Department of
    Health and Human Services

7

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CATHOLIC HEALTH INITIATIVES, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil No. 07-0555 (PLF) |
| ) | |
| MICHAEL O. LEAVITT, Secretary of ) | |
| Health and Human Services, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiffs are a group of fifty-five hospitals and their parent organization, Catholic Health

Initiatives, that participate in the Medicare program and maintain liability insurance through an

offshore captive insurer. Plaintiffs have brought this action against Defendant Michael O.

Leavitt, Secretary of Health and Human Services (the "Secretary"), seeking judicial review of the

Secretary's decision denying Medicare reimbursement to Plaintiffs for any of their insurance

premium costs paid to the captive insurer for various cost reporting periods covering the years

1997-2002.

The Secretary's rules do not allow reimbursement for premium costs paid to an offshore

captive insurer that invests greater than ten percent of assets in equity securities. Plaintiffs, who

fully understood these rules, and whose offshore captive invested forty to fifty percent of assets

in equity securities, therefore have no one but themselves to blame for the fact these costs were

disallowed from their Medicare cost reports for the years at issue. Plaintiffs later appealed these

initial disallowances to the Secretary's Provider Reimbursement Review Board ("PRRB" or the

"Board") contending that they were due payment for these costs despite the Secretary's rule to

the contrary.  The PRRB denied Plaintiffs' claims for reimbursement, finding that the costs were

not proper based on the Secretary's rules.

As shown below, the PRRB's decision is in accordance with the Secretary's valid rules, is

reasonable, and should be sustained.  Plaintiffs fully admit they knew of the Secretary's rule and

the fact they would forego certain Medicare reimbursement by choosing not to comply with the

ten percent equity limitation for offshore captive insurers.  Plaintiffs nevertheless made the

business decision to pursue greater financial returns in the riskier offshore environment in

violation of the Medicare rule.  While that choice was their prerogative, Plaintiffs now cannot be

rewarded with additional Medicare reimbursement contrary to the Medicare program's validly

promulgated rules.

## STATUTORY AND REGULATORY FRAMEWORK

### I.  The Medicare Program Generally

Title XVIII of the Social Security Act ("Medicare statute") establishes the Medicare

program, a federally funded health insurance program that provides payment for covered services

furnished to aged and certain disabled persons.  See generally 42 U.S.C. §§ 1395-1395ggg.  Part

A of the Medicare program authorizes payment for covered institutional care, including hospital

and skilled nursing care.  42 U.S.C. §§ 1395c, 1395d, 1395i, 1395x(b), (i).  Part B of the

Medicare program covers certain outpatient services such as physician services, medical

supplies, x-rays and laboratory tests.  42 U.S.C. §§ 1395k, 1395l, 1395x(s).  The Medicare

program is administered by the Centers for Medicare & Medicaid Services ("CMS") which is a

2

component agency of the Department of Health and Human Services.[1]

Part A services are furnished by "providers of services." 42 U.S.C. §§ 1395x(u). Providers of services must enter into agreements with the Secretary in order to participate in and obtain payment from the Medicare program. See 42 U.S.C. §§ 1395g, 1395cc. Part A reimbursement is made through a "fiscal intermediary," a private entity that acts as the Secretary's agent. 42 U.S.C. § 1395h. Providers submit to the intermediaries at the end of their fiscal year ("FY") a cost report setting forth all costs for which the provider claims reimbursement. 42 C.F.R. § 405.1801(b)(1). The intermediary then reviews the cost report and determines in a notice of program reimbursement how much reimbursement is actually due the provider for that cost year.

A provider that is dissatisfied with a final determination of the intermediary as to the amount of reimbursement due may, upon compliance with the statutorily imposed jurisdictional requirements, request a hearing before the Provider Reimbursement Review Board ("PRRB" or the "Board"). 42 U.S.C. § 1395oo(a), (b). Multiple providers may join in a single group appeal to the PRRB, as in the instant case, if the controversy involves a common question of fact or interpretation of law or regulation. 42 U.S.C. § 1395oo(b); 42 C.F.R. § 405.1837. If all the jurisdictional prerequisites are satisfied and the PRRB has the authority to decide the matter at issue, see 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842, the PRRB may hold a hearing and issue a decision that is potentially subject to further review by the Secretary's delegate, the CMS Administrator. See 42 C.F.R. § 405.1875. The statute authorizes a provider to request judicial

---

[1] CMS was formerly known as the Health Care Financing Administration ("HCFA"). The agency was renamed CMS in 2001. 66 Fed. Reg. 35,437 (July 5, 2001).

review of the final agency decision in federal district court within 60 days of the provider's

receipt of the final decision of either the PRRB or the Secretary, if the Secretary reverses the

PRRB's decision.  42 U.S.C. § 1395oo(f)(1).

## II.  Reasonable Cost Reimbursement Under the Medicare Statute

Many Medicare providers of services, including the facilities involved here, are

reimbursed on a "reasonable cost" basis.[2]  42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.1(d).

The Medicare statute defines "reasonable cost" as "the cost actually incurred, excluding

therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed

health services . . . ."  42 U.S.C. § 1395x(v)(1)(A).  The statute further provides that "reasonable

cost" "shall be determined in accordance with regulations establishing the method or methods to

be used, and the items to be included, in determining such costs . . . ."  Id.

Under the Secretary's reasonable cost regulations, see generally 42 C.F.R. Part 413, only

costs actually incurred by a provider are potentially reimbursable.  42 C.F.R. § 413.5.  In

addition, specific costs must be "allowable," properly "apportioned" between Medicare and non-

Medicare patients, and not in excess of amounts prescribed by limiting statutory and regulatory

provisions.  Allowable costs are costs actually incurred that are "related to the care of [Medicare]

beneficiaries," and "necessary and proper," i.e., costs "appropriate and helpful in developing and

maintaining the operation of patient care facilities and activities."  42 C.F.R. § 413.9(a), (b)(2).

_____

[2] Currently, most hospitals are reimbursed by Medicare pursuant to a prospective payment
system ("PPS").  Under PPS, payments for the operating costs of inpatient services are based
upon prospectively determined rates that vary according to the category of hospital treatment
rendered.  42 U.S.C. § 1395ww(d); see Washington Hosp. Ctr. v. Bowen, 795 F.2d 139 (D.C.
Cir. 1986).  This case does not involve the PPS.

Upon determination of a provider's allowable costs, Medicare's share of the costs is then calculated in accordance with various apportionment rules.  42 C.F.R. §§ 413.5(b)(3), 413.50(a). After allowable costs are apportioned, the provider is entitled to reimbursement for Medicare's share of the costs except for any costs in excess of amounts prescribed by any limiting statutory or regulatory requirement.  See, e.g., 42 C.F.R. §§ 413.9(c)(2), 413.30, 413.40.

In applying the concept of reasonable cost, the Medicare program recognizes that "[t]he costs of providers' services vary from one provider to another and the variations generally reflect differences in scope of services and intensity of care."  42 C.F.R. § 413.9(c)(2).  Thus, the reasonable cost regulations acknowledge that, while "payment of reasonable cost of services is intended to meet the actual costs, however widely they may vary from one institution to another," it is subject to a "limitation if a particular institution's costs are found to be substantially out of line with other institutions in the same area that are similar in size, scope of services, utilization, and other relevant factors."  Id.  In addition, if the provider's operating costs include amounts not related to patient care, specifically not reimbursable under the program, or flowing from the provision of luxury items or services (that is, those items or services substantially in excess or more expensive than those generally considered necessary for the provision of needed health services), such amounts will not be allowable.  42 C.F.R. § 413.9(c)(3).

The Secretary has further explained how providers will be reimbursed for insurance costs in his Medicare Provider Reimbursement Manual ("PRM"), CMS Pub. 15-1.  The reasonable costs of purchased commercial insurance are allowable if sound management practices are met. PRM § 2161.A.  Such insurance includes malpractice and comprehensive general liability protection, unemployment compensation, workers' compensation, and employee health care

5

insurance.  PRM § 2162.A.  The manual also allows the costs of insurance purchased from a

limited purpose insurance company (these are also known as captive insurance companies), like

the one at issue here, but requires that additional safeguards be met.  PRM § 2162.2.  One of

these safeguards, at issue in this case and applicable only to captive insurers that are domiciled

offshore, requires that the offshore captive's "investment in equity securities does not exceed 10

percent of the company's admitted assets . . . ."  PRM § 2162.2.A.4.

## STATEMENT OF FACTS

### I.  Factual Background

Plaintiff Catholic Health Initiatives ("CHI") is a non-profit health care organization based

in Denver, Colorado.  Administrative Record ("A.R.") 93, 5377.  The Plaintiff hospitals are fifty-

five Medicare-participating hospitals.  Complaint ¶ 12; Answer ¶ 12.  First Initiatives Insurance,

Ltd. ("FIIL") is an offshore captive insurance company wholly owned by CHI.  A.R. 9, 93, 279,

5377.  During their Medicare cost reporting periods ended in 1997 through 2002, the Plaintiff

hospitals paid premiums to FIIL for malpractice, other liability and workers' compensation

insurance coverage.  A.R. 8, 93, 5377.  FIIL is domiciled in the Cayman Islands.  A.R. 93, 5377.

FIIL invests forty to fifty percent of its assets in equity securities.  A.R. 9, 93, 279, 5377.

Medicare's PRM § 2162.2.A.4, requires that in order to receive reimbursement for their

insurance premiums, providers that choose to obtain insurance through offshore captives must

have no more than ten percent of assets invested in equity securities.  A.R. 8, 93, 5377.  Plaintiffs

were aware of this rule and knew that by choosing not to follow it they would forfeit Medicare

reimbursement for these costs.  A.R. 12, 229.  On their Medicare cost reports, Plaintiffs therefore

"self-disallowed" the premiums they paid to FIIL; that is, they declined to actually claim

6

reimbursement for the costs because they knew such reimbursement was contrary to the PRM, but preserved the issue for presentation to the PRRB.  A.R. 8, 93, 279, 5377.

## II. **Administrative Proceedings Before the PRRB**

In December 2003 and January 2004, the Plaintiff hospitals filed with the PRRB their requests for hearing challenging their self-disallowed insurance premiums paid to FIIL.  A.R. 6915-53.  On January 13, 2004, these individual hearing requests were consolidated into a group appeal.  A.R. 6910-14.  The Board held a hearing in this matter on November 4, 2004.  A.R. 6.

On January 24, 2007, the PRRB issued its decision upholding the disallowance.  A.R. 6-16.  The Board found that "[t]he investment restrictions of [CMS] Pub. 15-1 § 2162.2.A.4 do not serve to supervise or control the business of insurance that would be prohibited by 42 U.S.C. § 1395."  A.R. 11.   The PRRB reasoned that "[b]ecause offshore captives are under the control of foreign governments and are not subject to the same level of industry regulations applied to onshore agencies by State insurance commissions, CMS provided guidance and instructions to intermediaries and providers regarding how it would determine the necessary and proper costs with respect to offshore captives set up by related parties."  Id.  Finally, the Board found that Medicare should not pay any of the hospitals' actual claims because there was nothing in the manual "that allows costs found to be non-allowable, as are the costs in the present case, to surreptitiously become allowable."  A.R. 12.

On March 9, 2007, the CMS Administrator declined to review the Board decision.  A.R. 2.  On March 17, 2007, the CMS Attorney Advisor notified the hospitals that the Administrator had declined to review the PRRB's decision and that the hospitals could obtain judicial review of the Board's decision.  A.R. 1.  The Plaintiff hospitals filed the instant lawsuit on March 20, 2007.

**ARGUMENT**

**I.  The Standard of Review is Narrow and Deferential**

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, provides the standard

of review applicable to Plaintiffs' challenge to agency action.  The APA standard of review, 5

U.S.C. § 706(2)(A), (E), provides that agency action, findings, and conclusions can be set aside

only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law" or "unsupported by substantial evidence."  Citizens to Preserve Overton Park v. Volpe, 401

U.S. 402, 413-15 (1971); Memorial Hosp./Adair County Health Ctr., Inc. v. Bowen, 829 F.2d

111, 116-17 (D.C. Cir. 1987).

The courts have consistently held that the APA establishes a narrow standard of review.

Under the arbitrary and capricious standard, an agency action may be invalidated only if it is "not

rational and based on consideration of the relevant factors."  FCC v. National Citizens Comm.

for Broadcasting, 436 U.S. 775, 803 (1978).  See also Motor Vehicle Mfr. Ass'n v. State Farm

Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Similarly narrow is review under the substantial evidence standard.  The Supreme Court

has "defined 'substantial evidence' as 'such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'"  Consolo v. Federal Maritime Comm'n, 383 U.S. 607,

619-20 (1966), quoting Consolidated Edison Co. of New York v. NLRB, 305 U.S. 197, 229

(1938).  Substantial evidence is "something less than the weight of the evidence, and the

possibility of drawing two inconsistent conclusions from the evidence does not prevent an

administrative agency's findings from being supported by substantial evidence."  Id. at 620

(citations omitted).  In applying the substantial evidence standard, the reviewing court, may not

8

"displace the . . . [Secretary's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951).

Given the narrowness of the APA standard of review, the reviewing court may not substitute its judgment for that of the agency. Rather, the agency's decision should be given deference. <u>American Med. Int'l, Inc. v. Secretary of HEW</u>, 466 F. Supp. 605, 611 (D.D.C. 1979), <u>aff'd</u>, 677 F.2d 118 (D.C. Cir. 1981). The Secretary's interpretation of his rules is entitled to controlling weight, "unless an alternative reading is compelled by the regulation's plain language or other indications of the Secretary's intent at the time of the regulation's promulgation." <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512 (1994) (internal quotation marks and citation omitted); <u>see also</u> <u>Shalala v. Guernsey Mem'l Hosp.</u>, 514 U.S. 87 (1995). Broad deference to the Secretary's interpretation of his own regulations is "all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program'." <u>Thomas Jefferson</u>, 512 U.S. at 512, <u>citing</u> <u>Pauley v. BethEnergy Mines, Inc.</u>, 501 U.S. 680, 697 (1991).

## II.  The Secretary Retains Vast Discretion in Applying the Reasonable Cost Principles Such as Those at Issue Here

Plaintiffs contend that the Secretary must reimburse them for any costs that are "necessary and proper" and not "substantially out of line" with the costs of comparable providers. Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment ("Pls.' Mem.") at 13, 15. However, the principle of reasonable cost reimbursement vests the Secretary with vast discretion to apply this general rule. The relevant regulation reads,

in part:

> (a) Principle.  All payments to providers of services must be based on the reasonable cost of services covered under Medicare and related to the care of beneficiaries.  Reasonable cost includes all necessary and proper costs incurred in furnishing the services, subject to principles relating to specific items of revenue and costs.

42 C.F.R. § 413.9(a) (emphasis added).

This Circuit has long recognized that the Secretary has "broad discretion to develop the 'reasonable cost' [reimbursement] concept . . . enunciated in 42 U.S.C. § 1395x(v)(1)(A)." Richey Manor, Inc. v. Schweiker, 684 F.2d 130, 134 (D.C. Cir. 1982); see also Mercy Hosp. of Laredo v. Heckler, 777 F.2d 1028, 1034 (5th Cir. 1985); Sun Towers, Inc. v. Heckler, 725 F.2d 315, 325 (5th Cir.), cert. denied 469 U.S. 823 (1984).  As discussed supra at 4-6, the Secretary has exercised this discretion by promulgating regulations and manual provisions that develop this concept.  Section 1395x(v)(1)(A) defines "reasonable cost" as "costs 'actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services' as 'determined in accordance with regulations' promulgated by the Secretary."  Biloxi Reg'l Med. Ctr. v. Bowen, 835 F.2d 345, 349 (D.C. Cir. 1987).  See also Palms of Pasadena Hosp. v. Sullivan, 932 F.2d 982, 983-84 (D.C. Cir. 1991).  The Secretary's reasonable cost regulations provide for reimbursement of specific costs actually incurred by a provider, if the costs are allowable, properly apportioned between Medicare and non-Medicare patients and not in excess of amounts prescribed under limiting statutory and regulatory provisions.  See supra at 4.

Thus, the Secretary has the authority to articulate principles regarding the reimbursement of individual costs that are grounded in the concept of "necessary and proper."  For example, in

Guernsey Memorial Hospital v. Shalala, 514 U.S. 87 (1995), the Supreme Court upheld a

reasonable cost principle articulated by the Secretary solely in her manual provision.  In

Guernsey, the hospital challenged the Secretary's application of a manual provision requiring that

an accounting loss suffered by the hospital be amortized over a period of years.  Id. at 90.  The

Court held that the manual provision was a valid interpretive rule.  Id. at 101.  The Court

explained that:

> The Secretary has promulgated regulations setting forth the basic principles and
> methods of reimbursement, and has issued interpretive rules such as PRM § 233
> that advise providers how she will apply the Medicare statute and regulations in
> adjudicating particular reimbursement claims.  Because the Secretary's
> regulations do not bind her to make Medicare reimbursements in accordance with
> GAAP, her determination in PRM § 233 to depart from GAAP by requiring bond
> defeasance losses to be amortized does not amount to a substantive change in the
> regulations.

Id.  The Secretary has done much the same here.  Certainly, nothing in the statute or regulations

binds the Secretary to reimburse providers for insurance costs.  The Secretary's manual provision

places providers on notice that, besides meeting the general requirements of the statute and

regulations regarding reasonable cost, premiums paid to offshore captive insurers that do not

meet the ten percent requirement will not be considered proper costs.  Thus, the Board found

here that the costs incurred by the hospitals did not meet the "necessary and proper" standard in

that they were not "proper" because they did not comply with the requirements for offshore

captives as stated by the manual.  A.R. 11.

Plaintiffs note several times that the Secretary's manual provision "lacks the force and

effect of law."  Pls.' Mem. at 2, 6, 11.  Although it is true that the Secretary's manual provisions

do not have the force and effect of law, Guernsey Mem'l Hosp., 514 U.S. at 99, those provisions

are still entitled to significant deference.  First, Chevron deference is frequently applied to agency interpretations promulgated in the form of notice-and-comment rulemaking or formal adjudication.  See Christensen v. Harris County, 529 U.S. 576, 587 (2000); United States v. Mead Corp., 533 U.S. 218, 230 (2001).  The Secretary's decision here was the result of just such an adjudication.  The PRM is also entitled to great deference (arguably, even greater than Chevron deference) as an interpretation of the Secretary's reasonable cost regulations.  See Thomas Jefferson Univ. v. Shalala., 512 U.S. 504, 512 (1994).  Even apart from these considerations, courts also apply Chevron deference to other, less formal means of agency interpretation.  Thus, while an agency's use of policy statements, agency manuals, or enforcement guidelines to interpret a statute may in some cases be given deference under Skidmore v. Swift & Co., 323 U.S. 134, 139-40 (1944), the absence of notice-and-comment rulemaking "does not automatically deprive that interpretation" of deference under Chevron.  See Barnhart v. Walton, 535 U.S. 212, 221 (2002) (citations omitted); see also United States v. Mead Corp., 533 U.S. at 230; Community Health Ctr. v. Wilson-Coker, 311 F.3d 132, 138 (2d Cir. 2002).

As the Supreme Court has stated, regardless of the form of interpretation, where the agency has expertise in administering a complex statute and has carefully considered the issue over a long period of time, "Chevron provides the appropriate legal lens through which to view the legality of the Agency interpretation [] at issue."  Barnhart v. Walton, 535 U.S. at 222. Another court has similarly stated that

> we owe some significant measure of deference to CMS's interpretation of the statute, although we need not decide the exact molecular weight of the deference we accord to CMS's position.  In cases such as this, where a highly expert agency

12

administers a large and complex regulatory scheme in consultation with many
other institutional actors, the various possible standards for deference begin to
converge. . . . We therefore accord CMS's interpretation considerable deference,
whether under <u>Chevron</u> or otherwise.

<u>Community Health Ctr. v. Wilson-Coker</u>, 311 F.3d 132, 137-38 (2d Cir. 2002).

Moreover, the Secretary is empowered to promulgate bright line rules that are

prophylactic in nature so as to categorically preclude reimbursement under certain circumstances.

Such a prophylactic rule precluding reimbursement for costs incurred when a provider deals with

a related party has been repeatedly upheld.  <u>See</u> <u>Kidney Ctr. of Hollywood v. Shalala</u>, 133 F.3d

78 (D.C. Cir. 1998) (substantial evidence supported HHS Secretary's decision that change in

ownership of parent company involved related party transaction, precluding reimbursement of

certain costs of merger);  <u>Shaker Med. Ctr. Hosp. v. Sec'y of HHS</u>, 686 F.2d 1203, 1209 (6th Cir.

1982); <u>Marina Mercy Hosp. v. Harris</u>, 633 F.2d 1301, 1304 (9th Cir. 1980); <u>Fairfax Hosp. Ass'n,

Inc. v. Califano</u>, 585 F.2d 602, 606 (4th Cir. 1978).  Courts have further found that while

prophylactic rules might prove

> in particular cases to be "under-inclusive" or "overinclusive," in light of (their)
> presumed purpose, nonetheless (they are) . . . widely accepted responses(s) to
> legitimate interests in administrative economy and certainty of coverage for those
> who meet (their) terms.

<u>Shaker Med. Ctr. Hosp.</u>, 686 F.2d at 1209 (quoting <u>Weinberger v. Salfi</u>, 422 U.S. 749, 776

(1975).  The Fourth Circuit, quoting the Supreme Court, has explained:

> Particularly in a program as complex as the Medicare program, with its large
> numbers of providers and suppliers and with its wide range of suppliers and
> services, the Secretary, in his regulations may make, indeed he must make, "rough
> accommodations illogical, it may be, and unscientific" using generalized
> classifications governing the methods of calculating "reasonable cost" when it is
> obvious that individualized cost calculations are both not administratively
> practical and unduly expensive.

Fairfax Hosp., 585 F.2d at 606 (quoting Dandridge, 397 U.S. at 485); see Marina Mercy Hosp.,

633 F.2d at 1304 (prophylactic rules "eliminate the need for a cumbersome and expensive

process or adjudicating item-by-item the reasonableness of costs").  Such a prophylactic rule is

especially desirable in the instant case where the Secretary would have to investigate and make

difficult judgments about the regulatory processes of foreign jurisdictions in order to decide the

bona fides of various offshore insurance schemes.

A further example of a Medicare prophylactic rule promulgated in the PRM and respected

by the Federal courts is the funded depreciation rule.[3/]  PRM §§ 226-226.5 (attached hereto as

Exhibit 1).  This rule, like the ten percent limitation at issue here, exists solely in the PRM and

provides that

> Funds deposited in the funded depreciation account must be placed in readily
> marketable investments of the type that assures the availability and conservation
> of the funds.  Income earned on investments which do not meet this condition
> must be offset against allowable interest expense.

PRM § 226.  The Secretary has applied this rule to offset investment income earned on funded

depreciation accounts against interest expense (which are normally exempt from the offset of

investment income provision), where funded depreciation funds have been commingled with

operating funds, or otherwise violate funded depreciation rules.  Courts have readily upheld the

Secretary's disallowance of costs under this rule.  See, e.g., Sentara-Hampton Gen. Hosp. v.

Sullivan, 980 F.2d 749 (D.C. Cir. 1992); St. Mary's Hosp. of Troy v. Blue Cross & Blue Shield

Ass'n, 788 F.2d 888 (2d Cir. 1986); Monongahela Valley Hosp., Inc. v. Sullivan, 945 F.2d 576

---

[3/] "Funding of depreciation is the practice of placing funds, including nonborrowed bond reserve
and sinking funds, in a segregated account(s) for the acquisition of depreciable assets used in
rendering patient care or for other capital purposes related to patient care."  PRM § 226.

(3d Cir. 1991); Pleasant Valley Hosp., Inc. v. Shalala, 32 F.3d 67 (4th Cir. 1994).

The analogy between funded depreciation and the ten percent limitation here is strong, because in both instances it is not the amount of the payments made that is at issue, but rather how those payments are subsequently treated that runs afoul of the Secretary's interpretive rule. In both this case and the funded depreciation cases, the regulatory basis for the reasonable cost principle is 42 C.F.R. § 413.9, specifically the necessary and proper provision. Just as courts have upheld the propriety of applying the PRM's investment income offset provisions where funded depreciation funds have been commingled with operating funds, so too should the Court here uphold the Secretary's rule disallowing insurance premiums paid to an offshore captive which violated the ten percent equities restriction.

Plaintiffs attack the Secretary's application of the ten percent limitation on the basis that PRM § 2162.2.A.4 is in conflict with the Medicare statute and regulations. Pls.' Mem. at 18-21. To the contrary, section 2162.2.A.4 provides an obvious interpretation of how the Secretary intends to apply the reasonable cost principle announced in the Secretary's regulations at 42 C.F.R. § 413.9 that "[r]easonable cost includes all necessary and proper costs" as well as the more general statutory admonitions that the Secretary may only reimburse providers for their "reasonable costs." The Secretary desires to promote solvency and ensure the financial strength of the insurer. Thus, the Secretary's interpretive rule prevents reimbursement in the situation presented here, where the characteristics of the captive offshore insurer reasonably cause the Secretary to question whether he can reasonably be assured of that solvency and financial strength. As shown below, the rule is at least rational (as shown by its consistency with the law of at least six states) and therefore lawful, and the Secretary's decision relying on it should be

15

upheld.

### III. The Secretary's Application of the Manual Provision is Supported by Substantial Evidence and is Not Arbitrary or Capricious

Plaintiffs argue that the decision of the PRRB is not supported by substantial evidence and is arbitrary and capricious. Pls.' Mem. at 21-31. Plaintiffs' contention does not withstand scrutiny when viewed in light of the facts of this case.

There is no dispute that Plaintiffs maintain their insurance with an offshore captive insurance company, FIIL. Plaintiffs' Statement of Material Facts as to Which There is No Genuine Issue ("Pls.' Statement") ¶¶ 15, 16, 28, 32. There is also no dispute that FIIL maintained forty to fifty percent of its assets in equity securities. Pls.' Mem. at 10; Pls.' Statement ¶¶ 52, 56. Finally, there is no dispute that this investment allocation violates the requirements of the PRM, which limits the amount that an offshore captive may invest in equity securities to ten percent of assets. PRM § 2162.2.A.4, Pls.' Statement ¶ 17. Thus, there is not only substantial evidence that Plaintiffs are not in compliance with PRM § 2162.2.A.4, but this is not disputed.

Furthermore, there is ample evidence in the record that the Secretary's policy as set forth in the PRM is supported by substantial evidence and is not arbitrary and capricious. During the administrative hearing, the fiscal intermediary introduced statutes from eight States showing that they place percentage limitations on the amount of equity securities that an insurer may invest in. See A.R. 5452-58 (Maine Insurance Code); A.R. 5460-91 (Iowa Insurance Code); A.R. 5493 (Idaho Insurance Statute); A.R. 5495-5503 (Vermont Insurance Statute); A.R. 5505-12 (Illinois Insurance Code); A.R. 5518-19 (Colorado Insurance Statute); A.R. 5521-24 (Arkansas Insurance

16

Code); A.R. 5526-35 (Maryland Insurance Code). The model regulation of the National

Association of Insurance Commissioners also adopts investment limits. A.R. 5514-16. Plaintiffs

themselves acknowledge that at least six states impose limits on offshore captives regarding the

amount of assets they may invest in equity securities. Pls.' Mem. at 23; Complaint ¶ 95. The

imposition of limits by these States shows that the Secretary's rule is not arbitrary and capricious,

but is in fact completely reasonable.

Moreover, the Board found that "there is an inherent risk associated with offshore

captives that justifies the investment restrictions of [CMS] Pub. 15-1 § 2162.2.A.4. Moreover,

the record shows that the restrictions themselves are reasonable and in line with investment

allocations made by domestic insurance companies." A.R. 12. Evidence in the record shows that

for mutual property and casualty insurance companies, investments in equity securities ranged

from 7.23 percent to 9.37 percent during the years 1999-2003 for the medical malpractice line of

business, completely consistent with the ten percent limit conferred in the PRM. A.R. 114.

The Board succinctly summarized the reason behind CMS's manual provision:

> Because offshore captives are under the control of foreign governments and are
> not subject to the same level of industry regulations applied to onshore agencies
> by State insurance commissions, CMS provided guidance and instructions to
> intermediaries and providers regarding how it would determine the necessary and
> proper costs with respect to onshore captives set up by related parties.

A.R. 11. The Secretary need not address in regulations every reimbursement issue that might

arise. Guernsey Mem'l Hosp., 514 U.S. at 96. In such circumstances, it is "proper for the

Secretary to issue a guideline or interpretive rule." Id. at 97. Such is the case here where the

Secretary cannot reasonably be expected to examine the regulatory environment of every foreign

jurisdiction in which a provider chooses to set up a captive insurer. Thus, lacking confidence in

17

the rigor with which foreign jurisdictions may regulate captive insurers, and lacking the resources to evaluate the regulatory requirements of these jurisdictions, the Secretary has reasonably placed the ten percent limitation on offshore captives.

Furthermore, Plaintiffs have brought forth little evidence to show that FIIL's business operations and investments were subject to much regulatory oversight by the Cayman Islands, fully justifying the agency's concerns that led to the promulgation of PRM § 2162.2.A.4. Plaintiffs' witness before the Board, Mr. Doug Wickerham, could say little other than that "we meet with [the Cayman Islands Monetary Authority] annually."  A.R. 223.  Mr. Wickerham testified that "there is not a specific you can do this or you can't do this."  Id.  In fact, Mr. Wickerham testified that it was FIIL's "manager's responsibility to alert the regulators if the captive is or is not following the business plan," suggesting that unless FIIL's manager himself were to bring an irregularity to the Cayman Islands Monetary Authority's attention, it would not otherwise be detected.  Id.  Likewise, Plaintiffs' brief is largely silent on whether there is really any rigorous regulation of captive insurers by the Cayman Islands.  The only mention made in Plaintiffs' brief on this is a single sentence that "FIIL also is subject to regulatory oversight by the Cayman Islands Monetary Authority, which annually approves FIIL's business plan and investment policies in accordance with established guidelines."  Pls.' Mem. at 9-10.  Plaintiffs have pointed to no record evidence as to what "guidelines" actually exist.  These facts only further demonstrate the good reasons behind the Secretary's ten percent limitation.

Finally, as noted above, Plaintiffs made a fully informed business choice to forego Medicare reimbursement so as to pursue riskier financial returns in the relaxed regulatory environment of the Cayman Islands.  Plaintiffs highlight the fact that they made this decision

18

after carefully considering the Secretary's rules and their own needs.  Pls.' Mem. at 8-9.  In fact,

Plaintiffs appear to have considered their insurance options in a very sophisticated manner.  They

formed an Advisory Board and retained the services of a consulting company, Alexander &

Alexander to fully explore their alternatives.  Id.; Pls.' Statement at 25.  Thus, Plaintiffs made an

informed business decision to forego Medicare reimbursement in exchange for certain other

potential benefits.  Having made that choice, they should not now be allowed to have it both

ways.

**IV.  The Secretary's Rules Do Not Provide for Reimbursement of the Hospitals' Paid
      Claims and Administrative Expenses**

Plaintiffs' final argument is that, should this Court find that the Secretary's disallowance

of the premium costs was correct (and it should), that the hospitals should still recover Medicare

reimbursement for their actual claims paid plus administrative expenses.  Pls.' Mem. at 32-36.

Plaintiffs present no compelling legal argument for this proposition, instead merely relying, once

again, on their view of general reasonable cost principles.

First, Plaintiffs misread the Board's citation and use of PRM § 2162.13.  A.R. 12.  That

manual section addresses the situation where a provider maintains no insurance protection

against malpractice or comprehensive general liability and states that losses and related expenses

that a provider experiences because it has no insurance are not allowable.  PRM § 2162.13.

Plaintiffs misconstrue the Board's reference to this provision to conclude that the Board relied on

this provision to mean that non-compliant investments through an offshore captive insurer are

not reimbursable.  Pls.' Mem. at 33.  But that was not the purpose behind the Board's citation of

this section.  Rather, the Board's point was to demonstrate, through other sections of the manual

19

like this one, that there is no per se right for a provider to be reimbursed for losses stemming
from malpractice or general liability.

Plaintiffs' further contention that they "did not have fair notice of the majority's
interpretation of the Manual" regarding reimbursement of claims paid and administrative
expenses strains credulity. Pls.' Mem. at 33. Such an interpretation was plainly foreseeable,
especially by a party that received as much expert advice as Plaintiffs did. As the Board pointed
out, an interpretation of the program rules that would permit Plaintiffs to be reimbursed for their
claims and administrative expenses would convert Plaintiffs' non-allowable insurance costs into
allowable costs, thus largely eviscerating the ten percent rule contained in the PRM. A.R. 12.
Whether foreseeable or not, no such extraordinary interpretation is compelled by the language of
the PRM.

Second, Plaintiffs contend that the Board's statement that "the program is not necessarily
obligated to share in a provider's malpractice or other liability losses" is contrary to the plain
meaning and manifest intent of the statute. Pls.' Mem. at 33. Once again, Plaintiffs attempt to
apply the reasonable cost provision in the statute in isolation from the Secretary's regulations and
manual provisions. As explained supra, the Secretary has vast authority to promulgate rules in
further application of the broad reimbursement principles enunciated in the statute. In
determining a provider's reimbursement, the statute and its implementing rules must all be
applied, and here those rules plainly and reasonably preclude reimbursement. As noted above,
there is simply nothing in the statute that requires reimbursement for insurance costs under any
circumstances, let alone the particular circumstances at issue here.

Finally, Plaintiffs contend that the Board merely quoted the manual provision rather than

seeking to apply it in this case.  Pls.' Mem. at 35.  Plaintiffs also contend that the manual" was

shown to be inconsistent with the program's treatment of other similar situations."  Id.  But it is

Plaintiffs who fail to engage the question that is key to this dispute – that the circumstances of

their captive insurance company are different from domestically domiciled insurance companies,

be they captive or not, because FILL is an offshore captive and thus is not regulated by any state.

The manual provision in question exists to hold offshore captives to some very basic and

reasonable standards in order for their costs to be allowable by Medicare.  Requiring that

offshore captives follow these minimum standards does not result in inconsistent treatment

because offshore captives are by their very nature different from other captive insurers in that

they operate under the oversight, if any, of foreign governments.

## V. **CONCLUSION**

For the foregoing reasons, the Secretary respectfully requests that the Court deny

Plaintiffs' motion for summary judgment and grant the Secretary's motion for summary

judgment.

Respectfully submitted,

_____s/Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_____s/Peter S. Smith_____
PETER S. SMITH, D.C. BAR # 465131
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-0372

___s/ Paul E. Soeffing_____
PAUL E. SOEFFING
Attorney
D.C. Bar No. 459480
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
Room C2-05-23
7500 Security Boulevard
Baltimore, Maryland 21244-1850
410-786-1895

OF COUNSEL:

DANIEL MERON
General Counsel

MARK D. POLSTON
Acting Associate General Counsel

22

LAWRENCE J. HARDER
Acting Deputy Associate General
    Counsel for Litigation

United States Department of
    Health and Human Services

218.3    **Owner(s) of Provider Institution on the Board of Directors of Lending Institutions.**--Owners of providers may sometimes serve as members of the Board of Directors of a bank or other financial institution which lends money to the provider.   A determination as to whether a personal relationship or control exists between the provider and lending institution within the meaning of §218 will be based on the facts and circumstances of each case.

219.    ACCOUNTS RECEIVABLE FINANCING

In accounts receivable financing, the intermediary must first determine if the arrangement represents a sale of receivables or if it is a loan.   If it is a loan, the interest incurred on the loan is an allowable expense if it is necessary and proper as defined in §§202.1, 202.2 and 202.3.   The interest on the loan is the discount on the advance on the receivables (e.g., 10 percent where a provider receives 90 cents on the dollar).

If the intermediary determines that the arrangement is a sale, the costs associated with the sale are not allowable expenses.   The provider has opted to receive payment prior to collection on the accounts.

To the extent the provider uses the funds obtained from the financing arrangement to invest in other than its patient care operations, the investment income must be offset against the provider's interest expense.   (See §202.2.)

With regards to accounts receivable financing, note that, except as specified in 42 CFR 424.73, Medicare does not pay amounts that are due a provider to any other person under assignment, or power of attorney, or any other direct payment arrangement.

220.    INTEREST PAID TO THE MOTHER HOUSE OR OTHER GOVERNING BODY OF A RELIGIOUS ORDER

Providers owned and operated by members of religious orders often obtain funds through loans from the Mother House or Governing Body of the religious order. Where there is a contractual agreement for the payment of interest, and for the eventual repayment of the loan, the interest expense is allowable as cost provided the interest is applicable to the period after the certification of the institution as a provider.   Interest expense incurred during a reporting period must be paid within the succeeding reporting period.

226.    FUNDED DEPRECIATION

Funding of depreciation is the practice of placing funds, including nonborrowed bond reserve and sinking funds, in a segregated account(s) for the acquisition of depreciable assets used in rendering patient care or for other capital purposes related to patient care. Other capital purposes include capital debt liquidation, such as principal payments for bonds and mortgages and nonborrowed bond reserve and sinking funds to the extent used for a capital purpose, provided they meet all the requirements of §§226ff.   Funds deposited in the funded depreciation account must be placed in readily marketable investments of the type that assures the availability and conservation of the funds. Income earned on investments which do not meet this condition must be offset against allowable interest expense.

Although funding of depreciation is not required, it is strongly recommended that providers use this mechanism as a means of conserving funds for acquisition of depreciable assets as described above. The following provisions apply to funded depreciation.

Previous Revision: 279
~~Previous Revision:~~
~~Date:~~   1-83
Date:

A.  Approval.--The action to fund depreciation must be approved by the appropriate managing body of the provider, such as the Board of Trustees or the Board of Directors, in accordance with the needs and objectives of management. As such needs and objectives change, action could be taken in some situations by the managing body to use all or part of the funds in the funded depreciation account for a purpose other than the acquisition of the provider's depreciable assets used to render patient care.  The provisions of §226.4 are applicable to those situations.

B.  Provider's Records.--The fund or funds must be clearly designated in the provider's records as funded depreciation accounts.

C.  Restrictions.--Funded depreciation (total market value of fund) must be available (unless contractually committed as noted below) on an as needed basis for the acquisition of the provider's depreciable assets used to render patient care, or for other capital purposes related to patient care.  Loans made from funded depreciation do not alter the requirement that funded depreciation must be available.

Funds are considered available unless committed, by virtue of contractual arrangements, to the acquisition of depreciable assets used to render patient care, or to other capital purposes.  Borrowing for a purpose intended by funded depreciation is unnecessary to the extent funded depreciation is available. Thus, interest expense for borrowing up to the amount of available funded depreciation is not an allowable cost.

EXAMPLE:    A provider has available $1,500,000 in a funded depreciation account when it decides to construct a $3,500,000 addition to its present facility.  If the provider borrows $3,500,000 to finance this capital improvement, the interest expense incurred on the borrowed funds equal in amount to the funded depreciation amount ($1,500,000) would be unallowable.

D.  Investment or Transfer.--When a provider invests or transfers the assets of the fund to a home office of a chain organization or to the Mother House or governing body of a religious order or to other related parties, these assets shall be treated as the provider's fund and are subject to all the provisions of §§226ff.

226.1    Interest Paid on Loans from Funded Depreciation.--When the general fund of the provider borrows from the funded depreciation to obtain working capital for normal operating expenses to render patient care, interest incurred by the general fund is an allowable cost.  The "necessary and proper" requirements apply to such loans.  However, when the general fund of the provider borrows from funded depreciation to acquire depreciable assets to render patient care, interest paid by the general fund to the funded depreciation account is not an allowable cost.  Providers are expected to use the funded depreciation for that purpose.

Funding of depreciation from general funds will not be recognized to the extent of any working capital loans the depreciation fund has outstanding and due from the general fund at the time of deposit.  Deposits of general funds into the funded depreciation account must be first applied to reduce loans outstanding from the funded depreciation account to the general fund.  Until such loans are repaid in full, general funds deposited in the funded depreciation account will be considered as repayments on the loans and, therefore, any subsequent interest expense of the general fund to the extent of the repaid loans is not allowable.

226.2   Interest or Other Income Earned by the Funded Depreciation Account.--
Where the provider funds depreciation, it is expected that money in the fund
will be invested to earn revenues.  Investment income earned by the funded
depreciation account attributable to cumulative allowable depreciation expense
funded in periods either before or after the provider's participation in the
Medicare program is not a reduction of allowable interest expense, provided
such investment income is deposited in and becomes part of the funded
depreciation account.

226.3   Deposits in the Funded Depreciation Account.--The provider's cumulative
deposits in this account cannot exceed its total cumulative allowable
depreciation expense (not including gains or losses on the depreciation of
depreciable assets and recapture of accelerated depreciation) from the date of
acquisition of all provider depreciable assets used to provide patient care
services under the Medicare program, including periods before and after the
provider's participation in the Medicare program.   (See Chapter I.) Hence,
funding of such amounts is permitted even though depreciation expense
applicable to a period prior to the provider's participation in the program is
not an allowable cost.  If the total deposits do not exceed total cumulative
depreciation expense of assets used to provide services under the Medicare
program at the time of the deposit, the provisions of §§226.1 and 226.2 apply.
Total cumulative allowable depreciation expense must not be confused with the
balance sheet valuation account, accumulated depreciation.   Total allowable
depreciation expense is computed by totalling all depreciation expense incurred
on all assets used to provide services under the Medicare program.  This total
is compared with total deposits (excluding income earned) to the funded
depreciation account. Investment income from such funded depreciation deposits
retains its identity and becomes a part of the funded depreciation fund if
deposited in the funded depreciation account at the time of receipt by the
provider.   Such investment income remains funded depreciation even if the
deposit of such funds results in a fund balance in excess of total cumulative
allowable depreciation expense.  If the provider makes "extra" deposits of
funds in excess of the accumulated depreciation, the provisions of §§226.1 and
226.2 do not apply.  Thus, any income earned by such "extra" deposits is
applied as a reduction of interest expense.

Deposits to the funded depreciation account must remain for 6 months or more
to be considered as valid funding transactions and to permit application of
§§226.1 and 226.2. Deposits of less than 6 months' duration are not eligible
for the benefits of those sections. Investment income earned prior to elapse
of the 6-month period will not be offset unless the deposits are actually
withdrawn during this period.  A loan to the general fund is considered a
withdrawal for this purpose.

226.4   Withdrawals from the Funded Depreciation Account.--Because deposits in
the funded depreciation account may be used for a variety of purposes, the
following provisions apply:

    A.   Withdrawals for the Acquisition of Depreciable Assets Used to Render
Patient  Care  or  Other  Patient  Care-Related  Capital  Purposes  and  for
Investments.--These withdrawals must be made on a first-in, first-out basis.
The oldest deposits must be withdrawn first.  These withdrawals must be related
to the acquisition of such assets of the same provider maintaining the fund
from which such withdrawals are made.  The program does not recognize the use
of one provider's funded account to acquire patient care assets of another
provider because a funded depreciation account is limited to the use of the
provider maintaining it.

Previous Revision: 279
Date:   1-83

Case 1:07-cv-00555-PLF    Document 15-2    Filed 10/01/2007    Page 4 of 4

B.    Withdrawals for Other Than the Acquisition of Depreciable Assets Used to Render Patient Care or for Other Patient Care-Related Capital Purposes and Investments.—These withdrawals must be made on a last-in-, first-out basis. The latest deposit made must be considered the deposit withdrawn for these purposes. For example, if a loan is made to the general fund on February 1, 1980, and deposit of an equal or greater amount is in the funded account since January 1, 1980, the withdrawal will be considered to be made from the January 1 deposit and interest, if any, paid by the general fund is not allowable as a cost, because the funds were not on deposit for at least 6 months. (See §226.3.)

When funded depreciation is used by the provider for other than (1) the acquisition of depreciable assets used to render patient care; (2) investments; (3) loans to the general fund for current operating costs related to patient care; or (4) other capital purposes as described in §226, the investment income earned on these funds while on deposit in the funded account shall be used to reduce allowable interest expense incurred during all cost reporting periods subject to reopening.

C.    Priority of Withdrawals.—Available funded depreciation must be withdrawn and used before resorting to borrowing for the acquisition of depreciable assets or other capital purposes, except that, when available funded depreciation is insufficient to cover the total cost of a major construction project and borrowing is necessary (see §202.2), all available funded depreciation need not be withdrawn and applied to construction cost prior to borrowing. Because it is frequently difficult to time a bond offering or other borrowing to coincide with the exhaustion of available funded depreciation, it is sufficient if available funded depreciation is contractually committed to and expended during the course of construction.

226.5    Money Borrowed to Fund Depreciation.—Borrowed bond reserve and sinking funds are not allowable as funded depreciation, but the interest on such borrowing is allowable subject to the requirements of §202.1, and income erned by the borrowed funds is applied as a reduction of interest expense. (Reference §202.2.)

228.    QUALIFIED PENSION FUND
Generally, a qualified pension plan under Internal Revenue Service regulations is a plan established and maintained by a provider primarily to provide systematically for the payment of definitely determinable benefits to the provider's employees for a period, usually for life, after retirement. The trust instrument establishing the plan would provide for a fund

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CATHOLIC HEALTH INITIATIVES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 07-0555 (PLF) |
| | ) | |
| MICHAEL O. LEAVITT, Secretary of Health and Human Services, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### <u>ORDER</u>

Upon consideration of the parties' cross-motions for summary judgment, oppositions and replies thereto, and the entire record herein, it is this _____ day of _____, 2007,

ORDERED, that Plaintiffs' Motion for Summary Judgment be, and hereby is, DENIED; and it is further

ORDERED, that Defendant's Motion for Summary Judgment be, and hereby is, GRANTED; and it is further

ORDERED, that judgment be, and hereby is, entered in favor of Defendant and against Plaintiffs.

_____
PAUL L. FRIEDMAN
United States District Judge