**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CATHOLIC HEALTH INITIATIVES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No.: 07-0555 (PLF) |
| | ) | |
| MICHAEL O. LEAVITT, Secretary | ) | |
| of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT AND REPLY IN FURTHER SUPPORT**
**OF THEIR MOTION FOR SUMMARY JUDGMENT**

Ours is a "government of laws, and not of men,"[1] nor of *manuals*, either. See Wilkinson v. Legal Servs. Corp., 27 F. Supp. 2d 32, 48 (D.D.C. 1998) (the rule of law is the "founding principle of this Republic"). The agency Manual provision at issue in this case is a statement of agency policy, not law. The Secretary's application of the Manual to disallow reimbursement for the expenses at issue conflicts with the plain meaning of the statute and regulation, which are law. D.C. Circuit precedent therefore is quite clear that reversal is required.

The Court of Appeals concluded in Monmouth Medical Center v. Thompson, for example, that an agency Ruling that prohibited the mandatory reopening that was required by the plain terms of the controlling regulation was "simply inapplicable," a mere statement of policy that had to give way before the law as stated in the regulation. 257 F.3d 807, 814-15 (2001). Likewise, this Court later rejected the Secretary's argument that it would be inequitable for the Court to compel him to perform those reopenings, concluding that there is a "compelling public

---

[1]    John Adams, Novanglus Papers, Boston Gazette, No. 7 (1774).

interest" in the Secretary's compliance with the law.  In re Medicare Reimbursement Litig., 309

F. Supp. 2d 89, 99 (2004), aff'd, 414 F.3d 7 (D.C. Cir. 2005), cert. denied, 574 U.S. 1054 (2006)

("Baystate").

Yet, here again, the Secretary is arguing that he has the "vast" discretion to issue policy

guidance, adopted without notice and comment rulemaking and admittedly lacking the force or

effect of law – just like the Ruling at issue in Monmouth – to bring about a result in conflict with

the plain meaning of the Secretary's own controlling regulation and the underlying statute.

Monmouth, Baystate, and other cases clearly reject that proposition and require the Secretary's

reversal here.

       The fatal flaws in the Secretary's position are underscored as much by what his brief does

not say as by what it does.  For example:

       (1)     The Secretary's brief [2] argues that the agency has tremendous discretion to issue

informal program guidelines that lack the force and effect of law, that are not adopted through

the notice and comment rulemaking procedure mandated by the Administrative Procedure Act

("APA"), and that limit or completely deny reimbursement for costs that are allowed by the plain

terms of the statute, 42 U.S.C. § 1395x(v)(1)(A), and the controlling regulation, 42 C.F.R.

§ 413.9.  But the brief does not address controlling circuit precedent holding otherwise.  See,

e.g., Mem'l Hosp./Adair County Health Ctr., Inc. v. Bowen, 829 F.2d 111 (D.C. Cir. 1987)

(reversing a decision of the Secretary applying manual guidelines regarding a "prudent buyer"

principle to disallow reimbursement for actual costs incurred that were not shown to be

substantially out of line under § 413.9).

---

[2]    Memorandum of Points and Authorities in Support of Defendant's Motion for Summary
Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment ("Def. Mem.") at 9-15.

(2)    The Secretary's brief also asserts that the Secretary is not bound to reimburse a hospital at all for malpractice insurance costs. Def. Mem. at 11, 19-20. But the brief never even mentions this Court's decision in <u>LGH, Ltd. v. Sullivan,</u> 786 F. Supp. 1047, 1053 (D.D.C. 1992), that malpractice insurance assessments are "necessary and proper" costs as defined in the controlling regulation in section 413.9.

(3)    The Secretary's brief also argues that "the costs incurred by the hospitals did not meet the 'necessary and proper' standard in that they were not 'proper' because they did not comply with the requirements for offshore captives as stated by the manual." Def. Mem. at 11. But the brief never even attempts to square the Manual's investment restrictions with the plain language of the definition of "necessary and proper" costs in section 413.9 of the regulation.

In addition, as an adjunct to his "vast" discretion argument, the Secretary's brief asserts that the Hospitals waived their right to reimbursement because their captive insurer knowingly exceeded the Manual's investment limitations. <u>See</u> Def. Mem. at 1, 18; Defendant's Statement of Material Facts As to Which There Is No Genuine Issue ("Def. Stmt.") ¶ 8. This argument is not worthy of the Secretary. As the Secretary's Board pointed out, Administrative Record ("AR") at 8-9, the Plaintiffs properly disclosed this issue and self-disallowed their insurance premium expense on the cost reports they submitted for the years at issue, and in doing so they followed the Secretary's established procedure for protesting the Manual's limitation and preserving the hospitals' right to contest it under the statutory review provisions. <u>See</u> Plaintiffs' Statement of Material Facts as to Which There is No Genuine Issue ("Pl. Stmt.") ¶ 17; Plaintiffs' Response to Defendant's Statement of Material Facts ("Pl. Resp.") ¶ 8. <u>See also</u> Provider Reimbursement Manual ("PRM"), Part II § 115 ("You are permitted to dispute regulatory and policy interpretations through the appeals process established by the Social Security Act.").

The legal infirmity of the Secretary's policy and his baseless attempt to assert waiver are not the only defects in his position. The Secretary also has yet to show that the establishment or application of the Manual's investment limitation is the product of reasoned decision-making based upon substantial evidence. The Secretary's best witness proved unable to identify any evidence, let alone substantial evidence, that the agency actually considered in developing this limitation. Pl. Stmt. ¶¶ 79, 86-88. Additionally, she freely pled ignorance of the factors that lead insurance regulators to apply different limitations to different types of insurers, with the vast majority (if not all) opting to apply no limitation at all on investment by captive insurers that cover the types of property and casualty insurance that the Hospitals obtained from their captive. Id. ¶¶ 76-78, 89-96. Inasmuch as the Secretary admits to being unaware of the relevant factors, he could not have considered them, and his failure to have considered these important aspects of the problem is the very hallmark of arbitrary and capricious agency action. See Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). So, the Secretary's witness may have said it best when she said, "it's probably time for Medicare to revisit the manual procedures." Pl. Stmt. ¶ 97.

Finally, even if it were otherwise permissible for the Secretary to impose an investment limitation through the Manual provision that is at odds with the Medicare reasonable cost reimbursement provisions of the statute and regulations (and it is not permissible), the Secretary still would lack the authority to deny the Hospitals any reimbursement at all for Medicare's share of the actual liability claims paid by the Hospitals. See Saint Mary of Nazareth Hosp. Ctr. v. Schweiker, 718 F.2d 459, 467 (D.C. Cir. 1983) (prohibiting the Secretary from determining that a hospital "would not be reimbursed at all for the costs of rendering care to Medicare patients").

For all of these reasons, and because there are no genuine issues of material fact, the Plaintiffs are entitled to judgment as a matter of law.

**I.      THE MEDICARE STATUTE, REGULATIONS, AND CONTROLLING D.C. CIRCUIT PRECEDENT ALL REQUIRE THE SECRETARY TO REIMBURSE THE HOSPITALS FOR MEDICARE'S SHARE OF THE HOSPITALS' INSURANCE PREMIUM COSTS.**

Claiming (incorrectly) that he is not bound to reimburse Medicare providers for insurance premiums at all, see Def. Mem. at 11, 19-20, the Secretary argues that, having elected as a matter of grace to permit some reimbursement for these costs, it was fully within his vast discretion to place whatever limits on that reimbursement that he thinks best, through informal program guidance like the Manual provision at issue here. The controlling statute, the regulations, and the D.C. Circuit all require otherwise.

The Medicare statute defines "reasonable cost" as "the cost actually incurred" in the efficient delivery of necessary health services. 42 U.S.C. § 1395x(v)(1)(A). The intent of the statute is to provide for the payment of a hospital's *actual costs* incurred, however widely they may vary, subject only to a limitation on costs that are shown to be "substantially out of line" with the costs incurred by comparable health care providers for similar services. See S. Rep. No. 89-404 (1965), reprinted in 1965 U.S.C.C.A.N. 1943, 1976. As the statute requires, the Secretary's implementing regulations "take into account both *direct and indirect costs*" of Medicare providers, 42 U.S.C. § 1395x(v)(1)(A)(i) (emphasis added); see 42 C.F.R. § 413.9(b)(1). The regulations also broadly define "necessary and proper costs" to encompass all "costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities" and that are "common and accepted occurrences in the field of the provider's activity." 42 C.F.R. § 413.9(b)(2); Pl. Mem. at 18-20.

Neither the PRRB nor the Secretary has shown that the Hospitals' insurance costs do not fit within this expansive regulatory definition of "necessary and proper" costs or that they are "substantially out of line" with those incurred by other comparable health care providers. See Pl. Mem. at 15-18, Pl. Stmt. ¶¶ 22-59. No other statute or regulation precludes reimbursement of such costs, either. In fact, contrary to the Secretary's assertion that whatever reimbursement hospitals receive for such costs is a matter of his administrative largesse, this Court has previously held – in a decision the Secretary does not even acknowledge – that malpractice insurance premium expenses are "necessary and proper" costs, as defined in section 413.9 of the regulations. See LGH, Ltd., 786 F. Supp. at 1052-53; see also Pl. Mem. at 18.

The Hospitals' premium costs were not only allowable as a matter of law, but were prudently incurred as well. The Secretary's brief concedes that "Plaintiffs appear to have considered their insurance options in a very sophisticated manner," while making "informed business decision[s]" based upon "expert advice." Def. Mem. at 19, 20. Moreover, the undisputed evidence shows that the Hospitals saved millions of dollars in insurance premiums for the time periods at issue because the captive's prudent investments increased expected rates of return and thus reduced premium assessments necessary to cover actuarially-determined loss costs. Pl. Stmt. ¶¶ 53, 57-59. Although the Secretary suggests that the Hospitals will realize a financial windfall if they are "rewarded with additional Medicare reimbursement," Def. Mem. at 2, 18-19, the only party that seems to be looking for a windfall in this case is the Medicare program, which refuses to reimburse the Hospitals *at all* for "necessary and proper" insurance premiums that were never determined to be "substantially out of line." Pl. Stmt. ¶¶ 60-66. As the Court of Appeals has held, moreover, there is nothing inequitable about requiring the Secretary to pay sums owed to hospitals. Baystate, 414 F.3d at 12.

6

In the face of all this clear legal authority requiring reimbursement and an undisputed economic benefit to the program he administers, the Secretary demands "deference" to his "discretion" – "vast discretion" (Def. Mem. at 9), "broad discretion" (id. at 10), "significant deference" (id. at 12), "great deference," (id.), and "even greater than Chevron deference."  (id.). But all of that is beside the point.  No matter how much discretion the Secretary has in interpreting ambiguous statutes or regulations, and no matter how much deference is owed to such interpretations, program guidelines like the Manual provision at issue are "simply inapplicable" when they conflict, as in this case, with the plain language of the controlling statute or regulations.  See Monmouth Medical Center, 257 F.3d at 814-15; see also Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994).  It is that simple.

The Supreme Court's decision in Shalala v. Guernsey Memorial Hospital, 514 U.S. 87 (1995), is not to the contrary.  It is true that the Secretary has "the authority to articulate principles regarding the reimbursement of individual costs that are grounded in the concept of 'necessary and proper.'"  See Def. Mem. at 9-12.  However, neither Guernsey nor any other case represents an exception to the familiar rule that the Secretary's "articulated principles" must not conflict with the plain language of his regulations.  See Mem'l Hosp./Adair County Health Ctr., 829 F.2d 111.  In Guernsey, the Court specifically found that the Secretary's manual provision at issue in that case did *not* conflict with the regulation.  See 514 U.S. at 94-95.  The opposite situation is presented here – the Secretary's manual *is* contrary to the plain language of the regulation as well as the intent of the statute.  Pl. Mem. at 15-18.

In short, the Secretary must conform his "principles" to the statute and to his own broad definition of "reasonable costs" set forth in the regulations.  In decisions the Secretary elects not to address, the D.C. Circuit has consistently struck down his many attempts to graft additional

requirements onto the regulatory definition of "reasonable costs." The <u>Memorial Hospital</u> case, for example, involved the Secretary's application of the "prudent buyer" guideline articulated in the same chapter of the Provider Reimbursement Manual at issue in this case. The Court of Appeals held, however, that costs actually incurred by a Medicare provider must be allowed so long as they are "necessary and proper" and not proven by the Secretary to be "substantially out of line" in accordance with the plain meaning of the regulation in section 413.9, and regardless of whether the costs satisfied the additional "prudent buyer" standard articulated in the Secretary's Manual. 829 F.2d at 118; <u>see also</u> <u>Grancare, Inc. v. Shalala</u>, 93 F. Supp. 2d 24, 33 (D.D.C. 2000) (reversing Secretary's interpretation of his prudent buyer guidelines in PRM § 2103 to permit disallowance of costs that were not substantially out of line).

       The Secretary's similar attempts in other circuits met the same fate. <u>See</u> <u>Vista Hill Found., Inc. v. Heckler</u>, 767 F.2d 556, 560-62 (9th Cir. 1985); <u>Charter Peachford Hosp., Inc. v. Bowen</u>, 803 F.2d 1541, 1546-47 (11th Cir. 1986). In <u>Vista Hill</u> and <u>Charter Peachford,</u> the courts reversed the Secretary's application of other sections of the same chapter of the Manual to disallow Medicare reimbursement for adolescent education costs incurred by psychiatric hospitals because those costs fit within the broad definition of "necessary and proper" costs in section 413.9 of the regulations.

       Given these adverse litigation results and the clarity of the statute and regulations that bind the Secretary, it is no wonder that he neither addresses the cases nor makes any effort to show how the application of the blanket investment restrictions contained in the PRM square with the plain statutory and regulatory language. Instead, the Secretary shifts the focus to other legal principles and authorities that have no bearing on the outcome of this case.

8

For example, the Secretary cites to the opening provisions of 42 C.F.R. § 413.9(a), which state that "[r]easonable cost includes all necessary and proper costs incurred in furnishing the services, *subject to principles relating to specific items of revenue and cost*," and evidently relies on the italicized phrase as regulatory authority to limit reimbursement as he wishes. Def. Mem. at 9-10. But, the Secretary reads this regulation out of context. Immediately following the language quoted by the Secretary, his regulation states:

> Reasonable cost of any services must be determined *in accordance with regulations* establishing the method or methods to be used, and the items to be included. The regulations *in this part* take into account both direct and indirect costs of providers of services.

42 C.F.R. § 413.9(b) (emphasis added). In other words, the "principles relating to specific items of revenue and costs" are the ones defined elsewhere in Part 413 of the regulations – they are regulations, not just policy concepts that the Secretary might choose to articulate from time to time in his interpretive Manual. Under those regulations, as discussed above, the Hospitals should have been reimbursed for the costs of their insurance premiums because those costs were "necessary and proper" and not "substantially out of line" with the costs of similar providers. Pl. Mem. at 15-18.

The Secretary also goes on to cite numerous cases dealing with the related organization principle and funded depreciation, arguing that he may "promulgate bright line rules that are prophylactic in nature so as to categorically preclude reimbursement under certain circumstances." See Def. Mem. at 13-15. These cases do not support the Secretary's claim that he has unfettered discretion to promulgate *manual guidelines* that conflict with the plain language of the regulation and the intent of the statute – and yet that is exactly what the Secretary has done here. See Shaker Med. Ctr. Hosp. v. Sec'y Health & Human Servs., 686 F.2d 1203, 1209 (6th Cir. 1982) ("It is within the power of an agency to promulgate prophylactic

*regulations* which are broad in scope in order to effectuate the purposes of the enabling

legislation") (emphasis added).  The Secretary's cases merely confirm his authority – not

questioned here – to issue regulations defining reasonable cost through the notice and comment

rulemaking procedure mandated by the APA.  See <u>Kidney Ctr. of Hollywood v. Shalala</u>, 133

F.3d 78, 86-88 (D.C. Cir. 1998); <u>Shaker Med. Ctr. Hosp.</u>, 686 F.2d at 1209; <u>Marina Mercy Hosp.</u>

<u>v. Harris</u>, 633 F.2d 1301, 1304 (9th Cir. 1980); <u>Fairfax Hosp. Ass'n, Inc. v. Califano</u>, 585 F.2d

602, 605-06 (4th Cir. 1978).  No such regulations are at issue in this case, just a Manual

provision, a policy document adopted without notice and comment rulemaking.

     The Secretary's cases on the treatment of funded depreciation suffer from an additional

defect.  Def. Mem. at 14-15.  The Secretary's brief suggest that courts have upheld the

Secretary's Manual provision regarding funded depreciation, PRM § 226, as a reasonable

interpretation of *42 C.F.R. § 413.9*, which sets forth the definition of "necessary and proper"

costs.  See Def. Mem. at 15.  PRM § 226 is a specific application of a different regulation,

however, 42 C.F.R. § 413.153 (formerly 42 C.F.R. § 405.419), which sets forth a wholly

separate provision governing reimbursement for interest expense.  The interest expense

regulation (§ 413.153) provides for payment of necessary and proper interest expense incurred,

net of investment income earned, by a health care provider.  That regulation also provides for an

exception to the offset of investment income against interest expense, which applies to

investment income earned on funds held in a funded depreciation account "that meets the

program's qualifying criteria."  See 42 C.F.R. § 413.153(b)(2)(iii)(B), (c)(3).  The Manual

provision cited in the Secretary's brief, PRM § 226, fleshes out the interest expense regulation's

criteria for qualifying funded depreciation accounts.  That provision of the Manual has nothing to

do with the regulation in section 413.9 or the definition of "necessary and proper" costs in that regulation.

It is well-settled that the provisions of the Secretary's Manual do not have the force of law, as regulations do, and that Manual provisions derive whatever limited authority they have to the extent that they are consistent with regulations. See Foreword of Provider Reimbursement Manual at I (stating that Manual guidelines do not "have the effect of regulations"); GCI Health Care Ctrs., Inc. v. Thompson, 209 F. Supp. 2d 63, 70-71 (D.D.C. 2002) (stating that PRM "contain[s] informal interpretive rules that do not carry the force of law"). Yet, in the Secretary's apparent view, the Manual provision at issue effectively trumps both the statute and the regulations. The Secretary's brief (at 11) puts it as follows:

> The Secretary's manual provision places providers on notice that, *besides meeting the general requirements of the statute and regulations regarding reasonable cost*, premiums paid to offshore captive insurers that do not meet the ten percent requirement will not be considered proper costs.

(Emphasis added). But, that is precisely the problem with the application of the Manual in this case – it has been applied to disallow costs that are allowed by the plain language of the statute and regulations. Therefore, because the Manual provision conflicts with the Medicare statute and regulations as applied in this case, it simply has no legal effect and the decision below must be reversed.

## II.    THE SECRETARY'S APPLICATION OF THE MANUAL'S INVESTMENT RESTRICTION IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE IN THE RECORD AND IS ARBITRARY AND CAPRICIOUS.

The Secretary argues that the Manual's investment restrictions, which apply *only* to offshore captives, are reasonable because, he asserts, offshore captives operate in a "riskier offshore environment" in which they are subject to more "relaxed" regulatory oversight than

they would be if they were domiciled in a State. Def. Mem. at 2, 16-18. Indeed, the Secretary states that the very "key" to this case is that "the circumstances of [Plaintiffs'] captive insurance company are different from domestically domiciled insurance companies." Def. Mem. at 21. The problem with these knee-jerk suspicions is the absence of any rational basis for them in the record evidence.

The Secretary's witness at the hearing before the PRRB was unable to identify any evidence, let alone substantial evidence, that the agency actually considered in developing the Manual's limitation on investment by offshore captives. Pl. Stmt. ¶¶ 79, 86-88. Further, the evidence in this case flies squarely in the face of the Secretary's unsubstantiated finding (AR at 11) that offshore captives "are not subject to the same level of industry regulations applied to onshore agencies [sic, captives] by State insurance commissions." See Pl. Stmt. ¶¶ 34-59, 89-96. The undisputed evidence shows that the majority of States do not regulate captives at all. Pl. Stmt. ¶ 91; AR 254 (CMS' witness testified that to her knowledge, 23 States regulate captive insurers). Moreover, most of the minority of States that regulate captives in some fashion do not limit their investment in equities to any fixed percentage. Id.; see also AR at 147 n.13 (citing State laws). In Vermont, where the vast majority of domestic captives are domiciled (Pl. Stmt. ¶ 92), for example, there are no fixed limits whatsoever on a captive's investment. Vt. Stat. Ann. tit. 8, § 6010(b) (2002) (AR at 3334). Thus, even if a handful of States were to impose some sort of limit on a captive's investment,[3] there is no substantial evidence supporting the Secretary's premise that offshore captives are categorically "not subject to the same level of

---

[3]    Neither the Board in its decision below nor the Secretary in his opening brief identified any State that imposes a fixed limit on a captive's investment in equity securities. The Secretary's brief (at 17) incorrectly states that "Plaintiffs themselves acknowledge that at least six states impose limits on offshore captives regarding the amount of assets they may invest in equity securities. Pls. Mem. at 23; Complaint ¶ 95." Not true. Plaintiffs are unaware of any State that limits or regulates investment by an offshore captive in any way.

industry regulations" as those that are domiciled in a State. In the vast majority, if not all, cases, there is no difference in the regulation of investments by a captive because the vast majority of States place no limits whatsoever on a captive's investment.[4] See also Pl. Stmt. ¶ 102.

There is no question that some States impose fixed limits on investments by certain types of insurers and that some types of insurers therefore have investment allocations in the range of the ten percent limit required by the Secretary's Manual. But, this does not justify the Secretary's application of the Manual's limitation on investments by the Plaintiffs' captive insurer. The evidence shows that State regulators apply differing limits, or in the case of all or nearly all captives, *no limit at all*, depending on the type of insurer (e.g., a commercial insurer vs. a captive or mutual insurance company) and type of insurance risk (e.g., life and health insurance vs. property and casualty insurance) involved.[5] Pl. Stmt. ¶¶ 76-78, 89-96.

The Secretary's witness admitted that these differences in States' regulation of insurers did not make sense to her because she is "not a specialist" in insurance regulation or investment risk. Id. ¶ 78. That is the critical point here. Insofar as the Secretary's agency admits to not even knowing what the relevant factors are, the Secretary cannot be said to have rationally considered them, and the agency's failure to have considered these important aspects of the problem is arbitrary and capricious. See State Farm, 463 U.S. at 43.

---

[4]    There is no dispute that Plaintiffs' captive is subject to regulatory oversight. See Pl. Stmt. ¶ 40. In Defendant's brief, the Secretary's lawyers attempt to mount a *post-hoc* challenge to the degree of oversight exercised by the Cayman Authority, Def. Mem. at 18, but the undisputed evidence clearly shows that the Plaintiff's captive and its investments are monitored and regulated by the Cayman Authority pursuant to the laws in that jurisdiction. See AR at 222-23, 3342-48.

[5]    The record evidence shows, and the Secretary admits, that for all mutual property and casualty insurers, the average investment allocation in equities ranged from 44-51%, well above the Manual's permissible limitation. See Pl. Stmt. ¶ 94; Defendant's Response to Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue ¶ 94; AR at 3388.

Finally, while the Secretary says that his application of the Manual's limit is intended "to promote solvency and ensure the financial strength of the insurer,"[6] Def. Mem. at 15, the undisputed record evidence shows that the Manual guideline is not rationally tailored to meet that objective. The Manual provision precludes any investment in the stock of a company that does not pay dividends, for example, but there is no evidence showing any correlation between the payment of dividends and the financial strength of a company. See Pl. Stmt. ¶¶ 80-81. Conversely, moreover, the Manual does not require any degree of diversification in a captive's investments (id. ¶¶ 82-83), but it is clear that diversification is necessary "to minimize the risk of large losses." 29 U.S.C. § 1104(a)(1)(C) (while not limiting investment in securities, the ERISA statute mandates that an ERISA plan fiduciary must "diversify [] the investments of the plan to as to minimize the risk of large losses").

In sum, the decision of the majority of the Board is arbitrary and capricious, and must be reversed, because the Secretary's application of the Manual's investment limitation in this case is marked by a complete "lack of reasoned analysis on the record." D&F Alfonso Realty Trust v. Garvey, 216 F.3d 1191, 1196-97 (D.C. Cir. 2000). Given the disconnect between the Secretary's position and the undisputed record evidence in this case, the time has come, as the Secretary's witness said, "to revisit the manual procedures." Pl. Stmt. ¶ 97.

---

[6]    This is regulation of the business of insurance. See Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 211-12 (1979) (the underwriting of risk and investment risk-taking by an insurer are central to the concept of insurance). The regulation of the business of insurance is clearly beyond the Secretary's field of expertise, as the testimony of the Secretary's witness clearly established. See Pl. Stmt. ¶¶ 75-78. And, it is not an area that Congress intended for the Secretary to regulate via his reasonable cost reimbursement principles. See 42 U.S.C. § 1395 (stating that nothing in the Medicare statute "shall be construed to authorize any Federal officer or employee . . . to exercise any supervision or control over the administration or operation of any such institution, agency, or person [that provides health services]"). Insofar as the Manual is intended, as the Secretary says it is, to regulate this central aspect of the business of insurance, it is beyond the Secretary's statutory authority and should be set aside pursuant to applicable review provision of the APA. See 5 U.S.C. § 706(2)(C).

14

III.    **THE SECRETARY MUST, AT A MINIMUM, REIMBURSE THE HOSPITALS FOR MEDICARE'S SHARE OF THE CLAIMS PAID AND ADMINISTRATIVE EXPENSES OF THE CAPTIVE.**

Even if the Secretary had some legitimate basis of authority in the law for attempting to limit the captive's investment (which he does not have), and even if the Secretary's application of the Manual's limitation was rationally connected to the record evidence in this case (which it is not), it is arbitrary and capricious for the Secretary to deny the Hospitals reimbursement for Medicare's share of the actual claims paid and the administrative expenses of the Hospitals' captive insurance and risk management program.  In this case, the Secretary has not reimbursed the Hospitals for *any* of the tens of millions of dollars in actual loss costs and administrative expenses incurred during the periods at issue.  Pl. Stmt. ¶¶ 63-64.

Harkening back again to one of the basic tenets of the Secretary's brief – that the agency is not required by the statute or regulations to reimburse insurance costs "under any circumstances" –  the Secretary argues that he has no obligation to reimburse the Plaintiffs for any of the actual loss costs incurred by the Hospitals in delivering health care services to patients.  Def. Mem. at 19-20.  But, as discussed above, the Secretary does not have unbridled discretion to determine as a matter of administrative prerogative whether, and to what extent, the Medicare program will reimburse a hospital for the actual costs it incurs in the delivery of necessary health care services.  There is law to apply here, and the law requires reimbursement for the actual direct and indirect costs incurred in the efficient delivery of necessary patient care services.  <u>See</u> 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.9.

Moreover, as discussed in Plaintiffs' opening brief, the Secretary's position is clearly contrary to the Court of Appeals' construction of the controlling law in <u>Saint Mary of Nazareth Hospital Center</u>, 718 F.2d at 467.  Though the Secretary refuses even to acknowledge that decision in his brief, the Court of Appeals construed the statute's proscription against cross-

subsidization to preclude the Secretary from determining that a hospital "would not be reimbursed at all for the costs of rendering care to Medicare patients." 718 F.2d at 467.

But, under the Secretary's *ipse dixit* approach, that is exactly what has happened here – the 3-2 majority of the Board applied the Manual to completely deny any reimbursement for premiums paid to the captive, for any of the claims paid on behalf of the Hospitals, and for any of the administrative costs of the Hospitals' captive insurance and risk management program. In short, the Hospitals have not been reimbursed at all for theses costs of rendering care to Medicare patients. That result is clearly contrary to controlling precedent and cannot stand.

When it comes to the reimbursement of the Hospitals' actual claims, moreover, not even the Secretary's Manual can support his position. The Manual provision at issue is addressed to insurance premiums, not claims. The Hospitals' claim experience is not affected in any way by how they choose to insure against those claims, and yet the Secretary takes the position that the Hospitals are entitled to no payment for the otherwise reimbursable claims against them solely because they insured those claims by paying actuarially-determined premiums to an offshore captive entity. Neither logic nor the Manual can sustain the Secretary's view.

## IV. THERE IS NO GENUINE ISSUE OF MATERIAL FACT.

The Secretary's responses to the Hospitals' fact statement can be addressed quickly.

Plaintiffs agree with Defendant's response to paragraph 94 of Plaintiffs' Statement that the average investment in equity securities by mutual insurance companies, like Plaintiffs'

captive, that underwrite property and casualty risk ranged from 44.38 to 51.78 percent, rather than the 45-50% range stated in paragraph 94 of Plaintiffs' Statement.[7]

The testimony cited in Defendant's response to paragraph 95 of Plaintiffs' Statement does not give rise to a genuine issue as to Plaintiffs' statement that the "record evidence shows that regulators typically have less concern about promoting policyholder confidence in a captive or mutual insurance company, like FIIL, because in these cases policyholders and shareholders have a commonality of interest. Complaint & Answer ¶ 96; AR 3343." The testimony of the Secretary's witness, which is cited in support of Defendant's denial of Plaintiffs' allegation, does not raise a genuine issue as to the allegation in Plaintiffs' Statement. When asked why she thought "a mutual insurance company writing property and casualty would have a higher equity percentage allocation than the average percentage you'd see if you looked at all types of insurers writing property and casualty", she answered: "I don't know." AR at 272.

In response to Defendant's professed confusion regarding the first and second allocation studies discussed in paragraphs 51-54 of Plaintiffs' Statement (see Def. Resp. to Pl. Stmt. ¶ 54), Plaintiffs state that the first asset allocation study is found on pages 2830-46 of the Administrative Record, and the second study is found on pages 2848-68 of the record.

As to the rest of the allegations in Plaintiffs' Statement, most of them must be taken as true for the simple reason that the Secretary did not respond to them at all. See Fed. R. Civ. P. 56(e). The remaining allegations also may be taken as true either because Defendant's response fails to "set forth specific facts showing that there is a genuine issue," id., or fails to refer to affirmative record evidence giving rise to something more than "metaphysical doubt" as to the

---

[7]    Plaintiffs also agree with Defendant's response that paragraph 9 of Plaintiffs' statement inadvertently misquoted the Foreword to the Secretary's Provider Reimbursement Manual. The Manual is accurately quoted in Plaintiffs' opening brief (at 6), and a copy of the Foreword is included in the exhibit attached to the brief.

17

facts set forth in Plaintiffs' Statement.[8]  In most instances, Defendant's response merely disputes Plaintiffs' "characterization" of the record, without referring to any record evidence raising a genuine issue as to the facts set forth in Plaintiffs' Statement.  As a result, the Court may take all of those facts as true.

## V.    CONCLUSION

For all of the reasons discussed above, Plaintiffs conclude that the Secretary's final decision should be reversed with instructions to reimburse the Hospitals for Medicare's share of the premium assessments paid to their captive for the periods at issue, or, alternatively, to reimburse them for Medicare's share of the claims paid by the captive on the Hospitals' behalf, for each of the years at issue, plus interest.

Respectfully submitted,

/s/ Christopher L. Keough
Christopher L. Keough
   D.C. Bar No. 436567
John M. Faust
   DC Bar No. 433553
J. Harold Richards (Admission pending)
   DC Bar No. 469524
**VINSON & ELKINS L.L.P.**
1455 Pennsylvania Avenue, N.W., Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiffs

November 1, 2007

---

[8]    See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-67 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Frito-Lay, Inc. v. Willoughby, 863 F.2d. 1029, 1033-34 (D.C. Cir. 1988); Williams v. United States, 932 F. Supp. 354, 355 (D.D.C. 1996); Rubin v. Estate of Warner, 881 F. Supp. 23, 25 (D.D.C. 1995); Campbell-El v. District of Columbia, 874 F. Supp. 403, 406 (D.D.C. 1994).

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CATHOLIC HEALTH INITIATIVES, et al.,    )
    )
                    Plaintiffs,    )
    )
                  v.    )        Civil No.: 07-0555 (PLF)
    )
MICHAEL O. LEAVITT, Secretary    )
of Health and Human Services,    )
    )
                  Defendant.    )
    )

**PLAINTIFFS' RESPONSE TO DEFENDANT'S**
**STATEMENT OF MATERIAL FACTS**

Pursuant to Local Civil Rule 7(h), Plaintiffs submit the following response to Defendant's Statement of Material Facts As to Which There is No Genuine Issue ("Def. Stmt."):

7.        Defendant's paragraph seven contains legal argument, to which no response is required.  To the extent a response is deemed necessary, Plaintiffs dispute the legal conclusion in paragraph seven of Defendant's Statement that Provider Reimbursement Manual ("PRM" or "Manual") § 2162.2.A.4 requires a provider that obtains insurance through an offshore captive insurer to have no more than ten percent of the provider's assets invested in equity securities.  A copy of this provision of the Manual is included in Plaintiffs' Exhibit 1, which is attached to Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment.  Plaintiffs refer to the text of this provision of the Manual for a complete and accurate statement of its terms.

8.        Plaintiffs dispute the allegation in paragraph eight of Defendant's Statement that they knew that they would forfeit Medicare reimbursement for premiums paid to the offshore captive insurer because the captive's investments exceeded the limitation set forth in PRM

§ 2162.2.A.4.   The record evidence reflects that the Plaintiffs were aware of the Manual's limitation, and their captive insurer knowingly invested more than 10% of its assets in equity securities based on studies showing that at the lower expected rates of return, compliance with the Manual's investment limitation would have the effect of increasing the hospitals' premium expense by millions of dollars per year.   See Plaintiffs' Statement of Material Facts as to Which There is No Genuine Issue ("Pl. Stmt.") ¶¶ 17, 53-58 (and record evidence cited therein).   The evidence also shows that because the captive's investment in securities did not comply with the Manual's limitation, the Plaintiffs disclosed and self-disallowed the premium expense under protest on the cost reports they submitted to the Medicare program for the periods at issue.   See id. ¶ 17 (and record evidence cited therein).   By invoking the process set forth in the Secretary's Manual for filing a cost report under protest, the Plaintiffs preserved their right to contest the validity of the PRM's investment limitation.   See Bethesda Hosp. Ass'n v. Bowen, 485 U.S. 399, 400-01 (1988); PRM, Part II § 115 ("You are permitted to dispute regulatory and policy interpretations through the appeals process established by the Social Security Act. Include the nonallowable item in the cost report in order to establish an appeal issue, and the disputed item must pertain to the cost reporting period for which the cost report is filed.")   In view of this undisputed record evidence, the Secretary cannot credibly say that the Plaintiffs knew that "they would forfeit Medicare reimbursement" for the premium expenses at issue.

10.   Plaintiffs dispute the allegation in paragraph ten of the Defendant's Statement that they filed all of their requests for hearing with the Provider Reimbursement Review Board in December 2003 and January 2004.   The pages of the record cited in Defendant's Statement constitute only a small portion of the hearing requests filed by the Plaintiffs over a period of

years, beginning in April 1999, in the consolidated appeals for fiscal years 1997-2002.  <u>See</u> AR

at 17-38.

Respectfully submitted,


<u>/s/ Christopher L. Keough</u>
Christopher L. Keough
  DC Bar No. 436567
**VINSON & ELKINS L.L.P**.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6745 (phone)
(202) 879-8945 (fax)

Counsel for Plaintiff


November 1, 2007