UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
CATHOLIC HEALTH INITIATIVES, <u>et al.</u>,         )
                                                    )
            Plaintiffs,                             )
                                                    )
      v.                                            )        Civil Action No. 07-555 (PLF)
                                                    )
KATHLEEN SEBELIUS,                                  )
  *Secretary, United States Department of*          )
  *Health and Human Services*,                      )
                                                    )
            Defendant.[1]                           )
_____)


<u>OPINION</u>

            This matter is before the Court on the parties' cross motions for summary

judgment.  Plaintiffs, a hospital group, brought this action seeking judicial review of the

Secretary of Health and Human Service's denial of reimbursement under the Medicare statute for

certain insurance premium payments made by plaintiffs.  After careful consideration of the

parties' papers, the attached exhibits, and the entire record in the case, the Court will grant

defendant's motion for summary judgment in its entirety.[2]

_____

            [1]      The Court has substituted Kathleen Sebelius, the current Secretary of the
Department of Health and Human Services, as the defendant in place of former Secretary
Michael O. Leavitt, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

            [2]      The following papers are relevant to the pending motions: Plaintiffs' Motion for
Summary Judgment ("Pl. Mot."); Defendant's Motion for Summary Judgment ("Def. Mot.");
Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Reply in Further
Support of their Motion for Summary Judgment ("Pl. Opp."); Defendant's Reply to Plaintiffs'
Opposition to Defendant's Motion for Summary Judgment ("Def. Reply"); and the
Administrative Record ("A.R.").

I.  BACKGROUND

The Medicare Act, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et

seq., creates a federally funded health insurance program for the elderly and disabled.  The

Centers for Medicare and Medicaid Services ("CMS") is the component of the Department of

Health and Human Services that administers the Medicare program for the Secretary.  Part A of

the Medicare Act reimburses hospitals for the operating costs of certain inpatient services.  See

42 U.S.C. § 1395ww.  In order to obtain this reimbursement, eligible hospitals file cost reports

with their "fiscal intermediaries," allocating a portion of those costs to Medicare.  See 42 C.F.R.

§ 413.20.  The intermediaries determine the amount owed by the Secretary to the hospitals for the

fiscal year at issue.  See 42 C.F.R. § 405.1803(a).  Hospitals may appeal the payment

determination to the Provider Reimbursement Review Board (the "Board") within 180 days.  See

42 U.S.C. § 1395oo(a).  The Board may reverse, affirm or modify the intermediary's decision;

similarly, the Secretary subsequently may reverse, affirm or modify the Board's decision.  See 42

U.S.C. §§ 1395oo(d) and (f)(1).  Hospitals still dissatisfied with the final decision may seek

judicial review by filing suit in the appropriate United States district court.  See 42 U.S.C.

§ 1395oo(f); In re Medicare Reimbursement Litig., 414 F.3d 7, 8 (D.C. Cir. 2005).

Provider hospitals receive reimbursement for the "reasonable cost" of Medicare

services provided.  42 U.S.C. § 1395x(v)(1)(A).  Following her statutory directive, the Secretary

of Health and Human Services promulgated regulations outlining principles for reasonable cost

reimbursement.  See 42 C.F.R., Part 413.  The Secretary also created a manual, called the

Provider Reimbursement Manual ("PRM"), to provide further detail to fiscal intermediaries to

determine appropriate reimbursement.  See Pl. Mot., Ex. 1, excerpts of U.S. Dept. of Health and

2

Human Services, Medicare Provider Reimbursement Manual ("PRM").  Premiums that hospitals

pay for malpractice insurance allocable to Medicare costs generally are reimbursable.  See PRM

§ 2162.2.A.  The PRM disallows from reimbursement, however, insurance liability premiums

paid to captive insurers (those that are wholly-owned by the provider hospitals) that are

domiciled offshore and invest more than ten percent of their assets in equity securities.  See PRM

§ 2162.2.A.4.

Plaintiff Catholic Health Initiatives ("CHI") is a non-profit health care

organization based in Denver, Colorado.  See Def. Mot., Statement of Material Facts as to which

there is no Genuine Dispute ("Def. Facts") ¶ 1.  The plaintiff hospitals are fifty-five Medicare

participating hospitals.  See Def. Facts ¶ 2.  Plaintiff hospitals paid premiums to First Initiatives

Insurance Ltd. ("FIIL") for malpractice, other liability and workers' compensation coverage for

the Medicare cost reporting periods ending in 1997 through 2002.  See Def. Facts ¶¶ 3-4.  FIIL is

a captive insurer, wholly-owned by CHI, and domiciled in the Cayman Islands.  See Def. Facts

¶¶ 3, 5.  FIIL invests forty to fifty percent of its assets in equity securities.  See Def. Facts ¶ 6.

Based on PRM § 2162.2.A.4, plaintiffs self-disallowed the premiums they paid to

FIIL on their Medicare cost reports.  See Def. Facts ¶ 8.  Plaintiffs then requested a hearing

challenging their self-disallowance of these insurance premiums, which the Board conducted on

November 4, 2004.  See Def. Facts ¶¶ 10, 12.  On January 24, 2007, the Board issued a decision

upholding the disallowance of the insurance premiums paid to FIIL.  See Def. Facts ¶ 13.  On

March 9, 2007, the CMS Administrator declined to review the Board decision, essentially

upholding it.  See Def. Facts ¶ 17.  Plaintiffs filed suit in this Court on March 20, 2007.

## II.  STANDARD OF REVIEW

Summary judgment may be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  In a case involving review of a final agency action under the Administrative Procedure Act, 5 U.S.C. § 706, however, the Court's role is limited to reviewing the administrative record, so the standard set forth in Rule 56(c) does not apply.  See Cottage Health System v. Sebelius, Civil Action No. 08-0098, 2009 U.S. Dist. LEXIS 57696 at *17 (D.D.C. July 7, 2009) (citing North Carolina Fisheries Ass'n v. Gutierrez, 518 F. Supp. 2d 62, 79 (D.D.C. 2007)); see also 42 U.S.C. § 1395oo(f)(1) (providing that judicial review of provider reimbursement under the Medicare Act shall be made under APA standards).  "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'"  Cottage Health System v. Sebelius, 2009 U.S. Dist. LEXIS 57696 at *17 (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985)).  Summary judgment serves as "the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review", but the normal summary judgment standard does not apply.  See id. at *18; see also Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995).

The standard of review under the APA "'is a highly deferential one.  It presumes agency action to be valid.'"  Humane Soc'ty of the United States v. Kempthorne, 579 F. Supp. 2d

7, 12 (D.D.C. 2008) (quoting Ethyl Corp. v. EPA, 541 F.2d 1, 34 (D.C. Cir. 1976)).

Nevertheless, a reviewing court must set aside agency actions, findings, or conclusions when

they are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or

unsupported by substantial evidence.  See 5 U.S.C. § 706(2)(A) and (E); Marsh v. Oregon

Natural Resources Council, 490 U.S. 360, 375 (1989).  Agency action is arbitrary and capricious

if the agency

> relied on factors which Congress has not intended it to consider,
> entirely failed to consider an important aspect of the problem,
> offered an explanation for its decision that runs counter to the
> evidence before the agency, or is so implausible that it could not be
> ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Assoc. v. State Farm Mutual Auto. Insurance Co., 463 U.S. 29, 43 (1983).

As explained in greater detail below, plaintiffs' principal argument calls into

question the Secretary's interpretation of the Medicare statute and regulations.  When the action

under review involves an agency's interpretation of a statute that the agency is charged with

administering, the court applies the familiar analytical framework set forth in Chevron U.S.A.,

Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  "Under step one of

Chevron, [the court] ask[s] whether Congress has directly spoken to the precise question at issue,

in which case [the court] must give effect to the unambiguously expressed intent of Congress."

Secretary of Labor, Mine Safety and Health Admin. v. Nat'l Cement Co. of California, Inc., 494

F.3d 1066, 1073 (D.C. Cir. 2007) (internal quotation marks and citation omitted); see also

Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. at 842-43.  If, after

employing the tools of statutory construction, the court concludes that "the statute is silent or

ambiguous with respect to the specific issue . . . , [the court] move[s] to the second step and

5

defer[s] to the agency's interpretation as long as it is 'based on a permissible construction of the statute.'" Secretary of Labor, Mine Safety and Health Admin. v. Nat'l Cement Co. of California, Inc., 494 F.3d at 1074 (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. at 843).

As this Court has previously explained, in the District of Columbia Circuit, "Chevron step two review is similar to (but conceptually distinct from) the standard 'arbitrary and capricious style  analysis' described [above]." Humane Society v. Kempthorne, 579 F. Supp.2d at 12-13 (quoting Continental Airlines Inc. v. DOT, 843 F.2d 1444, 1452 (D.C. Cir. 1988)).  Thus, a "'reasonable' explanation of how an agency's interpretation serves the statute's objectives is the stuff of which a 'permissible' construction is made . . . ; an explanation that is 'arbitrary, capricious, or manifestly contrary to the statute,' however, is not." Northpoint Technology Ltd. v. FCC, 412 F.3d 145, 151 (D.C. Cir. 2005) (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. at 844).  "'Reasonableness' in this context means . . . the compatibility of the agency's interpretation with the policy goals . . . or objectives of Congress." Continental Airlines Inc. v. DOT, 843 F.2d at 1452.  As a result, "the critical point is whether the agency has advanced what the Chevron Court called 'a reasonable explanation for its conclusion that the regulations serve the . . . objectives [in question].'" Continental Airlines Inc. v. DOT, 843 F.2d at 1452; see also Humane Society v. Kempthorne, 579 F. Supp.2d at 13.

III.  DISCUSSION

Plaintiffs challenge the Board's decision disallowing reimbursement.  See Compl. ¶¶ 115-17.  Much of the parties' discussion suggests that plaintiffs are challenging the PRM

provision directly, presumably because the Board first ruled that the PRM was consistent with the statute and the regulations and then relied on it in its determination in this case.  While the PRM provision itself would be due less deference than a Board decision, see Public Citizen, Inc. v. DHHS, 332 F.3d 654, 660 (D.C. Cir. 2003), the question before the Court is whether *the Board's ruling* — which found the reimbursement standard expressed in the PRM to be consistent with both the Medicare statute and the Medicare regulations — was lawful, not whether the PRM provision itself was lawful.  The Court will analyze the Board's interpretation first under the statute and then under the regulations.

### A.  The Medicare Statute

### 1.  Chevron Step One

Plaintiffs contend that the Board's denial of reimbursement for insurance premiums paid to offshore captive insurers that invest more than ten percent of their assets in equity securities is inconsistent with the plain meaning and intent of the Medicare statute to reimburse providers for their "reasonable costs."  See 42 U.S.C. § 1395x(v)(1)(A).  A challenge to the Secretary's interpretation of the Medicare statute, as explained by the Secretary in a final action on a Board decision, is analyzed under Chevron.  See Abington Crest Nursing & Rehab. Ctr. v. Sebelius, 575 F.3d 717, 719-20 (D.C. Cir. 2009); see also In re Sealed Case, 223 F.3d 775, 780 (D.C. Cir. 2000) (citing Christensen v. Harris County, 529 U.S. 576, 587 (2000)).  Under Chevron step one, the Court must consider whether the Secretary's decision not to reimburse the costs at issue conflicts with the plain language of the statute.

7

"Reasonable cost" is defined by the Medicare statute as follows:

The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; except that in any case to which paragraph (2) or (3) applies, the amount of the payment determined under such paragraph with respect to the services involved shall be considered the reasonable cost of such services.

42 U.S.C. § 1395x(v)(1)(A).  Plaintiffs argue that the Board's decision conflicted with the plain language of Section 1395x(v)(1)(A) because it disallowed reimbursement for a "reasonable cost" that was "actually incurred."  Plaintiffs are wrong; the statutory language does not mandate the conclusion that *any* actual cost incurred must be reimbursed.  While the phrase, "the cost actually incurred," standing alone, could be interpreted to mean that hospitals generally should be reimbursed for their actual expenses, the subsequent clause indicates Congress's intent to give the Secretary broad discretion in determining what those expenses may or may not include: ". . . excluding therefrom any part of incurred cost found to be *unnecessary* in the efficient delivery of needed health services, [which] *shall be determined in accordance with regulations* establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services."  42 U.S.C. § 1395x(v)(1)(A) (emphasis added).[3]  This statutory language gives the Secretary much more

---

[3]      Plaintiffs do not challenge the Secretary's authority under this statute to issue reasonable cost reimbursement regulations, 42 C.F.R., Part 413, or the specific regulation that defines what costs may be found to be "unnecessary."  See 42 C.F.R. § 413.9.  They challenge only the interpretation of the regulation as applied here.  Accordingly, the Court will consider below whether the refusal to reimburse the insurance premiums at issue in this case is lawful under the regulatory language.

discretion in determining what is a "reasonable cost" than plaintiffs' narrow reading would allow.

While it is true that occasionally the Secretary's decisions not to reimburse certain costs that were actually incurred by hospitals have been set aside by the courts, see, e.g., Memorial Hospital/Adair County Health Center, Inc. v. Bowen, 829 F.2d 111 (D.C. Cir. 1987), these decisions do not warrant the conclusion that the Medicare statute's plain language mandates that *any and all costs* actually incurred by a hospital must be reimbursed.  For example, in Memorial Hospital v. Bowen, 829 F.2d at 118-19, the court of appeals concluded that the Board's decision not to reimburse the hospital for certain pharmacy costs was improper because the Board did not engage in an appropriate comparison of the plaintiff hospital's costs with those of other comparable hospitals — not because *any and all costs* incurred by the hospital had to be reimbursed.  Plaintiffs suggest that the only basis for disallowing costs actually incurred is that the costs were too high.  But this is not what the statute says.  In fact, the court of appeals has upheld the disallowance of costs *actually incurred*, even though not unreasonable in value, because the Secretary had determined that the use of funds was unnecessary or improper.  See Sentara-Hampton General Hosp. v. Sullivan, 980 F.2d 749, 760 (D.C. Cir. 1992) (upholding funded depreciation rule).

Because the Medicare statute, by its terms, does not say whether insurance premiums paid to captive insurers that are domiciled offshore and invest more than ten percent of their assets in equity securities are reimbursable, the Court will move to Chevron step two, to consider whether the agency's interpretation is permissible.

9

2. <u>Chevron</u> Step Two

In its decision, the Board framed the issue as whether the restrictions in the policy manual were "[]consistent with the program's underlying principle that providers be paid the reasonable costs they incur in furnishing health care services to Medicare beneficiaries."  A.R. at 11.  Concluding that they were consistent, it explained its rationale as follows:

> The investment restrictions of [PRM] § 2162.A.4 are a valid extension of 42 U.S.C. § 1395x(v)(1)(A) [the statutory definition of "reasonable cost"] and 42 C.F.R. § 413.9 and are, therefore, compulsory.  42 U.S.C. § 1395x(v)(1)(A) defines reasonable cost for purposes of program reimbursement, and 42 C.F.R. §413.9 states that reasonable cost includes all costs that are "necessary and <u>proper</u>" (emphasis added).  Because offshore captives are under the control of foreign governments and are not subject to the same level of industry regulations applied to onshore agencies by State insurance commissions, CMS provided guidance and instructions to intermediaries and providers regarding how it would determine the necessary and proper costs with respect to offshore captives set up by related parties.  No evidence has been provided that would lead the Board majority to conclude that the investment restrictions of [PRM] § 2162.2A.4 are inappropriate or unreasonable.  Rather, the record shows that the 10% limitation/restriction on equity securities is in line with the asset allocations found among domestic insurance companies.  The Board majority finds that CMS was well within its authority and acted appropriately by imposing investment limitations on offshore captives in the determination of reasonable costs.  In addition, it is well documented that these provisions were well known to the Providers, and that they made a decision to ignore them.

A.R. at 11-12.

The Court concludes that the Board's decision, which the Secretary adopted, was within the Secretary's broad discretion under the statute to exclude reimbursement for costs "found to be unnecessary in the efficient delivery of needed health services."  42 U.S.C. § 1395x(v)(1)(A); <u>see also</u> <u>Richey Manor v. Schweiker</u>, 684 F.2d 130, 134 (D.C. Cir. 1982)

10

("Congress granted the Secretary broad discretion to develop the 'reasonable cost' concept. . .").
Reasoning that "reasonable costs" under the statute are only those that are "necessary and proper"
under the regulations lawfully promulgated by the Secretary in her discretion, the Board
rationally concluded that the policy manual's investment restrictions with respect to offshore
captive insurance companies were not an inappropriate or unreasonable development of the
reasonable costs principle.  This conclusion accords with the statutory language and purpose to
limit provider reimbursement to "reasonable costs," and it therefore was based on a permissible
construction of the statute.  See Bridgestone/Firestone, Inc. v. Pension Ben. Guaranty Corp., 892
F.2d 105, 110 (D.C. Cir. 1989) (At the Chevron step two stage, "[a]s long as the agency's
[construction of the statute is] consistent with the language and purpose of the statute, [the Court]
must defer to the agency's interpretation.").

        In the course of its discussion, and as part of its explanation for why the limitation
on reimbursement for these insurance premiums was consistent with the development of the
"reasonable cost" concept, the Board expressed its concern that offshore captives "are not subject
to the same level of industry regulation applied to onshore agencies by State insurance
companies" and thus are inherently more risky.  See A.R. at 11.  It noted, for example, that
hearing testimony revealed that liquidations of captive insurers increased by fifty percent
between 2001 and 2002.  A.R. at 9.  Plaintiffs argue that not all states impose the ten percent
restriction on investment in equity securities.  Be that as it may, the record evidence supports the
Board's conclusion that the ten percent limitation was in line with general state practice.[4]

_____

        [4]      The Board relied on exhibits to the fiscal intermediary's post-hearing brief, see
A.R. at 11-12, which showed that when restricted to the relevant insurance industries, medical
malpractice and workers compensation, domestically domiciled insurance companies' average

Plaintiffs also argue that the Medicare program does not refuse reimbursement to hospitals for insurance liability premiums paid to captive insurers domiciled domestically, even when those insurers invest more than ten percent of their assets in equity securities.  While that may be true, it was not unreasonable for the Board to conclude that it could rely on the regulatory framework of the various states to reduce the risk of failure of insurance companies domiciled domestically — even though the state regulatory environments may differ from state-to-state — while at the same time concluding that there was an "inherent risk" concerning the regulation of offshore insurance companies.  A.R. at 12.

While the Board did not delve deeply into the relative regulatory environments between the various states and between the various states and foreign governments, its decision nevertheless is reasonable.  As the Board noted, plaintiffs did not provide evidence that would have led it to conclude that the investment restrictions were "inappropriate or unreasonable." A.R. at 11.  For example, plaintiffs did not introduce evidence showing that offshore captives, as a group, are regulated to a similar degree as are domestically domiciled captives by the various state insurance commissioners or that they are no more risky than domestic captives.  In fact, the evidence before the Board suggested that the level of regulation in the Cayman Islands was extremely lax.  Whether the Court on its own would reach the same decision as did the Board is irrelevant.  There was substantial evidence in the record to support the Board's findings, and it reasonably relied on these findings in support of its interpretation of the statute.  See Abington Crest Nursing & Rehab. Ctr. v. Sebelius, 575 F.3d at 722.

_____

equity investment allocation ranged from  7.82% to 9.37% or 11.89% to 14.43%, respectively, over a five year period.  See id.; A.R at 114-15.

B.  *Medicare Regulations*

Plaintiffs also argue that the Secretary's disallowance of insurance premiums paid to captive insurers that are domiciled offshore and invest more than ten percent of their assets in equity securities conflicts with the Medicare statute's implementing regulations.  In considering this challenge to the Secretary's decision to uphold the Board's ruling, Chevron is not the appropriate analytical framework.  Rather, as the court of appeals recently stated in another Medicare reimbursement case, "[w]e must give substantial deference to an agency's interpretation of its own regulations. Our task is not to decide which among several competing interpretations best serves the regulatory purpose.  Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." Abington Crest Nursing & Rehab. Ctr. v. Sebelius, 575 F.3d at 722 (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1993)).  "This broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program.'" Thomas Jefferson Univ. v. Shalala, 512 U.S. at 512.

The Medicare statute expressly gives the Secretary the authority to issue regulations establishing the methods to be used and the items to be included in determining "reasonable costs" that will be reimbursed, 42 U.S.C. § 1395x(v)(1)(A), and it is established that the Secretary has broad discretion in doing so.  See Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 95-96 (1995).  The Secretary exercised this discretion in promulgating Section 413.9 of the reasonable cost reimbursement regulations, which provides: "All payments to providers of services must be based on the reasonable cost of services covered under Medicare and related to the care of beneficiaries.  Reasonable cost includes all *necessary and proper costs* incurred in

furnishing the services, *subject to principles relating to specific items of revenue and cost.*"  42

C.F.R. § 413.9 (emphasis added).  The regulation defines necessary and proper costs as "costs

that are appropriate and helpful in developing and maintaining the operation of patient care

facilities and activities."  42 C.F.R. § 413.9(b)(2).

      Plaintiffs argue that the costs for which they seek reimbursement must be allowed

because the regulations do not prohibit them.  The Supreme Court has recognized, however, that

the Medicare regulations do not, and need not, "address every conceivable question in the

process of determining equitable reimbursement."  <u>Shalala v. Guernsey Mem'l Hosp.</u>, 514 U.S.

at 96.  The fact that there may be areas of dispute over what costs are "necessary" or "proper,"

and therefore reimbursable under the regulations, does not require the Court to conclude that any

and all costs that may be reimbursed, must be reimbursed.  When formulating the reasonable cost

regulations, the Secretary did not specifically address the very specialized type of insurance

premiums at issue here.  It was appropriate for her to leave this application of the reasonable cost

principle unaddressed in the regulations and for it to be developed by adjudication.  <u>See</u> <u>Shalala</u>

<u>v. Guernsey Mem'l Hosp.</u>, 514 U.S. at 96-97 ("The Secretary's mode of determining benefits by

both rule-making and adjudication is, in our view, a proper exercise of her statutory mandate.").

      Plaintiffs are correct that reimbursement for malpractice and certain other

insurance premiums is allowed under the Medicare statute, even though the regulations do not

specifically provide for them.  <u>See</u>, <u>e.g.</u>, <u>LGH, Ltd. v. Sullivan</u>, 786 F. Supp. 1047, 1052 (D.D.C.

1992).  But this fact does not require the Secretary or the Court to conclude that *any* source of

insurance, no matter how risky the company, must be reimbursed under the regulations.

Defendant's hyperbolic example that plaintiffs could not be reimbursed for investing their

insurance premiums in lottery tickets is useful to the extent that it sets the far boundary of the continuum of conceivable insurance programs.  Along that continuum there will be types of insurance that are plainly proper, and some that are plainly improper, as well as some in the middle over which individuals could disagree as to the propriety.  That middle ground is exactly the area where Congress expected the Secretary to exercise her discretion.

In this case, the Board concluded that the premiums paid to the offshore captive insurers at issue were not "proper" because offshore captives are not "subject to the same level of industry regulations applied to onshore agencies by State insurance commissions."  A.R. at 11. As explained above in the discussion of the Secretary's interpretation of the statute, this interpretation is not plainly erroneous or inconsistent with the statute or the regulation.  It is a reasonable cost principle that is consistent with the Secretary's discretion to articulate what costs are necessary and proper.  See Shalala v. Guernsey Mem. Hosp., 514 U.S. at 100-01 (finding Secretary's interpretive rule regarding certain necessary and proper costs to be valid because it did not conflict with or change the regulations).

Finally, once the Board determined that the denial of reimbursement for this type of insurance premium was consistent with the statute and with the regulations, there could be no question that it would deny reimbursement to these plaintiffs.  It is undisputed that FIIL is an offshore captive insurance company, wholly-owned by plaintiffs, and that it invested forty to fifty percent of its assets in diversified equity securities.  In light of these facts, and because doing so was consistent with the statute and regulations, as discussed above, the Board appropriately decided to disallow the costs.

#### C.  The Refusal to Reimburse the Actual Liability Claims Paid

Plaintiffs argue that even if the Secretary's disallowance of the hospitals' premium costs is upheld, the Secretary should reimburse the *actual liability claims* paid during the years at issue.  The Board ruled against the plaintiffs on this claim, explaining that it

> [f]inds nothing in [PRM] §2305 that allows costs found to be non-allowable, as are the costs at issue in the present case, to surreptitiously become allowable.  The Board majority also finds that the program is not necessarily obligated to share in a provider's malpractice or other liability losses. [PRM] § 2162.13 states that "where a provider has no insurance protection for malpractice or comprehensive general liability in conjunction with malpractice, either in the form of a limited purpose or commercial insurance policy or a self-insurance fund as described in [PRM] § 2162.7, any losses and related expenses incurred are not allowable."

A.R. at 12-13.

The Court agrees with the Board that plaintiffs are attempting an end run around the disallowed premium costs, and that the plaintiffs are not entitled to relief on these grounds. The claims were paid by plaintiffs' insurer, FIIL.  Plaintiffs seek to recover the value of the paid claims and administrative costs because FIIL is wholly-owned by them; its losses are plaintiffs' losses.  Nothing in the Medicare statute or regulations entitles *insurers* to reimbursement for paid claims; instead, hospitals are expected to have valid insurance and are reimbursed for premiums they have paid.  In this case, the hospitals opted to use insurance whose liability premiums were expressly excluded from reimbursement.  This choice does not entitle plaintiffs to reimbursement (for paid liability claims) for which they would otherwise be ineligible.  Just as hospitals that do not have malpractice insurance are not entitled to reimbursement for actual liability claims paid pursuant to PRM Section 2162.13, even though those costs are costs actually incurred in the

16

provision of Medicare services, hospitals that select insurers whose liability premiums are not

reimbursable are not entitled to have their insurers receive reimbursement for the liability claims

actually paid.

## IV.  CONCLUSION

For these reasons, the Court will grant defendant's motion for summary judgment

and deny plaintiffs' motion for summary judgment.  An Order consistent with this Opinion will

issue this same day.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  September 30, 2009